# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND,

                Plaintiff,

    v.

KARI LAKE et al.,

                Defendants.

Civil Action No. 1:25-cv-840

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

    A.    OTF Operates Pursuant to a Congressional Mandate to Advance Internet Freedom and Security. ......................................................................................... 4

    B.    OTF Is Funded by Nondiscretionary Congressional Appropriations that Are Administered by USAGM. ..................................................................................... 6

    C.    USAGM Ceased Disbursing Funds to OTF and Issued the Grant Termination ..... 9

JURISDICTION ............................................................................................................... 11

LEGAL STANDARD ....................................................................................................... 13

ARGUMENT .................................................................................................................. 14

I.    OTF Is Likely to Succeed on the Merits of Its Claims. .................................................. 14

    A.    The Grant Termination and Withholding of OTF's Funds Violates the APA ...... 14

        1.    The Grant Termination Is a Final Agency Action Subject to Judicial Review. .............................................................................................. 14

        2.    The Grant Termination and Withholding of OTF's Funds Is Not in Accordance with Law. ............................................................................ 16

        3.    Defendants Have Unlawfully Withheld Required Agency Action to Distribute OTF's Funds. ......................................................................... 20

        4.    The Grant Termination Is Arbitrary and Capricious ................................. 20

    B.    If OTF's APA Claims Are Unavailable, OTF Is Likely to Succeed under Alternative Forms of Relief. .................................................................................. 22

        1.    The Grant Termination Is Ultra Vires ..................................................... 22

        2.    OTF Is Likely to Succeed on Its Request for Mandamus Relief. ............. 24

    C.    The Grant Termination and Withholding of OTF's Funds Violates the U.S. Constitution. .......................................................................................................... 25

II.    OTF Will Suffer Irreparable Harm If a Temporary Restraining Order Is Not Granted. .. 26

    A.    OTF Cannot Continue Operations Without Access to Appropriated Funds......... 27

    B.    A Freeze in Funding Puts OTF Programs and Partners at Risk............................ 28

    C.    Without Access to Appropriated Funds, OTF Will Suffer Irreparable Harm to Its Reputation as a Trusted Partner in the Global Effort to Fight Digital Authoritarianism. ........................................................................................... 29

    D.    Damages Are Unavailable and Would Not Cure the Harms Caused by the Grant Termination........................................................................................... 31

III.    The Balance of Equities and the Public Interest Support Issuing the Temporary Restraining Order........................................................................................... 31

IV.    The Court Should Waive Any Bond Requirement. ......................................... 32

CONCLUSION................................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) ............................................................................ 14

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    ___ F. Supp. 3d ___, No. 25-cv-400, 2025 WL 485324 (D.D.C. Feb. 13,
    2025) ................................................................................................................ 20, 27

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    ___ F. Supp. 3d ___, No. 25-cv-400, 2025 WL 752378 (D.D.C. Mar. 10,
    2025) ........................................................................................................ 12, 13, 25

*Appalachian Power Co. v. Envtl. Prot. Agency*,
    208 F.3d 1015 (D.C. Cir. 2000) ........................................................................ 15

*Ark Initiative v. Tidwell*,
    816 F.3d 119 (D.C. Cir. 2016) .......................................................................... 21

*Armour & Co. v. Freeman*,
    304 F.2d 404 (D.C. Cir. 1962) .......................................................................... 30

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) .......................................................................................... 25

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
    280 F. Supp. 3d 59 (D.D.C. 2017) .................................................................... 30

*Bailey v. Fed. Bureau of Prisons*,
    No. 24-cv-1219, 2024 WL 3219207 (D.D.C. June 28, 2024) ............................ 33

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................................... 14, 16

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ...................................................................................... 11, 12

*Brendsel v. Off. of Fed. Hous. Enter. Oversight*,
    339 F. Supp. 2d 52 (D.D.C. 2004) .................................................................... 31

*Bridgeport Hosp. v. Becerra*,
    108 F.4th 882 (D.C. Cir. 2024) ...................................................................... 18, 23

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) .......................................................................................... 21

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .................................................................................26

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017).....................................................................................15

*Climate United Fund v. Citibank, N.A.*,
    ___ F. Supp. 3d ___, No. 25-cv-698, 2025 WL 842360 (D.D.C. Mar. 18,
    2025) ..................................................................................................................13, 32

*Clinton v. City of New York*,
    524 U.S. 417 (1998).................................................................................................25

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024).................................................................................................18

*Costa v. Bazron*,
    456 F. Supp. 3d 126 (D.D.C. 2020) ........................................................................13

*Cresote Council v. Johnson*,
    555 F. Supp. 2d 36 (D.D.C. 2008) ..........................................................................32

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022)............................................................................22, 23

*Feinerman v. Bernardi*,
    558 F. Supp. 2d 36 (D.D.C. 2008) ..........................................................................31

*Friedman v. Fed. Aviation Admin.*,
    841 F.3d 537 (D.C. Cir. 2016).................................................................................15

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020).................................................................................14

*Katz v. Cisneros*,
    16 F.3d 1204 (1994).................................................................................................12

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)..................................................................26, 28, 29, 32

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................................27, 32

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020)...................................................................................15

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    26 F.4th 960 (D.C. Cir. 2022)............................................................................22, 23

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    ___ F. Supp. 3d ___, No. 25-cv-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ....................28

*Nat'l Ctr. for Mfg. Scis. v. United States*,
    114 F.3d 196 (1997)..................................................................................................................12

*Nat'l Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) ...........................................................................................30

*NextWave Personal Commc'ns, Inc. v. Fed. Commc'ns Comm'n*,
    254 F.3d 130 (D.C. Cir. 2001)...........................................................................................16, 19

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)....................................................................................................................20

*Oceana, Inc. v. Locke*,
    670 F.3d 1238 (D.C. Cir. 2011) ...............................................................................................18

*Open Cmty. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) .........................................................................................31

*PFLAG, Inc. v. Trump*,
    No. CV 25-337, 2025 WL 510050 (D. Md. Feb. 14, 2025) .....................................................25

*Potomac Elec. Power Co. v. Interstate Com. Comm'n*,
    702 F.2d 1026 .........................................................................................................................24

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015)...........................................................................................32

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    471 F. Supp. 3d 88 (D.D.C. 2020) ...........................................................................................20

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) .................................................................................................16

*Richardson v. Trump*,
    496 F. Supp. 3d 165 (D.D.C. 2020) .........................................................................................31

*Sackett v. Envtl. Prot. Agency*,
    566 U.S. 120 (2012)............................................................................................................15, 16

*Simms v. Dist. of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ...........................................................................................33

*Tex. Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ...........................................................................................30

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020) ................................................................32

*Train v. City of New York*,
    420 U.S. 35 (1975) ........................................................................................18

*Turner v. U.S. Agency for Glob. Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) ..............................................................31

*U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ....................................................................25

*Vietnam Veterans of Am. v. Shinseki*,
    599 F.3d 654 (D.C. Cir. 2010) ......................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................................13

*Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n*,
    758 F.2d 669 (D.C. Cir. 1985) ......................................................................27

*Xiaomi Corp. v. Dep't of Def.*,
    No. 21-cv-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ...........................30

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ......................................................................................26

**Statutes**

2 U.S.C. §§ 682 et seq............................................................................................19

2 U.S.C. § 683(a) ...................................................................................................19

2 U.S.C. § 683(b) ...................................................................................................19

5 U.S.C. § 704 ........................................................................................................11

5 U.S.C. § 706(1) ..............................................................................................20, 24

5 U.S.C. § 706(2) ...................................................................................................20

5 U.S.C. § 706(2)(A)..........................................................................................16, 21

5 U.S.C. § 706(2)(C)...............................................................................................16

22 U.S.C. § 6203 ....................................................................................................18

22 U.S.C. § 6204 ....................................................................................................18

22 U.S.C. § 6204(a) ...................................................................................................................23

22 U.S.C. § 6205 ..............................................................................................................8, 9, 18

22 U.S.C. § 6205(f)(1) ........................................................................................................18, 24

22 U.S.C. § 6205(f)(3) ...............................................................................................................18

22 U.S.C. § 6208a .................................................................................................................4, 16

22 U.S.C. § 6208a(a) .....................................................................................................................1

22 U.S.C. § 6208a(a)(1) ...................................................................................................1, 17, 23

22 U.S.C. § 6208a(a)(2) ..............................................................................................................16

22 U.S.C. § 6208a(b) ..........................................................................................................1, 4, 16

22 U.S.C. § 6208a(c) ...................................................................................................................16

22 U.S.C. § 6208a(e) .....................................................................................................................8

22 U.S.C. § 6208a(e)(2) ..............................................................................................................17

22 U.S.C. § 6208a(f) ......................................................................................................................1

22 U.S.C. § 6208a(f) ....................................................................................................................17

28 U.S.C. § 1331 ..........................................................................................................................11

28 U.S.C. § 1491(a)(1) ................................................................................................................13

31 U.S.C. § 1301(a) .....................................................................................................................19

American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ....................................7

Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 929 (1982) ...................................................19

Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 (1974) ...........................................................................................................19

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49 (2022) ....................7

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022) ..........................................................................................................................................7

Continuing Appropriations Act, 2025, Pub. L. No. 118-83, 138 Stat. 1524 (2024) ....................7

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024).................................................................................................7, 17, 23

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, 136 Stat. 2395 (2022) ..........................................................7

National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136, 989 (2023).......................................................................................4

William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 (2020).................................1, 4, 7

## Other Authorities

2 C.F.R. § 200.308(e)(2).........................................................................................8

2 C.F.R. § 200.342.................................................................................................15

## Other Authorities

170 Cong. Rec. H2097 (daily ed. Mar. 22, 2024)............................................7, 17

Executive Order, "Continuing the Reduction of the Federal Bureaucracy"............2, 10

H.R. 1968, 119th Cong. § 1101(a) (2025) ............................................................7, 8

U.S. Const. art. I, § 8, cl. 1....................................................................................25

U.S. Const. art. II, § 3 ...........................................................................................26

## INTRODUCTION

The Open Technology Fund ("OTF") is an independent, nonpartisan, nonprofit organization founded in 2019 to advance global internet freedom. OTF distributes funding to "research, develop, implement and maintain . . . technologies that circumvent techniques used by authoritarian governments, nonstate actors, and others to block or censor access to the internet . . . and secure communications tools and other forms of privacy and security technology" via contracts with individuals and entities worldwide. 22 U.S.C. § 6208a(a) & (b). Through these contracts, the organization funds programs in 60 countries to allow secure and uncensored access to U.S. information sources and the internet; protect journalists, sources, and consumers from digital attack; and aid researchers and technology developers. OTF's primary source of funding is through a grant issued by the U.S. Agency for Global Media ("USAGM") by way of congressional appropriation.

Congress established OTF's mission, which is focused on promoting "global internet freedom by countering internet censorship and repressive surveillance and protecting the internet as a platform for the free exchange of ideas, promotion of human rights and democracy, and advancement of a free press[]." William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("FY21 NDAA"), Pub. L. No. 116-283, § 1299P, 134 Stat. 3388, 4016 (2020) (codified at 22 U.S.C. § 6208a(b)). Congress envisioned that OTF would fulfill its mission by directing USAGM to "make annual grants for the purpose of promoting . . . unrestricted access to uncensored sources of information via the internet" thereby enabling journalists to "create and disseminate" news and information. 22 U.S.C. § 6208a(a)(1). Congress also directed USAGM to "ensure that internet freedom research and development projects of the Open Technology Fund are coordinated with internet freedom programs of the Department of State and other relevant United States Government departments . . . ." *Id.* § 6208a(f).

Since OTF's inception, Congress has appropriated money that it directs to be distributed to OTF by USAGM via grant agreements. Each of these grants provide funding for the three subsequent fiscal years.  OTF's mission also is supported by a smaller grant from the U.S. Department of State, IAA Number: 1931CL22Y0003 (the "State Department Grant") which is also administered by USAGM pursuant to an interagency agreement between the State Department and USAGM. OTF cannot meet its statutory mandate without access to its congressionally appropriated and granted funds.

On Friday March 14, 2025, the White House issued an Executive Order, "Continuing the Reduction of the Federal Bureaucracy" (the "March 14 Executive Order"), which proclaimed that the "non-statutory components and functions of the following governmental entities shall be eliminated to the maximum extent consistent with the applicable law" and listed the "United States Agency for Global Media" as one of those governmental entities.  *See* March 14 Executive Order, Sec. 2(a).

The next day, March 15, 2025, the President signed into law an act that extended through the rest of the fiscal year Congress's direct appropriation of funds to OTF.  That same day, Kari Lake, in her role as the "Senior Advisor to the Acting CEO Victor Morales with authorities delegated" to her by Victor Morales, issued a Notice of Grant Termination (the "Grant Termination") to OTF.  The Grant Termination notified OTF that USAGM was terminating FAIN:OT01-25-GO-00001 "and any other grants with USAGM" (collectively, the "OTF Grant") effective immediately, stating that the OTF Grant "no longer effectuates agency priorities." The termination appears to related to USAGM's efforts to carry out the dictates of the March 14 Executive Order, specifically, to eliminate "all non-statutorily required activities and functions" of USAGM.  Disbursement of funds appropriated by Congress to OTF and administration of the

State Department Grant are, however, *statutory functions of USAGM* that have been established and reiterated by Congress. Failure to disburse these funds contravenes statute and congressional directive that funds appropriated for OTF to meet its statutory mandate actually be provided to OTF.

The Grant Termination also instructs OTF to commence close-out procedures, which include preserving its already distributed funds, terminating staff, winding down its operations, and cutting off payments to contractors and partners. OTF anticipates that, absent a restraining order, OTF will face imminent closure, and it will be forced to abandon its mission to provide free and open internet access worldwide.

OTF reluctantly brings this motion for a temporary restraining order to preserve its existence and to allow it to fulfill its statutory mandate. OTF's technology is critical to protecting billions of people around the globe from persecution, repression, and censorship. OTF is likely to succeed on the merits of its claims that USAGM has violated both the APA by terminating OTF's grant in contravention of statutory directives and without following proper procedures, and by refusing to distribute or demanding to claw back funds that Congress deemed to be nondiscretionary. OTF also submits that USAGM's actions violate well-established constitutional provisions that grant Congress the authority to make laws and determine how funds are appropriated in furtherance of those laws.

The public equities also tip sharply in OTF's favor. OTF will suffer irreparable harm from the immediate effect of the Grant Termination. The Grant Termination instructs OTF to wind down its business, cancel contracts, terminate its employees, and cease providing funding to those who help provide free and safe access to the internet in areas where such access would be difficult, if not impossible. Users of OTF-supported technology will also face severe consequences if OTF

ceases to exist, as their access to and provision of the free flow of information are likely to be met with retribution.

OTF receives bipartisan support from Congress, which has attempted to work with USAGM to clear up any misunderstanding regarding the March 14 Executive Order. However, to date, OTF has not been successful in clarifying its statutorily authorized funding with USAGM, and therefore OTF has no choice but to seek a temporary restraining order in order to protect its existence and the billions of people who rely on its technology.

## BACKGROUND

### A. OTF Operates Pursuant to a Congressional Mandate to Advance Internet Freedom and Security.

OTF is a nonprofit corporation organized under the laws of the District of Columbia that supports internet freedom technologies. *See* Declaration of Laura Cunningham in support of Motion for Temporary Restraining Order ("Cunningham Decl."), ¶ 1. Congress set its mission vis-a-vis the FY21 NDAA. 134 Stat. at 4016-4025 (codified at 22 U.S.C. § 6208a); *see also* Cunningham Decl., ¶ 1.  In establishing OTF's mission, Congress mandated that OTF research, develop, implement, and maintain technologies that support open access to information and secure communication, advance internet freedom, help maintain the technological advantage of the United States over authoritarian governments, and develop, acquire, and distribute freedom technologies and techniques. 22 U.S.C § 6208a(b).

In the National Defense Authorization Act for Fiscal Year 2024 ("FY24 NDAA"), Congress established a Digital Connectivity and Cybersecurity Partnership, Pub. L. No. 118-31, § 6306, 137 Stat. 136, 989 (2023), and directed that, in developing and conceptualizing the implementation of the plan, "the Secretary [of State] shall consult with . . . the Open Technology Fund" among others.  *Id.* § 6306(d), 137 Stat. at 989, and made funds available for that purpose.

In furtherance of its congressional mandate, OTF pioneers open-source internet freedom technologies that counter authoritarian information controls and enhance digital security and privacy so that all people can access the Internet and the free flow of information. Cunningham Decl., ¶¶ 4–5. This includes supporting anti-censorship tools for 45 million users in the world's most repressive environments, and supporting over 400 interventions in over 80 countries in response to urgent, state-sponsored digital attacks. *Id.* ¶¶ 12, 23.  Today, over two billion people around the world use OTF-supported technology on a daily basis, and more than two-thirds of all mobile phone users have OTF-incubated technology on their devices. *Id.* ¶ 5.  OTF currently has ongoing activities in 60 different countries. *Id.* ¶ 18. By orders of magnitude, OTF is the largest funder and project partner in the internet freedom space, specializing in technical solutions to digital authoritarianism. *Id.* ¶ 20. Increasingly, digital authoritarianism is being embraced by regimes worldwide in efforts to stymie access to a free and open Internet.  *Id.* ¶ 18. For example, OTF's Security Lab has investigated and exposed apps used for repressive surveillance throughout China, including tools used by the government to target religious minority Uyghur Muslims in Xinjiang province as well as tourists entering the region, *id.* ¶¶ 21, 33; in Iran OTF supported the infrastructure costs of carrying additional circumvention users—approximately 26 million—for a number of VPN providers, *id.* ¶¶ 23, 34; and in Myanmar OTF's Rapid Respond Fund Partners deployed mirror sites of blocked independent media cites to allow residents to access these publications in both English and Burmese without fear of retribution. *Id.* ¶¶ 21, 36.

To help combat the use of technology for state surveillance and repressive tactics, OTF provides technologies such as Virtual Private Networks ("VPN") and Messaging Layer Security ("MLS").  *Id.* ¶¶ 17, 22.  A VPN provides a user with a secure, encrypted connection between their device and the internet by masking the IP address, location, and encrypting data.  *Id.* ¶¶ 17–18.

Today VPNs are an essential prerequisite for tens of millions of people to be able to access the global internet. *Id*. ¶ 18.  OTF has ongoing active contracts with partners in highly repressive environments.  *Id*. ¶ 20. Traditional communication methods such as cell service, email, instant messaging or social media can leave a user vulnerable to data collection and surveillance. *Id*. ¶¶ 17–18.  End-to-end encryption protects the privacy of data being transmitted between a sender and a receiver. *Id*. ¶¶ 22, 29. The encryption is applied to the data at the source (sender) and can only be decrypted by the intended recipient (receiver).  No one can access or view the encrypted information, not even the provider of the messaging-service.  OTF was an early funder of the Signal Protocol, which underlies many of the most popular secure communications technologies in the world, including WhatsApp.  *Id*. ¶ 29. OTF is now funding the development and implementation of MLS, which extends the privacy and security of end-to-end encryption to complex messaging environments comprising large groups with many senders and receivers.

With 32 full-time employees, OTF oversees 149 active programmatic contracts totaling over $71 million essential to carrying out its congressionally mandated mission and 23 operational contracts and leases for enterprise services, office space, and supplies. *Id*. ¶ 12. All of these contracts are funded in whole or in part with federal dollars that Congress has directed that OTF spend. *Id.* The employees of these contractors are highly skilled developers and security experts who focus on the challenges presented by authoritarian censorship and information controls.  *Id*. ¶ 19.

### B.    OTF Is Funded by Nondiscretionary Congressional Appropriations that Are Administered by USAGM.

OTF is funded by Congress through a specific appropriation every year since it was created:

- *For fiscal year 2022*, Congress provided: "There is authorized to be appropriated for the Open Technology Fund $25,000,000 for fiscal year 2022 to carry out" OTF's

congressional directive. FY21 NDAA, § 309A(d), 134 Stat. at 4020. The Consolidated Appropriations Act, 2022 ("FY22 CAA") also provided that "Subject to subsection (b), funds appropriated by this Act under titles III through V shall be made available in the amounts specifically designated in the respective tables included in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act)." Pub. L. No. 117-103, §§ 7019 & 7050, 136 Stat. 49, 665 (2022). The referenced table includes a specific line item for OTF to be funded at $27,000,000.

- *For fiscal year 2023*, Congress provided: "There are authorized to be appropriated for fiscal year 2023 . . . (2) $49,000,000 to the United States Agency for Global Media (referred to in this section as the 'USAGM') and its grantees, for internet freedom and circumvention technologies that are designed—(A) for open-source tools and techniques to securely develop and distribute digital content produced by the USAGM and its grantees; (B) to facilitate audience access to such digital content on websites that are censored; (C) to coordinate the distribution of such digital content to targeted regional audiences; and (D) to promote and distribute such tools and techniques, including digital security techniques." James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 ("FY23 NDAA"), Pub. L. No. 117-263, § 9707(c)(2), 136 Stat. 2395, 3916 (2022). The Consolidated Appropriations Act, 2023 also provided "[t]hat funds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act)." Pub. L. No. 117-328, §§ 7019 & 7050, 136 Stat. 4459, 4980 (2022). The referenced table includes a specific line item for OTF to be funded at $40,000,000.

- *For fiscal year 2024*, Congress provided that "Subject to subsection (b), funds appropriated by this Act under titles III through V shall be made available in the amounts specifically designated in the respective tables included in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act)." Further Consolidated Appropriations Act of 2024 ("FY24 FCAA"), Pub. L. No. 118-47, §§ 7019 & 7050, 138 Stat. 460, 833 (2024). The referenced table includes a specific line item for OTF to be funded at $43,500,000. 170 Cong. Rec. H2097 (daily ed. Mar. 22, 2024); *see also id.* at H2089. The FY24 FCAA also provided additional funding of "not less than $94,000,000 shall be made available for programs to promote Internet freedom globally," 138 Stat. at 833, which provides the basis for the State Department Grant to OTF.

- *For fiscal year 2025*, Congress has continued funding for OTF under the various continuing resolutions, Continuing Appropriations Act ("First Continuing Resolution"), 2025, Pub. L. No. 118-83, 138 Stat. 1524 (2024); the American Relief Act, 2025 ("Second Continuing Resolution"), Pub. L. No. 118-158, 138 Stat. 1722 (2024); and Full Year Continuing Appropriations and Extensions Act, 2025 ("Third Continuing Resolution"), H.R. 1968, 119th Cong. § 1101(a) (2025).

Upon the expiration of fiscal year 2024 funding on September 30, 2024, Congress renewed OTF's

funding on three separation occasions:

- *The First Continuing Resolution* renewed OTF's funding until December 20, 2024. Division A of the First Continuing Resolution appropriated "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities . . . that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024, and for which appropriations, funds, or other authority were made available" in "The Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (division F of Public Law 118-47)."

- *The Second Continuing Resolution* again renewed OTF's funding in, through March 14, 2025.  Division A of the Second Continuing Resolution amended the First Continuing Resolution by replacing the expiration date of December 20, 2024, with March 14, 2025. The Second Continuing Resolution thus appropriated funding for the period December 21, 2024, through March 14, 2025, under the same conditions, as relevant to OTF, as the First Continuing Resolution.

- *The Third Continuing Resolution*, which the President signed into law on March 15, 2025, like the previous continuing resolutions, appropriated "[s]uch amounts as may be necessary, at the level specified . . . under the authority and conditions provided in applicable appropriations Act for fiscal year 2024" until September 30, 2025. H.R. 1968, 119th Cong. § 1101(a).

The money appropriated for OTF is first apportioned to USAGM and then provided to OTF

under a grant agreement between OTF and USAGM (the "OTF Grant"). *See* 22 U.S.C. § 6208a(e);

*see also* Cunningham Decl., ¶ 6.  The period of performance for each OTF Grant lasts for the three

subsequent fiscal years with an elective one-year extension option.  Cunningham Decl., ¶ 6; 2

C.F.R. § 200.308(e)(2). The International Broadcasting Advisory Board (the "Advisory Board")

oversees USAGM.  22 U.S.C. § 6205; *see also* Cunningham Decl., ¶ 7.  Congress has taken specific

action to ensure that OTF receives the grant money appropriated to it.  Specifically, Congress has

restricted USAGM's ability to interfere with the OTF Grant by specifically defining USAGM's

authority and requiring a vote by three-fourths of the Advisory Board to suspend or debar OTF (a

lesser power than grant termination).  Congress has not provided a mechanism for USAGM to

unilaterally withhold OTF's appropriated funds or to terminate the OTF Grant.  *See* 22 U.S.C. § 6205; Cunningham Decl., ¶ 7.  Importantly, USAGM has no discretion whether to provide the OTF Grant or even how much to provide; rather, Congress has directed that the money it appropriates for OTF shall go to OTF.  USAGM administers the OTF Grant pursuant to strict parameters set by Congress. Further, OTF is unique in that the grants it receives from USAGM are generally considered "no-year" funds—i.e., funds that are appropriations that remain available for obligation indefinitely until expended, regardless of the fiscal year.[1]

### C.    USAGM Ceased Disbursing Funds to OTF and Issued the Grant Termination

On January 28, 2025, the State Department notified OTF that it was reviewing all foreign assistance programs in accordance with 25 State 6828,[2] Executive Order on Review of Foreign Assistance Programs, and that OTF should stop work funded by the State Department grant. Cunningham Decl., ¶ 12.  After review, the State Department instructed OTF to resume work under the grant.  The State Department simultaneously directed USAGM to distribute the grant money to OTF.  *Id*. ¶ 12.  USAGM did not do so.  *Id*. ¶ 13, Ex. B.

On February 26, 2025, OTF submitted its drawdown request to USAGM for operating funds to cover the period of March 1, 2025 to March 31, 2025, consistent with the OTF Grant Agreement, USAGM procedure for grantee drawdown requests, OTF's financial plan previously approved by USAGM, and the congressional appropriations to OTF for fiscal year 2024.  *Id*

---

[1] In each of OTF's grants, there is the following provision: "No-Year International Broadcasting Operations Funds: USAGM acknowledges that unlike other USAGM grantees, the funds provided to OTF are generally "no-year" funds.  (Specifically, they are from a specific sub-account of International Broadcasting Operations Funds which do not have an express statutory limit on the period of availability.)" Cunningham Decl., ¶ 6, Ex. A.

[2] 25 State 6826 was distributed on January 24, 2025 as outlined in the Agency Notice, *Initial Instructions for Implementing Executive Order Reevaluating* and Realigning United States Foreign Aid, issued on January 22, 2025.

Pl.'s Mem. in Supp. of Mot. for Temp. Restraining Order - 9
*Open Technology Fund v. Kari Lake et al.*, No. 1:25-cv-840

¶ 9.  Previously, OTF received funding within a week of submitting its drawdown requests for January and February funds respectively.  *Id.* During the first week of March 2025, OTF was informed by USAGM that the drawdown request had been submitted to USAGM leadership and funds were forthcoming.  *Id*. ¶ 10. When OTF followed up with USAGM on March 12, 2025 on the payment, USAGM then indicated that they would release the funds by the end of the month. *Id*. ¶ 10.  OTF never received the March 2025 funds from USAGM.  *Id*.

On March 14, 2025, Congress passed, and the President signed into law, the Third Continuing Resolution, which extended OTF funding through September 30, 2025.  That same day the White House issued the March 14 Executive Order, which directed a number of agencies, including USAGM, to reduce their components and functions to the extent consistent with applicable law. The Office of Management and Budget ("OMB") approves the disbursement of funding to USAGM to be disbursed to OTF. The March 14 Executive Order directed OMB that it should review any grant requests from USAGM and "to the extent consistent with applicable law . . . reject funding requests for such government entities to the extent they are inconsistent with this order." March 14 Executive Order, Sec. 2(c).

The next day, March 15, 2025, Defendant Lake, acting as a "Senior Advisor to the Acting CEO with Authorities Delegated by Acting CEO," notified OTF that USAGM was terminating OTF's federal grants.  Cunningham Decl., ¶ 13.  The Grant Termination stated that "The award no longer effectuates agency priorities" and cited the March 14 Executive Order directing USAGM to eliminate all non-statutorily required activities and functions. *Id*. ¶ 13, Ex. B.  The Grant Termination did not acknowledge OTF's congressional mandate, the congressional appropriations directed specifically to OTF, or the State Department grant. *Id*.

The Grant Termination directs OTF to close out its programs funded by the grant—which are substantially all of OTF's operations. *Id.* Failure to distribute the withheld funds will result in OTF becoming insolvent, shutting down its entire operations, and leaving millions of lives around the world at risk. *Id.* ¶¶ 15–19, 23–32. Moreover, without the requested temporary restraining order, if OTF does not shut down its operations, USAGM may argue that OTF is in material breach with the terms of its grant agreement and then attempt to terminate the OTF Grant for cause.

Moreover, a substantially smaller portion of OTF's funding comes in recognition of the national security and diplomacy function that OTF fills, the U.S. Department of State ("State Department") funds a portion of OTF's work through an interagency agreement with USAGM. Cunningham Decl., ¶ 12. The State Department notified OTF on March 11, 2025, that OTF was authorized and directed to resume work under the State Department Grant. *Id.*

OTF has not received $4,838,559.00 of its FY24 funding from USAGM, and has not received $27,303,645.00 (over half) of its FY25 funding to date, which was appropriated via the three Continuing Resolutions. *Id.* ¶ 14.

## JURISDICTION

OTF's claims are based on violation of the APA, federal statutes, and the U.S. Constitution. The Court has jurisdiction over these claims. 5 U.S.C. § 704; 28 U.S.C. § 1331.

The relief OTF seeks may be awarded by this Court. OTF primarily seeks a declaration that the Grant Termination was unlawful and that OTF can continue to operate to fulfill its statutory mandate. OTF also seeks disbursement of the funds that have been appropriated to OTF. The request for monetary relief does not divest the Court of jurisdiction over OTF's claim. "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Rather, the relief sought by OTF is injunctive in nature—release of the funds already appropriated

to it.  "[A]n order providing for . . . 'the recovery of specific property *or monies* . . . or injunction either directing or restraining [an agency]'s actions'" is injunctive in nature and does not constitute damages.  *Id.* (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 688 (1949)) (emphasis in original) (contrasting specific monetary relief with money damages that "are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation").

To that end, courts routinely conclude that actions to enforce requirements for the government to pay certain amounts a party is entitled to are not claims for "money damages." *See id.* at 900 (suit to enforce government payment for Medicaid services "is not a suit seeking money in *compensation* for the damage sustained by failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money."); *see also Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (1997) (demand for release of remaining funds in appropriations act is for "funds to which [plaintiff] is entitled under a statute; [plaintiff] is not seeking money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds."); *Katz v. Cisneros*, 16 F.3d 1204, 1207–09 (1994) (jurisdiction proper in district court when plaintiff sought "payments to which it alleges it is entitled pursuant to federal statute and regulations; it did not seek money as compensation for a loss suffered"). Just as this court has recently acknowledged, OTF is "not seeking compensation for [its] losses due to the failure to pay them, which . . . could be far greater than the amount withheld" but is seeking "invalidation of the policy, including the withholding of payment that flowed from it." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, ___ F. Supp. 3d ___, No. 25-cv-400, 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025).

Additionally, the fact that OTF seeks to set aside the unlawful termination of its grant agreement does not mean that this action is "founded . . . upon" a "contract with the United States" such that it falls under the Court of Federal Claim's jurisdiction for breach of contract claims. 28 U.S.C. § 1491(a)(1). Rather, the question is "whether the action is *at its essence* a contract claim" which "turns on the source of the rights upon which the plaintiff bases its claims[.]" *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *8 (quoting *Crowley Gov't Servs., Inc. v. Gen Servs. Admin*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (emphasis in original) (internal quotations omitted)). Here, the source of OTF's claims are not the terms of the grant agreement, but grounded in statute, including the International Broadcasting Act and relevant appropriations laws, all of which require USAGM to release congressionally appropriated funds to OTF through the grant agreement. *Id.* at *9 ("[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach."). Jurisdiction is proper in this court. *See Climate United Fund v. Citibank, N.A.*, ___ F. Supp. 3d ___, No. 25-cv-698, 2025 WL 842360, at *5-6 (D.D.C. Mar. 18, 2025) (holding claims seeking to compel disbursement of federal grant awards could proceed in this Court because plaintiffs were awarded a grant pursuant to a statute authorized by Congress, and challenged an action, not a contract between the parties).

## LEGAL STANDARD

To obtain a temporary restraining order, a movant must show: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, *Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020) (noting that "the factors applicable to

preliminary injunctive relief" are the same for a temporary restraining order) (citation omitted). The third and fourth factors merge when the government is a party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The movant bears the burden to show that "all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation omitted). Here, all the factors strongly support the issuance of a temporary restraining order to prevent irreparable harm caused by USAGM's Grant Termination.

## ARGUMENT

I. **OTF Is Likely to Succeed on the Merits of Its Claims.**

OTF is likely to succeed on the merits of the claims it raises here. The Grant Termination and ongoing withholding of funds from OTF violate the APA, federal statutes, and the U.S. Constitution. OTF is likely to succeed on the merits of these claims.

### A.    The Grant Termination and Withholding of OTF's Funds Violates the APA.

#### 1.    *The Grant Termination Is a Final Agency Action Subject to Judicial Review.*

The Grant Termination is a final agency action and therefore is subject to judicial review under the APA. Agency actions are final where: (1) the action "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature"; and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted). The Grant Termination satisfies both requirements and therefore is final agency action.

The Grant Termination is the consummation of USAGM's decisionmaking process because it is "'properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,'" as opposed to "'only the ruling of a subordinate official, or

tentative.'" *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)). The Grant Termination "commands," "requires," "orders," and "dictates" OTF rights and obligations. *Appalachian Power Co. v. Envtl. Prot. Agency*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). It notes that, effective immediately, USAGM is terminating OTF's grant, and that OTF must review and comply with its closeout responsibilities. Cunningham Decl., ¶ 13, Ex. B

While the Grant Termination states that OTF can "object to or challenge this termination decision," *id.*, that process is illusory as USAGM does not have any procedures for processing objections, hearings, and appeals. *See* 2 C.F.R. § 200.342. In any event, "[t]he mere possibility that an agency might reconsider" its decision "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. Envtl. Prot. Agency*, 566 U.S. 120, 127 (2012). The Grant Termination asserted that the OTF Grant "no longer effectuate[] agency priorities." Cunningham Decl., ¶ 13, Ex. B. In doing so, USAGM left no doubt that it had made a final decision to terminate OTF's funding, including the congressionally directed grant money and the money for OTF provided by the State Department to USAGM. The Grant Termination indicates that USAGM has "made up its mind" to withhold the funds. *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 543 (D.C. Cir. 2016). Where, as here, the agency's decision "represents the final agency position on this issue, has the status of law, and has an immediate and direct effect on the parties" it is actionable as final agency action. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (citation omitted).

The Grant Termination also "determined legal rights and obligations" and "gave rise to legal consequences" for OTF. *Wheeler*, 955 F.3d at 80. Not only does the failure to distribute appropriated funds to OTF have significant legal consequences, *infra* Section II, below but the Grant Termination also instructs that OTF must begin close-out of its programs funded by the

USAGM Grant and the State Department Grant, which constitute the entirety of OTF's operations. Cunningham Decl., ¶ 13, Ex. B. The Grant Termination thus creates obligations on OTF "from which legal consequences will flow," *Bennett*, 520 U.S. at 177–78, and so is final agency action. *See also Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("An agency action is deemed final if it is definitive and has a direct and immediate effect on the day-to-day business of the party challenging the agency action.") (cleaned up and citations omitted). The Grant Termination has all the "hallmarks of APA finality" and is a final agency action subject to review under the APA. *Sackett*, 566 U.S. at 126.

### 2. The Grant Termination and Withholding of OTF's Funds Is Not in Accordance with Law.

OTF is likely to succeed in demonstrating that the Grant Termination and continued withholding of OTF funds are "not in accordance with law" and in "excess of statutory authority" under 5 U.S.C. § 706(2)(A) & (C). The Grant Termination is contrary to law as it violates the following: (1) statutory provisions defining administration of the OTF Grant and Congress's specific appropriation acts; (2) the Impoundment Control Act of 1974 and the Anti-Deficiency Act of 1982; and (3) the Constitution's separation of powers principles. Accordingly, because the Grant Termination conflicts with both federal statute and the U.S. Constitution in several respects, the Court should invalidate the Grant Termination. *NextWave Personal Commc'ns, Inc. v. Fed. Commc'ns Comm'n*, 254 F.3d 130, 149 (D.C. Cir. 2001).

### a. USAGM Violated Its Statutory Obligations to Provide the Appropriated Grant Funds to OTF.

OTF is unique in that it is a private nonprofit corporation with a congressional remit established in the FY21 NDAA and receives funding by name in congressional appropriations. OTF's mission is codified in the U.S. Code, 22 U.S.C. § 6208a, which states that OTF "shall carry out" its congressionally defined mission, *id.* §§ 6208a(a)(2), (b) & (c). Congress has enacted

special provisions governing OTF's funding and appropriates money to USAGM that "shall be available" to OTF. *Id.* § 6208a(a)(1). Congress underscored the importance of OTF's mission by directing that, if OTF were unable to fulfill its congressional remit, USAGM is required to provide OTF with assistance. *See id.* § 6208a(e)(2). Congress has also directed that USAGM "shall ensure that internet freedom research and development projects of the [OTF] are coordinated with internet freedom programs of the Department of State and other [U.S.] Government departments[.]" *Id.* § 6208a(f).

In each appropriation since establishing OTF, Congress has specifically directed the funds that shall be provided to OTF. *See supra* Section B. At particular issue here, the appropriation act for fiscal year 2024, FY24 FCAA, appropriated funds to OTF. FY24 FCAA § 7019, 138 Stat. at 833. The FY24 FCAA states that "funds appropriated by this Act . . . *shall be made available in the amounts specifically designated* in the respective tables included in the explanatory statement described in section 4 . . . ." *Id.* § 7019(a), 138 Stat. at 833. The referenced table appropriates $43,500,000 million for OTF. 170 Cong. Rec. H2097. Importantly, the FY24 FCAA authorizes deviations by USAGM from this amount of only up to 5% of the appropriated amounts. FY24 FCAA § 7019(a), 138 Stat. at 833. OTF's appropriation has been maintained at these levels for fiscal year 2025. *See* First Continuing Resolution; Second Continuing Resolution; Third Continuing Resolution.

USAGM's discretion in administering the OTF Grant is defined and circumscribed by statute. 22 U.S.C. § 6208a(a)(1) ("Grants authorized under section 6204 of this title *shall be available* to make annual grants for the purpose of promoting, consistent with United States law, unrestricted access to uncensored sources of information via the internet to enable journalists . . . to create and disseminate, and for their audiences to receive, news and information consistent with

the purposes, standards, and principles specified in sections 6201 and 6202 of this title." (emphasis added)); *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024) (Congress uses "shall" to "'impose[] a mandatory duty' that is 'impervious to discretion.'" (omission in original) (citation omitted)).  The statutory language directing OTF's funding stands in contrast to situations where Congress gives the executive branch discretion to spend less than the full amount appropriated—for example, that an agency is appropriated "sums not exceeding" or "up to" an amount for a particular purpose.  *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 432–33 (2024); *id.* at 442–43 (Kagan, J., concurring).  Absent such language, courts properly understand appropriations statutes as commands to obligate and expend the full amount of money appropriated. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 47–48 (1975).

USAGM is run by a Chief Executive Officer ("CEO") with oversight conducted by the International Broadcasting Advisory Board (the "Advisory Board"). *See* 22 U.S.C. §§ 6203 & 6205 (establishing the office of CEO and the Advisory Board).  The powers of USAGM's CEO are established by Congress and do not include the statutory authority to terminate grants like the one directed to OTF.  *See id.* § 6204 (enumerating the powers of USAGM's CEO).  In addition, Congress clearly intended to insulate OTF's congressional appropriations and grant funding from unilateral actions by USAGM's CEO.  *See id.* § 6205(f)(1), (3) (instructing that no USAGM grantee can be debarred or suspended absent approval by the Advisory Board by a three-fourths vote).

Where, as here, "a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then it should take its concerns to Congress" and, in the meantime, comply with the statute as written.  *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (internal

quotations omitted).  Because Defendants' actions "conflict[] with [] federal law," they must be reversed under the APA.  *NextWave Pers. Commc'ns, Inc.*, 254 F.3d at 149.

    b. <u>The Grant Termination Violates the Impoundment Control Act and the Anti-Deficiency Act.</u>

   Even if OTF's funding were not specifically directed and secured by the statutory provisions detailed above, USAGM still could not terminate the OTF grant as it has attempted in this instance.  Congress has further directed how appropriated funds may be treated in the Congressional Budget and Impoundment Control Act of 1974 (the "Impoundment Control Act"), Pub. L. No. 93-344, 88 Stat. 297 (1974) (codified as amended at 2 U.S.C. §§ 682 et seq.), and the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 929 (1982) (codified as amended at scattered sections of Title 31 of the U.S. Code).

   Under the Impoundment Control Act, appropriated funds "shall be made available for obligation" unless specific procedures are followed, which include transmitting a special message to Congress and Congress rescinding the appropriation. 2 U.S.C. § 683(a) & (b).  The Impoundment Control Act requires that the funds in question be made available for obligation unless Congress rescinds the appropriation within forty-five days. *Id.* § 683(b).  USAGM did not follow the procedures required under the Impoundment Control Act to rescind or otherwise withhold the funds.

   The Anti-Deficiency Act provides similar direction on appropriated funds.  Under that statute, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."  31 U.S.C. § 1301(a).  Government officers thus violate the Anti-Deficiency Act if they withhold appropriated funds from their congressionally assigned program.  To the extent USAGM is holding appropriated funds in reserve instead of distributing them to OTF, USAGM has violated the Anti-Deficiency Act.

c.  USAGM's Actions Violated the U.S. Constitution

For the reasons set out below, the Grant Termination and USAGM's failure to disburse OTF's funds violated the U.S. Constitution. *See infra* Section II.C.

3.  *Defendants Have Unlawfully Withheld Required Agency Action to Distribute OTF's Funds.*

USAGM's refusal to make OTF's appropriated funds available to OTF also constitutes agency action as the funds are being "unlawfully withheld."  5 U.S.C. § 706(1); *see Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 94, 191 (D.D.C. 2020) (allowing plaintiffs to bring two counts, under 5 U.S.C. § 706(1) and (2), that "focus[ed] on the same conduct."). Section 706(1) requires a plaintiff to identify a "discrete agency action" that the agency is "required to take," either by statute or regulation. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004). As set forth above, Defendants' failure to disburse OTF's funds satisfy this requirement.

There can be no question that in failing to disburse funds that are appropriated by Congress to OTF and apportioned to USAGM, Defendants have failed to take "discrete" and "required" steps.  *Id.*  Apportionment of funds to USAGM and disbursement to OTF are discrete, legally required, and non-discretionary actions that the Court can and should compel. *See supra* Section I.A.2.a.

4.  *The Grant Termination Is Arbitrary and Capricious.*

USAGM's Grant Termination is arbitrary and capricious because, as discussed *supra* Section I.A.2, it directly contradicts USAGM's congressional mandate to provide funds to OTF, as well as OTF's obligation to fulfil its statutory mandates and USAGM's statutorily defined obligation to assist OTF in meeting those obligations, and therefore  "entirely failed to consider an important aspect of the problem." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, ___ F. Supp. 3d ___, No. 25-cv-400, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025). The APA requires courts

to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Under that standard, a reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted)). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). And agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself[.]" *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

A wholesale termination of a grant, with a one sentence explanation that "the award no longer effectuates agency priorities" with a citation to the March 14 Executive Order does not demonstrate a rational connection between the facts and USAGM's decision. The March 14 Executive Order does not provide any justification for USAGM's actions, as that order directs USAGM to eliminate all *non-statutorily required* activities and functions. And, as articulated above, USAGM's distribution of funds to OTF and assistance to OTF to fulfil its congressional mandate *are* statutorily required activities.

For the foregoing reasons, OTF has demonstrated a high likelihood of success on its claims that Defendants actions violated the APA, that the Grant Termination be set aside, and that the payment of OTF's funds be compelled.

**B.      If OTF's APA Claims Are Unavailable, OTF Is Likely to Succeed under Alternative Forms of Relief.**

As demonstrated above, OTF is likely to succeed on the merits of its APA claim. In the alternative, OTF is also likely to succeed on its claims that the Grant Termination was *ultra vires* and OTF has also made a strong showing of success in its mandamus action to compel USAGM to release OTF's appropriated funds.

*1.    The Grant Termination Is* Ultra Vires.

As set out above, *supra* Section I.A.2, Congress's intent to appropriate funds to OTF was clear by mandating that USAGM shall make "annual grants" available to OTF and by declaring the amount appropriated to OTF via line item in the Appropriation Act itself.  By "disregard[ing] a specific and unambiguous statutory directive" by Congress to direct the appropriated funds to OTF, the Grant Termination and withholding of OTF's funds were *ultra vires.  Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (internal quotation and citation omitted).

Judicial "[r]eview for *ultra vires* acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief."  *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (internal quotations and citations omitted, alterations in original).  To prevail on an *ultra vires* claim, a plaintiff must show that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."

*Fed. Express Corp.*, 39 F.4th at 763 (internal quotation and citations omitted). "Moreover, an agency acts *ultra vires* when its decision is not supported by a contemporaneous justification by the agency itself, but only a *post hoc* explanation [by] counsel." *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 975 (internal quotation and citation omitted).

Defendants have also acted "in excess of [their] statutory authority." *Id.* at 970 (internal quotation and citation omitted). Congress has thoughtfully delineated procedures that prohibit USAGM from unilaterally terminating its congressionally directed grant to OTF and from withholding appropriated funds.

*First*, the powers of the USAGM CEO are delineated in 22 U.S.C. § 6204(a). They do not include the authority to terminate OTF's grant or to withhold its appropriated funding as attempted here.

*Second*, Congress imposed a non-discretionary duty on USAGM to make annual grants available to OTF in furtherance of OTF's statutory mandate. 22 U.S.C. § 6208a(a)(1) ("Grants authorized under section 6204 of this title *shall be available* to make annual grants for the purpose of promoting, consistent with United States law, unrestricted access to uncensored sources of information via the internet to enable journalists . . . to create and disseminate, and for their audiences to receive, news and information consistent with the purposes, standards, and principles specified in sections 6201 and 6202 of this title." (emphasis added)); *Bridgeport Hosp.*, 108 F.4th at 887 (Congress uses "shall" to "'impose[] a mandatory duty' that is 'impervious to discretion.'" (omission in original) (citation omitted)). And Congress has subsequently imposed additional restrictions on reducing funding for OTF's operations. *See* FY24 FCAA, 138 Stat. at 735 ("funds may be reprogrammed within and between amounts designated in such table, subject to the regular notification procedures of the Committees on Appropriations, except that no such reprogramming

may reduce a designated amount by more than 5 percent"). USAGM is thus required by law to fund OTF, the only exception being a proper suspension or debarment, which USAGM has not pursued.

*Third*, Congress provided a specific statutory procedure for suspension or debarment of OTF by the USAGM Advisory Council, but did not include any procedure for terminating OTF's grants. This confirms that Congress did not grant USAGM the power to terminate the OTF Grant. Congress placed bipartisan guardrails on the lesser power of suspension by requiring a three-fourths vote of the Advisory Board to take action. 22 U.S.C. § 6205(f)(1). As a matter of statutory construction, it makes little sense that Congress intended that USAGM's CEO possess the power to unilaterally terminate OTF's funding, while prohibiting such action for the lesser power of suspension.

Defendants acted *ultra vires* in withholding the OTF funds that Congress specifically required be provided to OTF under the OTF Grant and in issuing the Grant Termination, which went far beyond the authority delegated by Congress. OTF is likely to prevail on this count.

### 2. OTF Is Likely to Succeed on Its Request for Mandamus Relief.

To the extent that review under the APA is unavailable, mandamus relief is appropriate. The "power grounded in 5 U.S.C. § 706(1) to compel agency action can also be effectuated through the use of a writ of mandamus." *Potomac Elec. Power Co. v. Interstate Com. Comm'n*, 702 F.2d 1026, 1034, *suppl. by*, 705 F.2d 1343 (D.C. Cir. 1983). *See also Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010) (the "standard[] for obtaining relief" under 5 U.S.C. § 706(1) and under mandamus "are essentially the same.") (citing *In re Core Commc'n Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)).

For the reasons discussed *supra* Section I.A.3, USAGM's failure to disburse funds constitutes action unlawfully withheld and unreasonably delayed under 5 U.S.C. § 706(1).

**C.      The Grant Termination and Withholding of OTF's Funds Violates the U.S.
Constitution.**

OTF is likely to succeed on its claims that Defendants violated the U.S. Constitution.  The

Court has jurisdiction to enjoin constitutional violations by federal officials.  *See Armstrong v.

Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (internal citations omitted).  OTF's

Constitutional claims include violation of the Appropriations Clause, Spending Clause,

Presentment Clause, Take Care Clause, and separation of powers principles.  OTF is likely to

succeed on these claims for the reasons set out below.

Defendants' actions violate the Constitution's Appropriations Clause and Spending Clause.

The Constitution vests in Congress "exclusive power over the federal purse."  *U.S. Dep't of the

Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (internal quotation and citation

omitted); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *16 (finding that

the "Constitution *explicitly* vests in Congress the power to spend, U.S. Const. art. I, § 8, cl. 1, and

appropriate funds, *id.* art. I, § 9, cl. 7.") (emphasis in original).  As set out above, Congress has

directly spoken as to how OTF shall be funded.  Defendants' refusal to distribute the money set

aside for OTF amounts to an unconstitutional violation of Congress's exclusive authority.  In fact,

the most recent Continuing Resolution confirms that Congress intended to maintain the funds

appropriated for OTF to fulfil the mission it set out for it.

Defendants' actions also run afoul of the Presentment Clause, which prohibits the executive

branch from "unilaterally amending or cancelling federal appropriations[.]" *See PFLAG, Inc. v.

Trump*, No. CV 25-337, 2025 WL 510050, at *18 (D. Md. Feb. 14, 2025) (citing *Clinton v. City

of New York*, 524 U.S. 417, 448 (1998)).  Defendants' actions are, in practice, an attempt by the

executive branch to amend the statutes described above, including the FY21 NDAA and the

appropriation acts, *supra* Section I.A.2, which is not allowed.  *Clinton*, 524 U.S. at 438 (explaining

that the Constitution does not authorize the executive branch to enact, amend, or repeal statutes); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from the power of veto, the President is without authority to thwart congressional will by cancelling appropriations passed by Congress.").

The Constitution requires the executive branch to take care that the laws of the United States are faithfully executed. U.S. Const. art. II, § 3. This "necessarily extends to appropriations." *City & Cnty. of San Francisco*, 897 F.3d at 1234. The FY21 NDAA and the subsequent appropriation acts all are laws of the United States. Indeed, the FY24 NDAA, which has been extended through fiscal year 2025 by continuing resolution, incorporates a specific line item that mandates $43.5 million be appropriated for OTF to fulfil its statutory mission. Defendants' refusal to honor the statutory appropriations to OTF thus violates the Take Care Clause.

Finally, Defendants actions have violated the separation of powers principles. Under the Constitution, the executive branch's powers "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Defendants lack the authority to withhold OTF's funds or to terminate the USAGM Grant in this manner, as Congress has directed precisely how the grant money should flow to OTF and has delineated USAGM's limited authority to withhold the funds. USAGM's withholding of the OTF funds is incompatible with Congress's instructions.

## II.    OTF Will Suffer Irreparable Harm If a Temporary Restraining Order Is Not Granted.

This Court should issue a temporary restraining order because the harm OTF faces is "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm . . . [that is] beyond remediation." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (cleaned up and citation omitted).

A party experiences actionable harm when he is "depriv[ed] of a procedural protection to which he is entitled" under the APA. *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)) (alteration in original). OTF will suffer irreparable harm unless the Court intervenes.

### A.    OTF Cannot Continue Operations Without Access to Appropriated Funds.

The harm to OTF began immediately on March 15, 2025, when Defendant Lake issued the Grant Termination. Cunningham Decl., ¶ 13. Under the Grant Termination, not only is OTF deprived of access to funds allocated to it by Congress, it also is deprived of the ability to spend funds in its possession that have already been delivered under the grant. *Id.* ¶ 13, Ex. B. In other words, OTF, which sources 98% of its operating and programmatic budget from the OTF Grant administered by USAGM, is being unlawfully commanded to no longer spend the funds already received so long as the Grant Termination remains in effect. This means that OTF immediately began to suffer harm; and will be forced to terminate staff with little notice and take other measures to remain in compliance with its grant obligations. *Id.* ¶¶ 15–19, 23–32.

The harm OTF will suffer is particularly acute because the appropriation administered by USAGM is the life-blood of OTF, constituting virtually all of OTF's operating and programmatic budget. *Id.* ¶ 8 (fiscal years 2024 and 2025 appropriations "cover approximately 98% of OTF's operating budget."). OTF's loss of funding "threatens the very existence of [its] business." *Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977)). As this Court has repeatedly found "blanket suspension of congressionally appropriated funds" results in extreme financial hardship, which "in many cases, force[s] [grantees] to significantly cut down on staff or otherwise reduce core operations." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 485324, at *2, *4 ("Plaintiffs have made a sufficient preliminary

showing that the loss of funding at issue in this litigation 'threatens the very existence of [its] business'"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, ___ F. Supp. 3d ___, No. 25-cv-239, 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025) ("Because the funding freeze threatens the lifeline that keeps countless organizations operational, Plaintiffs have met their burden of showing irreparable harm."). Without distribution of the money, OTF will be insolvent and unable to meet its financial obligations to its employees, contractors, and vendors.  Cunningham Decl., ¶¶ 8, 15–19.  In particular, OTF will have to terminate 32 full-time staff without notice, and they would immediately lose their income and benefits.  *Id*. ¶¶ 12, 15.  A funding freeze would require OTF to materially breach some, if not all, of its 149 programmatic and 23 operational contracts that it oversees around the world.  *Id*. ¶¶ 12, 19.  These contracts would be breached without the requisite notice required under the terms of the contracts, exposing OTF to monetary damages through no fault of its own.  *Id*. ¶ 16.  OTF currently provides stipends to a number of fellows located abroad who research authoritarian information controls and often provide the beginnings of practical solutions (80 total to date). *Id*. ¶ 26. Without access to its funds, these stipends cannot continue to be paid. *Id*.  These fellows work on highly sensitive matters and may be subject to reprisal without support from, and connection to, OTF. *Id.*

In short, if the appropriated grant money continues to be blocked, OTF will not be able to continue as an entity.  These are harms for which "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

### B.    A Freeze in Funding Puts OTF Programs and Partners at Risk.

OTF would suffer additional irreparable harm from the fact that a shut-down of operations would extinguish a number of programs that fulfill the agency's core mission with little to no hope of restoration.  The Grant Termination undoubtedly makes "it more difficult for the [plaintiffs] to

accomplish their primary mission." *Id.* (citations omitted).  OTF currently has ongoing activities in 60 different countries and is by far the largest funder and project partner in the internet freedom space.  Cunningham Decl., ¶ 18.  OTF offers technical solutions to counter digital authoritarianism. *Id*. ¶ 5.  If OTF can no longer support its own programs, or even if it is viewed as an unreliable partner because of funding risk, the United States' position as the worldwide leader in opposing digital authoritarianism will be substantially weaker.  *Id.* ¶ 18.  This harm to OTF would directly contravene Congress's ongoing funding of the organization.  *Id*. ¶¶ 5, 18.  Moreover, as a trusted partner to experts operating in countries under authoritarian rule, to continue to fulfill its congressionally mandated mission OTF must protect its contractors, who are frequent cyber targets of hostile adversaries *Id.* ¶ 19.  A denial of funding will put sensitive organizational and contractor information at risk.  *Id.* This will likely jeopardize the safety, and potentially the lives of, a number of OTF's partners. *Id.*

### C.    Without Access to Appropriated Funds, OTF Will Suffer Irreparable Harm to Its Reputation as a Trusted Partner in the Global Effort to Fight Digital Authoritarianism.

Further harm to OTF, its network of experts, and its reputation, is ongoing.  OTF has a reputation as a reliable partner in the global effort to preserve access to critical communications tools.  Immediate reputational harm is and will continue to be felt in the following areas:

- *Threat intelligence*.  OTF supports a network of regional helpdesks and complementary technologies to effectuate a threat intelligence sharing network. *Id*. ¶ 30. In this effort, OTF works alongside U.S. government efforts to identify and respond to threats of attack and actual attacks carried out by authoritarian regimes.  *Id*.

- *VPN Access*.  If the termination of the OTF Grant is upheld, OTF will need to immediately terminate all contracts with VPN providers.  *Id*. ¶ 17.  OTF-supported VPNs currently provide secure and uncensored access to the internet over 45 million people living in authoritarian countries. *Id*.  OTF is the largest funder of VPNs worldwide and has active multi-million-dollar contracts with partners located in repressive environments.  *Id*. ¶ 20. Without access to VPNs, users will be immediately exposed to online censorship and surveillance, putting their communication, work, and safety at significant risk, and leaving them vulnerable to despotic reprisal.  *Id*. ¶¶ 17, 23.

- *Rapid Response Fund*. OTF's Rapid Response Fund has supported over 100 interventions in over 80 countries in response to urgent, state-sponsored digital attacks. *Id.* ¶ 25. OTF's inability to offer this support will mean that independent media and civil society actors in authoritarian countries will be at serious risk without any recourse against targeted digital attacks from their governments. *Id.* ¶¶ 21, 25. Examples of recent rapid response projects include: mitigating digital attacks and device compromises for targeted independent journalists reporting on the Junta military actions in Myanmar; urgent forensic assessments and digital compromise remediations of the digital infrastructure used by a prominent civil society leader highly targeted by the Communist Party of China; and detection and compromise remediation for journalists and human rights defenders targeted by the highly advanced commercial spyware Pegasus. *Id.* ¶ 21.

- *Internet Freedom Fund*. OTF's primary funding mechanism for new applications and technologies is its Internet Freedom Fund. *Id.* ¶ 24. This fund is designed to be nimble and operate at the speed of private sector technology development to quickly respond to novel forms of digital authoritarianism. *Id.*

The suspension of new projects will result in significant opportunity cost, and will enable autocrats to develop unchecked information. *Id.*; *see also Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction.") (citations omitted); *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases).

While "economic loss does not, in and of itself, constitute irreparable harm," if a plaintiff demonstrates that "financial losses are certain, imminent, and unrecoverable, then the imposition of [the restraining order] is appropriate and necessary." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (internal citation and quotation omitted). Additionally, where the movant "will be unable to sue to recover any monetary damages against a government agency in the future . . . financial loss can constitute irreparable injury." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (internal citation and quotation omitted).

**D.      Damages Are Unavailable and Would Not Cure the Harms Caused by the Grant Termination.**

Here, because OTF's claims are brought under the APA, OTF cannot recover damages from the federal government.  *Open Cmty. All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017). As this Court has recognized, when plaintiffs cannot recover damages due to the defendant's sovereign immunity, "any loss of income suffered by a plaintiff is irreparable *per se*."  *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (citing *United States v. New York*, 708 F.2d 92, 93–94 (2d Cir. 1983)) (emphasis in original); *Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66–67 (D.D.C. 2004) (irreparable harm when loss of compensation is not recoverable due to federal government's immunity from suit).  Given the inability to remediate the demonstrated economic harms, OTF is harmed for purposes of preliminary injunctive relief.

**III.    The Balance of Equities and the Public Interest Support Issuing the Temporary Restraining Order.**

The balance of equities and the public interest also support issuing the preliminary injunction.  The balance-of-equities factor "directs the Court to balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief."  *Richardson v. Trump*, 496 F. Supp. 3d 165, 188 (D.D.C. 2020) (internal quotation and citation omitted).  When the government is the non-movant, this factor merges into the public interest factor, and the Court weighs "the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined[.]" *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (internal quotation and citation omitted). These factors favor granting the request for preliminary injunction.

OTF funds and supports the ongoing maintenance of some of the world's most vital secure communications solutions.   Granting a temporary restraining order would allow OTF's congressionally mandated mission and programs to survive and would be in the public interest,

which has been recognized repeatedly by Congress and the State Department, as recently as a few weeks ago. The public interest in this case extends to billions of individuals worldwide who continue to rely upon accessible networks, technologies, and communication platforms.

Preliminary injunctive relief, on the other hand, will not harm the Defendants; it will merely require that USAGM continue to administer the OTF Grant and disburse funds as the agency has been directed by Congress. This will end the unlawful withholding of these appropriated funds. The Government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (same). That is because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12; *see also Climate United Fund*, 2025 WL 842360, at *12 (same). Rather, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their . . . operations.'" *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). This Court has recognized that "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands*, 686 F. Supp. 2d at 21 (citation omitted); *see also Cresote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008) (granting injunction because it "serves the general public interest in open and accountable agency decision-making[.]").

Here, an injunction compelling Defendants to fulfill their statutory obligations would do no more than end Defendants' unlawful practices.

## IV.    The Court Should Waive Any Bond Requirement.

If OTF's motion for a temporary restraining order is granted, this Court should waive any bond requirement or, in the alternative, require OTF to post a minimal bond in the amount of $100.

Fed. R. Civ. P. 65(c) requires an applicant for preliminary relief to post security "in an amount that the court considers proper." However, the amount of security is a matter of discretion for the trial court and the court is permitted to require no security at all. *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012). Here, there will be little to no financial harm inflicted on USAGM if the Court grants a temporary restraining order. *Bailey v. Fed. Bureau of Prisons*, No. 24-cv-1219, 2024 WL 3219207, at \*13 n.5 (D.D.C. June 28, 2024).

## CONCLUSION

For the foregoing reasons, the Court should enter a temporary restraining order barring Defendants from implementing or enforcing the Grant Termination pending resolution of this case.

Dated this 20th day of March, 2025.

VAN NESS FELDMAN, LLP

/s/ *Patrick O. Daugherty*
Patrick O. Daugherty, D.C. Bar No. 981008
Anne Lynch, D.C. Bar No. 976226
Michael Farber, D.C. Bar No. 449215
    (*Admission Pending*)
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Tel.: 202-298-1800
Email: pod@vnf.com; alynch@vnf.com;
mfarber@vnf.com

Sophia E. Amberson, WA Bar No. 52528
    (*Pro Hac Vice Forthcoming*)
Liberty Quihuis, WA Bar No. 57779
    (*Pro Hac Vice Forthcoming*)
1191 Second Avenue
Suite 1800
Seattle, WA 98101
Tel.: 206-623-9372
Email: samberson@vnf.com; lquihuis@vnf.com

*Attorneys for Plaintiff*