**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OPEN TECHNOLOGY FUND,<br><br>               Plaintiff,<br><br>    v.<br><br>KARI LAKE, in her official capacity, *et al.*,<br><br>           Defendants. | No. 25-cv-00840-RCL |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR A TEMPORARY RESTRAINING ORDER</u>**

## INTRODUCTION

United States Agency for Global Media (USAGM); Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of USAGM; Victor Morales, in his official capacity as Acting CEO of USAGM; and the Office of Management and Budget (together, Defendants) respectfully submit this opposition to Plaintiff Open Technology Fund's request for a temporary restraining order, ECF No. 4 (Plaintiff's Motion).

As this Court has recognized, "[p]reliminary injunctive relief is 'an extraordinary remedy and must be sparingly granted.'" *Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 30 (D.D.C. 2006) (quoting *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996)).[1]  A movant requesting such relief must carry its burden of persuasion by a "clear showing." *Id.*  Plaintiff's Motion falls far short of that mark.

The core of Plaintiff's TRO motion is a claim for an emergency payment of $655,508 and the requirement that USAGM provide additional, unspecified funds to Plaintiff upon Plaintiff's request moving forward.  *See* Proposed Order, ECF No. 4-5.  To begin, as to the monetary relief sought, Plaintiff fails to make *any* showing as to why it is entitled to the particular sum it demands, especially on an emergency basis.  But neither that sum, nor any explanation for why Plaintiff is entitled to it now, appears in Plaintiff's memorandum in support of its Motion.  *See* Pl.'s Mem., ECF No. 4-1.  Indeed, the proposed order reflects that the sum covers March 1–31, 2025, a period of performance that was not yet complete when Plaintiff's Motion was filed, and will not be complete, even on filing of this opposition.  *See* ECF No. 4-5.

---

[1] "[T]he same substantive standard generally applies to both temporary restraining orders and preliminary injunctions." *Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011). *See also*, *e.g.*, *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

Nor does Plaintiff offer any particularized explanation—much less any "clear showing"—laying out why the Court should take the extraordinary step, on an emergency basis, of ordering the ultimate relief sought in this case. Plaintiff asks this Court to declare the termination of its grant agreements unlawful and null and void; to order payment on drawdown requests that have yet to be made; and to order that no steps be taken relating to closing out Plaintiff's grants. *See* ECF No. 4-5. Plaintiff does not explain—or even try to explain—why it requires such broad orders *now* to avoid certainly impending irreparable harm. *See* Pl.'s Mem.

Nor, as a threshold matter, can Plaintiff establish that this Court has subject matter jurisdiction to address its claims. At bottom, Plaintiff—just like the grantee in *U.S. Conf. of Catholic Bishops*—seeks specific performance on a contract with the Government. *See U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066, (citing *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)). Plaintiff "asks the Court to order the Government to cancel the termination, pay money due [or, in this case, *to be due*], and reinstate the contracts." *Id.* at *8. In *U.S. Conf. of Catholic Bishops*, Judge McFadden held that the Court had no jurisdiction to grant such relief, citing Circuit precedent holding that "jurisdiction could not lie in the district court because the suit was inherently contractual." The same is true here.

The lack of subject matter jurisdiction is but one of several reasons why the Plaintiff cannot demonstrate a likelihood of success on the merits. Indeed, none of the four factors informing whether a party is entitled to preliminary relief favors entry of temporary restraining order here. Plaintiff has made no showing of cognizable irreparable harm likely to result in the absence of preliminary relief; and the balance of equities and the public interest cut against the Plaintiff's request.

At its core, Plaintiff claims that USAGM plays no role in granting money to Plaintiff; that it is merely a mechanism of transferring appropriated funds from Congress to a private entity. This is wrong—and because it is wrong, Plaintiff's underlying theory of the case—that this action is resolved a matter of appropriations law rather than contract law—is wrong as well. As discussed further herein, Congress vested USAGM with broad authority to oversee its grantees—including by termination in appropriate cases. So, even if this Court had jurisdiction to grant the Plaintiff's request to override USAGM's judgment (it does not), it would not be in the public interest to enter this extraordinary relief.

For all the reasons discussed herein, the Court should deny the Plaintiff's request for a temporary restraining order.

## <u>BACKGROUND</u>

The mission of United States Agency for Global Media (USAGM) is to inform, engage, and connect people around the world in support of freedom and democracy. *See* https://www.usagm.gov/who-we-are/mission/. In furtherance of that mission, USAGM oversees multiple entities, including Plaintiff Open Technology Fund. *See id.*; *see also* 22 U.S.C. § 6208a. To effectuate its oversight authority, Congress granted USAGM's Chief Executive Officer (CEO) with the authority to, *inter alia*: "supervise all broadcasting activities conducted" by such entities; "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical." 22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8).

Congress further required that USAGM employ grants, in particular, to fund the entities under its supervision.  Section 6204(a) provides authority for USAGM's CEO to:  "make and supervise grants and cooperative agreements for broadcasting and related activities" and "allocate funds appropriated for international broadcasting activities among the various elements of the [USAGM] and grantees, subject to reprogramming notification requirements in law for the reallocation of funds."  22 U.S.C. §§ 6204(a)(5), (a)(6); *see also Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020) (recognizing "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making") *opinion vacated as moot, appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021).

Section 6208a sets forth "limitations and restrictions" on grants to Open Technology Fund.  22 U.S.C. § 6208a.  Among other limitations, this section requires that grants to Open Technology Fund "shall be made pursuant to a grant agreement which requires that grant funds be used only for activities consistent with this section, and that failure to comply with such requirements shall permit the grant to be terminated without fiscal obligation to the United States."  *Id.* § 6208a(d)(2).

Congressional appropriations statutes make funding available for grant awards to Open Technology Fund without mandating that any specific sum within the appropriation be directly granted to Open Technology Fund.  Each of the appropriations statutes that Plaintiff cites in its Motion reflects this.  For fiscal years 2022 through 2024, each quoted statute provides: a stated sum "authorized to be appropriated for the Open Technology Fund," and further states that the funds "shall be made available in the amounts specifically designated in the respective tables."  Pl.'s Mem. at 6, 7 (citing and quoting each year's respective appropriations legislation).  For 2025, the continuing resolutions have appropriated funds under the same conditions as applied in

prior years. *See* Pls.' Mem. at 8.   However, Congressional appropriations recognize flexibility for reprogramming among different USAGM grantees, and do not categorically mandate specific payment amounts. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 735 (noting that "funds may be reprogrammed within and between amounts designated in such table [i.e., for each USAGM grantee or federal entity], subject to the regular notification procedures of the Committees on Appropriations, except that no such reprogramming may reduce a designated amount by more than 5 percent.").  In other words, Congress does not require a specific sum-certain to be allocated.

Accordingly, as noted in the Declaration of Laura Cunningham, President of Open Technology Fund (OTF), "[t]he money appropriated for OTF is first apportioned to USAGM and then provided to OTF under a grant agreement between OTF and USAGM."  Cunningham Decl. ¶ 6.  The Federal Award Identification Number (FAIN) for OTF's Fiscal Year 2025 Grant is FAIN: OT01-25-GO-00001. *See id.*  On March 15, 2025, USAGM terminated that agreement via a letter. *See* Cunningham Decl., Ex. B.

On March 20, 2025, Plaintiff initiated this action and filed its motion for preliminary relief.  As part of its request for a temporary restraining order, Plaintiff asks the Court to order payment of $655,508. *See* ECF No. 4-5.  According to Plaintiff's proposed order, this sum comprises Plaintiff's operating expenses for March 1–31, 2025. *See id.*  Ms. Cunningham avers that "[o]n February 26, 2025, OTF submitted its drawdown request to USAGM for operating funds to cover the period of March 1, 2025 to March 31, 2025, consistent with [*inter alia*] the USAGM Grant Agreement," and further avers that it has not been paid.  Cunningham Decl., ¶ 9.  Plaintiff also requests that the Court declare the termination of its grant agreements "null and void," order payment on "subsequent drawdown requests," and order Defendants to "take no

steps" related to closing out the grant.  Proposed Order, ECF 4-5.

## LEGAL STANDARD

"A temporary restraining order is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, --- F. Supp. 3d ---, 2025 WL 520583, at *2 (D.D.C. Feb. 18, 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)).  To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Although the Court of Appeals has not yet expressly held that a plaintiff must make a clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach." *Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal quotation and citation omitted).  Indeed, relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*,

570 F.2d 950, 954–55 (D.C. Cir. 1978).

**ARGUMENT**

**I.    Plaintiff Cannot Establish a Likelihood of Success on the Merits.**

    **A.    Plaintiff Cannot Establish that this Court Has Subject-Matter Jurisdiction over this Action.**

        **1.    The Tucker Act vests exclusive jurisdiction over Plaintiff's claims in the Court of Federal Claims.**

To begin, Plaintiff is unlikely to prevail on the merits because its claims, fundamentally, are an effort to mandate payments it claims it is or will be entitled to under its grant agreements, and to reinstate its grant agreements as improperly terminated.  *See* ECF No. 4-5 (requesting an order that "termination of [certain grant agreements] is unlawful and null and void"; that Defendants "immediately obligate and disburse . . . approximately $655,508 pursuant to the February 26, 2025 drawdown request to USAGM for the period covering March 1–31, 2025"; and that "Defendants must honor subsequent drawdown requests submitted by the Open Technology Fund made consistent with the USAGM Grant Agreements.").  Those grant agreements are contracts with the federal government.  Because Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks "the authority to afford the 'drastic' emergency relief that [Plaintiff] seeks."  *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *8.

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides for judicial review of breach claims for express or implied contracts over $10,000 in the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute."  *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*).  The D.C. Circuit has long "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government."  *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4

(quoting *Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis in original)).  Put another way, "[t]he only remedy to which the United States has consented in cases of breach of contract is to the *payment of money damages* in either the Court of Claims [now the Court of Federal Claims], if the amount claimed is in excess of $10,000, 28 U.S.C. § 1491(a)(1), or the district courts, where the amount in controversy is $10,000 or less.  28 U.S.C. § 1346(a)(1)."  *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) (emphasis in original).  And "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations."  *Id.* at 3.

Plaintiff's claim is, at heart, contractual.  The grant agreement is a contract, because it sets out obligations that OTF must do in exchange for consideration from the government.  *See*, *e.g.*, FY 2025 OTF GRANT AGREEMENT – FAIN: OT01-25-GO-00001 ("Grant Agreement") at 3 ("USAGM agrees to make, and [OTF] agrees to accept, the grant of funds in accordance with the following provisions").  Plaintiff is seeking to require the payment of funds it says it is entitled to under the contract, or that it will be entitled to, and claims the contract was improperly terminated. *See, e.g.*, Pl.'s Mem. at 13 ("OTF seeks to set aside the unlawful termination of its grant agreement"); Grant Agreement, Article VII, § (c) ("USAGM will make disbursements in monthly increments or on such other basis as may be consistent with the Approved Financial Plan.")

To attempt to avoid the jurisdictional bar of the Tucker Act, Plaintiff focuses its attention on Congressional appropriations, and depicts its claims as requests for equitable relief stemming from statutes.  *See*, *e.g.*, Pl.'s Mem at 13 ("the source of OTF's claims are not the terms of the grant agreement, but grounded in statute").  In other words, it claims it is entitled to funds by statute, not by contract.  Yet, in legislating concerning the USAGM, Congress made clear that

any funds disbursed to grantees like Plaintiff are paid via grant agreements, *i.e.* contracts, between USAGM and the grantees. *See* 22 U.S.C. § 6208a(d)(2) ("[g]rants awarded under this section shall be made pursuant to a grant agreement"). Although Plaintiff depicts USAGM's hands as being tied, and characterizes the grants as "required," Pl.'s Mem. at 17, Congress vested the agency with considerable discretion. *See Open Tech. Fund*, 470 F. Supp. 3d at 31 (recognizing "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making").

The government acknowledges that the grant is funded via appropriations, but that is true for all government contracts—after all, no federal funds can be paid absent appropriations. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding). Nothing in the statutory framework mandates payment by methods other than grant agreements, *see supra* at 4–5, and Plaintiff ultimately acknowledges that its request is "to set aside the [allegedly] unlawful termination of its grant agreement." Pl.'s Mem. at 13. Moreover the request for emergency relief is for the payment of funds to which Plaintiff claims an entitlement under the grant agreement. *See, e.g.*, ECF No. 4-5 (seeking an order requiring Defendants to "honor subsequent drawdown requests submitted by the Open Technology Fund made consistent with the USAGM Grant Agreements"). However cloaked, the relief Plaintiff seeks "sounds in contract." *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, *5 (quoting *Albrecht v. Comm. On Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)).

It is well-established that a plaintiff cannot avoid the Court of Federal Claims simply by artful pleading. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of

the [Contract Disputes Act, vesting jurisdiction in the Court of Federal Claims] merely by alleging violations of regulatory or statutory provisions rather than breach of contract.").  In a case challenging an agency's decision to terminate a contract for convenience, the D.C. Circuit has explained "[t]hat the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations.  Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action." *See id.* at 78 ("where plaintiff was awarded contract and government terminated for convenience, cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations" citation omitted)).

Just ten days ago, another Judge of this Court held that the Court lacked jurisdiction to order strikingly similar relief. *In U.S. Conf. of Catholic Bishops*, 2025 WL 763738, a grantee that had been receiving funds via cooperative agreements with the State Department, sought a temporary restraining order preventing the State Department from terminating cooperative agreements with that grantee. *Id.* at *2–3.  The Court noted that the grantee had millions of dollars in requested reimbursements pending with State, and that without ongoing funding the grantee claimed "thousands of refugees already in its care would soon lack enough support." *Id.* at *2.  Nonetheless, the Court declined to grant preliminary relief, holding the Tucker Act stripped it of jurisdiction to entertain such a claim. *See id.* at *4–8.

Discussing the precedent, including *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992), the Court in *U.S. Conf. of Catholic Bishops* acknowledged the complexity in determining whether an action belongs before the Court of Federal Claims. *See U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4–5.  The Court further explained that "the ultimate inquiry of whether a claim is 'essentially a contract action'

turns on two key considerations:  '[t]he source of rights upon which the plaintiff bases its claims' and the type of relief sought." *Id.* at *5 (quoting *Albrecht*, 357 F.3d at 68).  The Court then found the latter factor to be dispositive, reasoning that the relief the plaintiff sought in that case "sounds in contract.' *Id.* (quoting *Albrecht*, 357 F.3d at 68).  There, as here, the grantee sought an order enjoining the government from taking steps to give effect to a letter terminating the plaintiff's grant.  *See id.*  As the Court explained, "[s]tripped of its equitable flair, the requested relief seeks one thing:  [plaintiff] wants the Court to order the Government to stop withholding the money due under [its grant agreements]." *Id.* at *7.  The Court held that treating the remedies sought in that case as equitable "would be to distort the obvious" since plaintiffs asked the Court to reverse the Government's decision to cease a financial relationship with the [plaintiff]." *Id.*

Plaintiff cites *Climate United Fund v. Citibank, N.A.*, --- F.Supp.3d ---- 2025 WL 842360 (D.D.C. Mar. 18, 2025), as having reached the opposite conclusion.  *See* Pl's Mem. at 13, 7. There, Judge Chutkan held that claims seeking disbursement of federal grants could proceed "because Plaintiffs do not challenge a contract between the parties—they challenge an action." *Id.* (quoting *Climate United Fund*, 2025 WL 842360, at *17).  That reasoning is wholly unpersuasive.  It countenances a so-called exception that would swallow the entirety of the jurisdiction reserved to the Court of Federal Claims since *any* action taken in relation to a contract by an agency is an agency action.  The Court's interpretation in *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *7, is consistent with Congress's purpose in enacting the Tucker Act and with the law of this Circuit, *see supra*.

The Court of Appeals has been clear that, where "the essence of [a] claim is a request for specific performance of the original contract"—whether or not it is pled as a contract claim at all—the jurisdiction for that action lies with the Court of Federal Claims.  *Ingersoll-Rand*, 780

F.2d at 80.  That is so for all of the relief requested in Plaintiff's proposed temporary restraining

order.  Because Plaintiff cannot establish jurisdiction, it cannot succeed on the merits, and its

request for extraordinary injunctive relief should be rejected on that basis alone.

     **2.**   **Plaintiff's request for payment of $655,508—and for payment on drawdown requests not yet submitted—is not ripe, or, in the alternative, is not agency action unlawfully withheld or unreasonably denied.**

Plaintiff also cannot establish a likelihood of success on its requests for payment of

$655,508 and for payment on future drawdown requests, for the additional reason that any claim

for recovery of those funds is not ripe or, in the alternative, such funds have not been unlawfully

withheld or unreasonably denied within the meaning of 5 U.S.C. § 706(1), *see* Compl. ¶¶ 55–60

(Count II).  Rooted in Article III limitations and prudential considerations, ripeness requires that

an alleged injury be "certainly impending."  A claim is not ripe if it is "dependent on 'contingent

future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New

York*, 529 U.S. 125, 131 (2020) (citation omitted).  A court lacks jurisdiction over un-ripe claims

that do not satisfy the Constitution's case or controversy requirements.   "Determining whether

administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the

issues for judicial decision and (2) the hardship to the parties of withholding court

consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003*)* (citation

omitted).

Relatedly, to state any claim under the APA, including under Section 706(1), a plaintiff

must allege that the conduct by the agency constitutes "final agency action."  5 U.S.C. § 704.  To

constitute final agency action: (1) "the action must mark the consummation of the agency's

decisionmaking process" and (2) it "must be one by which rights or obligations have been

determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–

78 (1997) (cleaned up).  Plaintiff has not plausibly alleged that USAGM has taken such a final agency action.

Here, the Plaintiff demands an emergency order requiring immediate disbursement of funds, both retrospectively and prospectively, but cites neither any final agency decision not to pay out those funds, nor any provision in the grant agreement requiring the funds to be paid out by a date certain.  *See* Pl.'s Mem.  The grant agreement itself merely requires disbursements be made "in monthly increments or on such other basis as may be consistent with the Approved Financial Plan."  Grant Agreement, Article VII(c).  Plaintiff cites to no requirement for the agency to disburse funds any faster.  This is fatal to Plaintiff's Section 706(1) claim, which "'can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004); *see also* 5 U.S.C. § 551(13) (defining "agency action" as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act").  Indeed, as to the future payments, the claims are not and cannot be ripe.  Moreover, Section 706(1) only permits a court to "compel an agency 'to perform a ministerial or non-discretionary act.'"  *SUWA*, 542 U.S. at 64.  For all the reasons explained below, Congress gave USAGM broad discretion in its oversight of its grantee, and its role cannot be characterized as ministerial.  *See infra* 15–16.

Furthermore, by Plaintiff's admission, the $655,508 covers a period of performance that has not yet ended.  *See* ECF No. 4-5.  On these facts, Plaintiff cannot establish a likelihood of success on a claim that those funds must be disbursed immediately.  Nor, in any event, is it appropriate to proceed at this time because the agency provided Plaintiff an opportunity to seek reconsideration in the March 15 letter.  Plaintiff acknowledges that the letter informs Plaintiff of

how it may appeal or object to the termination.  *See* Pl.'s Mem. at 15.  But Plaintiff dismiss that procedure as "illusory" because—according to Plaintiff—"USAGM does not have any procedures for processing objections, hearings, and appeals."  *Id.*  Plaintiff's contention is puzzling.  The termination letter itself sets forth the process and procedures for appeal, specifying the timeframe for appeal, the means by which appeals should be submitted, and the categories of information and documentation that should be included.  *See* March 15, 2025 Letter, ECF No. 4-2, Ex. B.  The fact that those requirements are not formal regulations in the CFR does not render the procedures illusory.  Plaintiff offers no support for its speculation that an appeal submitted according to the instructions in the March 15 letter would not be considered by USAGM.  Accordingly, even to the extent that this court considers the disbursement issue ripe for review and cognizable under 706(1), it should decline to proceed at this juncture until Plaintiff complies with, and the agency responds to, the appeal process set out in the March 15 letter.

### 3.  Plaintiff's Mandamus Claim Fails for Lack of Jurisdiction.

Plaintiff presents its mandamus claim as a backstop to its Administrative Procedure Act ("APA") claim.  *See* Pl.'s Mem. at 24 ("To the extent that review under the APA is unavailable, mandamus relief is appropriate.").  But that is mistaken.  Mandamus jurisdiction "is strictly confined. . . mandamus is 'drastic'; it is available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief.'"  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc); *Citizens for Resp. & Ethics in Washington v. Trump* ("*CREW*"), 924 F.3d 602, 606 (D.C. Cir.

2019) ("[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.").

To establish a court's jurisdiction over such a claim, a plaintiff seeking mandamus relief must show (1) "a 'clear and indisputable right to relief,'" (2) "that the defendant has a "'clear duty to act,'" and (3) "that 'no adequate alternative remedy exists.'" *Id.* (quoting *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)); *see also Lovitsky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *CREW*, 924 F.3d at 606. And, even when these requirements are met, "a court may grant relief only when it finds compelling equitable grounds." *Lovitsky*, 949 F.3d at 759. As discussed below, Plaintiff fails to establish either the first or the second requirement.

For the reasons explained above, *see supra* 6–14, Plaintiff does not have the clear and indisputable right to relief that is necessary to establish mandamus jurisdiction. Nor can Plaintiff establish the requisite duty to act. In the context of mandamus, the duty to be performed must be "ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)). A ministerial duty "is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Plainly, the USAGM's duties as to its oversight of its grantees are not merely "ministerial." To the contrary, the Court in *Open Tech. Fund* recognized "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making." *See Open Tech. Fund*, 470 F. Supp. 3d at 31. Several statutory provisions discussed above reflect USAGM's

substantial discretion in this regard.  USAGM's CEO is empowered to "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all [grantees'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical."  22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8).  And, as to Open Technology Fund in particular, the statute provides that "[g]rants awarded under this section shall be made pursuant to a grant agreement which requires that grant funds be used only for activities consistent with this section, and that failure to comply with such requirements *shall permit the grant to be terminated* without fiscal obligation to the United States."  22 U.S.C. § 6208a(d)(2) (emphasis added).  All of these authorities make clear that execution and termination of the agreement are not ministerial responsibilities.

For all these reasons, Plaintiff cannot show a likelihood of success on its mandamus claim.

### B.   Plaintiff Is Not Likely to Prevail on its Constitutional Claims.

Plaintiff's constitutional claims are barred because they are, at their heart, purely statutory.  As to the Presentment Clause, Plaintiff alleges, "Defendants' actions are, in practice, an attempt by the executive branch to amend the statutes described above . . . which is not allowed."  Pl.'s Mem. at 25.  As to the Appropriations and Spending Clauses, Plaintiff addresses them together, and states simply that "Congress has directly spoken as to how OTF shall be funded. Defendants' refusal to distribute the money set aside for OTF amounts to an unconstitutional violation of Congress's exclusive authority."  *Id.*  Likewise, as to the Take Care Clause, Plaintiff alleges "Defendants' refusal to honor the statutory appropriations to OTF . . .

violates the Take Care Clause." *Id.* at 26.  Finally, on Separation of Powers, Plaintiff argues

"USAGM's withholding of the OTF funds is incompatible with Congress's instructions." *Id.*

      In sum, each claim hinges, in turn, on Plaintiff's allegation concerning its statutory

claims.  The Supreme Court has made clear that "claims simply alleging that the President has

exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ."

*Dalton v. Specter*, 511 U.S. 462, 473 (1994).[2]  This keeps with the long tradition of

"distinguish[ing] between claims of constitutional violations and claims that an official has acted

in excess of his statutory authority." *Id.* at 472.  Because Plaintiff's claims here comprise

restatements of the allegation that USAGM acted in excess of its statutory duty, Plaintiff cannot

prevail on its claims alleging constitutional violations.

      Nor, to any extent, are these claims viable.  Plaintiff is not funded through direct

congressional appropriations, rather, it is explicitly funded through grant agreements.  *See* 22

U.S.C. § 6208a(d)(2) ("Grants awarded under this section shall be made pursuant to a grant

agreement.").  Execution of that grant agreement—and its termination—are governed by the

applicable grant agreement; and indeed, Congress contemplated that the grant agreement could

be terminated, notwithstanding the fact that there may be line-item appropriations applicable to

OTF.  *See*, *e.g.*, *id.* § 6208a(d)(2) (stating that failure to comply with the requirements of this

section may result termination of a grant without further obligation by the United States").

---

[2]  Likewise, Plaintiff's ultra vires claim amounts to a rehashing of its other causes of
action; it is a contention that Defendants acted in excess of their statutory authority.  *See* Pl.'s
Mem. 22–24.  As Plaintiff acknowledges, stating an ultra vires claim would require a showing
that "there is no alternative procedure for review of the statutory claim."  Pl.'s Mem. at 22.
Where, as here, Plaintiff asserts an APA claim alongside the ultra vires claim, the latter claim is
duplicative and cannot survive.  *See e.g. Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th
716 (D.C. Cir. 2022) (ultra vires claim permitted where Congress had statutorily barred APA
review).

USAGM's conduct under that grant agreement is reviewable—as Defendants argue, in the Court of Federal Claims—but the mere fact that a grant agreement is funded through line-item appropriations does not mean that the routine execution of that grant agreement takes on statutory—let alone constitutional—dimensions.

### II.    Plaintiff Cannot Establish Irreparable Harm.

Plaintiff likewise fails to establish that it will suffer irreparable harm absent a temporary restraining order. To demonstrate irreparable harm, Plaintiff must meet a "high standard"—Plaintiff must show that it faces injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Making that showing requires "proof" that the harm it identifies "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiff identifies four sources of irreparable harm: economic harms stemming from the funding pause, cybersecurity harms, reputational harms, and additional harms to third parties. *See* Pl.'s Mem. at 27–30. None is sufficient to justify the extraordinary relief of a temporary restraining order.

As to economic harms: Plaintiff identifies several harms that stem from its lack of access to grant funds, in the form of harms to its operations and efforts to fulfill its missions. But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co.*, 758 F.2d at 674

(describing that principle as "well-settled").   The only exceptions are "where the loss threatens

the very existence of the movant's business," *id.* (citation omitted), or "where the claimed

economic loss is unrecoverable."  *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C.

2014) (citation omitted).

      The first exception is a narrow one—it encompasses only cases where the plaintiffs

demonstrate "extreme hardship to the business" or a threat to the business's "very existence."

*Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981).  Plaintiffs may be

forced to make difficult choices and lose profits in critical areas of their business without

incurring irreparable harm sufficient to warrant injunctive relief.  *Cf. Boivin v. U.S. Airways,*

*Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock. .

. do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy

of a preliminary injunction.").  And Plaintiffs must document any claim that an alleged harm is a

threat to the business's very existence with specific details.  *Nat'l Mining Ass'n v. Jackson*, 768

F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future

losses, tie that to an accounting of the company's current assets, [and] explain with . . .

specificity how he arrived at the conclusion that he would be forced out of business in eighteen

months" to show irreparable harm on this theory).  Here, Plaintiff alleges that a lack of funds

"'threatens the very existence'" of the organization, Pl.'s Mem. at 27 (quoting *Wis. Gas Co. v.*

*FERC*, 758 F.2d 669 (D.C. Cir. 1985)), but supplies none of the detailed projections required

under the caselaw to substantiate such a claim, *see id.*; *see also* Cunningham Decl. ¶ 15.

      Notably, Plaintiff tries to expand the scope of the first exception, asserting that grant

termination "make[s] it more difficult for the [plaintiff] to accomplish [its] primary mission."

Pl.'s Mem. at 28–29 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C.

Cir. 2016)).  But *Newby* involved *statutory* obstacles, not economic harm.  Here, Defendants have not enacted or enforced laws that make it more legally or logistically difficult for Plaintiffs to execute the missions they have identified.  Defendants have instead paused the government's *sponsorship* of those activities.  Plaintiff's reliance on *Newby* is therefore misplaced.

The second exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply.  As discussed above, Plaintiffs' economic injuries are reparable through the Tucker Act for contract disputes concerning monetary payments. Sovereign immunity is not an obstacle for monetary recovery on Plaintiffs' claims because of that statute.  *See Safari Club Int'l*, 47 F. Supp. 3d at 37.

Additionally, with respect to the majority of monetary harms Plaintiff asserts, it appears Plaintiff is simply mistaken.  Plaintiff asserts it "is being unlawfully commanded to no longer spend the funds already received so long as the Grant Termination remains in effect."  Pl.'s Mot. at 27.  Plaintiff cites no support for this contention beyond the March 15, 2025 letter, which does not state that pre-termination obligations cannot be paid.  *See* Cunningham Decl., ¶ 13, Ex. B. Indeed, the regulations governing termination—while specifically disallowing new obligations unless they are authorized—provide that "costs during suspension or after termination are allowable if . . . [t]he costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it."  2 C.F.R. § 200.343(a).  Therefore, insofar as Plaintiff is asserting that it cannot expend money owed on contracts with its existing "employees, contractors, and vendors,"

Pl.'s Mem. at 28, that is not correct; nothing prevents Plaintiff from making payments on obligations that predate the March 15, 2025 letter.

Plaintiff also claims severe "reputational harm" because of Defendants' conduct and "opportunity cost" arising from the suspension of new projects. Pl.'s Mem. at 29–30. But "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and therefore recoverable. *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013). Here, it also requires speculation regarding those expected reactions, which may ascribe blame to Defendants rather than Plaintiff.

Likewise with the Plaintiff's assertions concerning potential cybersecurity risks, *see* Pl.'s Mem. at 29; this risk is speculative and falls far short of the strong showing required to justify a temporary restraining order. In this Circuit any alleged irreparable injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. It also must be of such "*imminence* that there is a clear and present need for equitable relief." *Id.* (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)) (emphasis in original). Plaintiff's unsupported predictions regarding potential cyberattacks cannot fulfill this standard.

Finally, Plaintiff identifies other forms of harm that may flow to third parties, including its employees, contractors, or individuals served by Plaintiff's mission. *See* Pl.'s Mem. at 29–30.

But "harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court."  *State v. Musk*. ---F. Supp. 3d ---, 2025 WL 520583, at *4 (D.D.C. 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).  Thus, in *State v. Musk*, although the Court noted that "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large," *id.* at *4, the Court held that it could not consider alleged harm to parties not before the Court on a request for emergency injunctive relief.  *See id.*  Likewise, in this case, Plaintiff's allegations concerning possible harm to third parties cannot support the requested temporary restraining order.

### III.    The Balance of the Equities (Including the Public Interest) Does Not Favor a Temporary Restraining Order.

A temporary restraining order also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  In this setting, granting the temporary restraining order that Plaintiff seeks would disrupt USAGM's oversight of its grantees to ensure taxpayer money is stewarded well, as intended by the statutory scheme that Congress provided.  *See supra* 4–5.

In another case in which OTF sought preliminary equitable relief against USAGM, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest."  *Open Tech. Fund*, 470 F. Supp. 3d at 31.  The Court held:  "[s]etting USAGM's priorities and managing, at a broad level, U.S. international broadcasting is the prerogative of the USAGM CEO—not that of plaintiffs, and certainly not of this Court.  Moreover, Congress's choice to grant the USAGM CEO broad,

unilateral powers over grant-making and oversight of USAGM grantees is itself 'a declaration of public interest and policy which should be persuasive in inducing courts to give relief.'" *Id.* (quoting Va. *Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)). Meanwhile, Plaintiff, as discussed above, will suffer no cognizable irreparable harm from the denial of its motion, as each of the potential harms that Plaintiff identifies is economic, and therefore inherently not irreparable; speculative; or asserted on behalf of a third party not before this Court. On these facts, the balance of the equities and the public interest align against the entry of relief.

### IV.    Plaintiff Cannot Make the Heightened Showing Required for the Mandatory Injunctive Relief It Seeks.

To the extent Plaintiff requests an order now requiring Defendants to "honor subsequent drawdown requests," ECF No. 4-5, Plaintiff seeks a highly disfavored mandatory injunction that would, in effect, grant Plaintiff the ultimate relief it seeks in the complaint. Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018); *accord Archdiocese of Wash. v. Wash. Metro Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

Here, because the March 15, 2025, termination letter has already issued, Plaintiff asks the Court to change the status quo, and order payment on drawdown requests yet to be made. Yet beyond the general discussion of economic harms, and other forms of asserted harm either too speculative or too removed from Plaintiff to be cognizable for the reasons discussed above, *see supra* 18–22, Plaintiff proffers no grounds supporting this especially extraordinary form of relief. This falls far short of meeting a plaintiff's heightened burden when seeking an affirmative injunction for mandatory relief against the Government.

## V.    Plaintiff Should Be Ordered to Post Security in Connection with Any Temporary Injunctive Relief

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiff's motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiff to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues a temporary restraining order here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such temporary order. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). As Plaintiff is seeking the payment of a particular sum, *i.e.* $655,508, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c).

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Plaintiff's Motion for a Temporary Restraining Order.


Dated:  March 24, 2025                    Respectfully submitted,

                                                       YAAKOV M. ROTH
                                                       Acting Assistant Attorney General

                                                       ERIC J. HAMILTON
                                                       Deputy Assistant Attorney General
                                                       Civil Division, Federal Programs Branch

                                                       JOSEPH E. BORSON
                                                       Assistant Branch Director
                                                       Federal Programs Branch

                                                       */s/  Julia A. Heiman*
                                                       JULIA A. HEIMAN (D.C. Bar No. 986228)
                                                       Federal Programs Branch
                                                       U.S. Department of Justice, Civil Division
                                                       1100 L Street, N.W.
                                                       Washington, DC  20005
                                                       Tel. (202) 616-8480 / Fax (202) 616-8470
                                                       julia.heiman@usdoj.gov
                                                       *Attorneys for Defendants*