IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OPEN TECHNOLOGY FUND,<br><br>                Plaintiff,<br><br>v.<br><br>KARI LAKE et al.,<br><br>                Defendants. | Civil Action No. 1:25-cv-840-RCL<br><br>**FIFTH DECLARATION OF LAURA CUNNINGHAM** |

I, Laura Cunningham, declare the following:

       1.      I am the president of Open Technology Fund ("OTF"), a private section 501(c)(3) nonprofit organization incorporated in the District of Columbia and authorized under the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 and funded through a congressionally directed grant from U.S. Agency for Global Media ("USAGM").

       2.      OTF is funded by Congress pursuant to appropriations, and Congress has set OTF's mission in statute.

       3.      OTF's Fiscal Year ("FY") 2025 Grant Agreement, Federal Award Identification Number (FAIN) OT01-25-GO-00001 ("FY2025 Grant Agreement"), has a period of performance that commenced on October 1, 2024 and concludes on September 30, 2027, but OTF's funds are appropriated by Congress as "no-year funds"—they "may remain available until expended"—which means they can be distributed to and spent by OTF outside of FY2025.

       4.      For FY2025, Congress appropriated a total of $43,500,000 to OTF through a series of continuing resolutions. The FY2025 "Full Year Continuing Appropriations and Extensions Act, 2025" (the "Full Year Continuing Resolution"), Pub. L. No. 119-04, adopted and extended the provisions in the FY2024 Appropriations Act, Pub. L. No. 118-47. The

FY2024 Appropriations Act directed USAGM to provide "until expended" $43,500,000 for "internet freedom programs." Two distinct tables in the accompanying explanatory statement, incorporated by reference, further specify that OTF is allocated $43,500,000. On December 5, 2024, following the enactment of a partial-year FY2025 continuing resolution, USAGM asked OTF to submit an FY2025 "Must Pay" financial plan.

5. On December 9, 2024, OTF submitted that plan to USAGM.

6. On January 8, 2025, USAGM asked OTF to make minor revisions to the plan, and OTF resubmitted the plan the same day.

7. On January 22, 2025, the financial plan was approved by USAGM.

8. On January 24, 2025, OTF received $16,196,355 of its congressionally appropriated FY2025 funds in accordance with its approved financial plan: $8,098,178 for January, and $8,098,177 for February.

9. However, OTF has not received any FY2025 funds since January 24, 2025, despite repeated requests and best efforts by OTF to have USAGM disburse OTF's congressionally appropriated funds.

10. On March 15, 2025, the day after the FY2025 Full Year Continuing Resolution was enacted, USAGM notified OTF that it was terminating OTF's FY2025 Grant Agreement but later notified OTF—and the Court—that it was rescinding that termination.

11. After rescinding the termination of OTF's FY2025 Grant Agreement, on March 28, 2025, USAGM requested that OTF "submit a Financial Plan through the end of FY 2025."

12. Per USAGM's request, OTF prepared an updated financial plan for the FY2025 funds that were appropriated in the Full Year Continuing Resolution and provided it to USAGM on March 28, 2025. OTF's FY2025 financial plan included an anticipated schedule for the

drawdown of funds consistent with the solicitation and contracting timeline for different projects (e.g., Internet Freedom Fund and FOSS Sustainability Funds).

13. On April 1, 2025 OTF formally requested, by way of a standard draw down request, that USAGM immediately disburse the FY2025 funds included in the March 28 Financial Plan needed to fund OTF's programmatic activities during April and May 2025. Neither those funds nor any additional FY2025 funds have been disbursed to OTF by USAGM.

14. On April 15, 2025, despite having a fully executed grant for the FY2025 funds, USAGM sent to OTF a revised grant agreement with over one hundred modifications from the fully executed version, many of which were contrary to law or would otherwise impede or wholly prevent OTF from fulfilling its congressional mandate. After lengthy discussions and multiple attempts by OTF to work with USAGM to bring the proposed revised grant agreement into proper scope (both legally and practically), USAGM became non-responsive to any further negotiations. Accordingly, the proposed revised FY2025 Grant Agreement was never executed.

15. On June 20, 2025, this court entered an order compelling USAGM to disburse the FY2024 funds, which USAGM unlawfully withheld, in accordance with OTF's approved financial plan for that period. In accordance with that court order, USAGM paid OTF the FY2024 funds through September 2025. There are no remaining FY2024 funds outstanding.

16. OTF has yet to receive the majority of the congressionally appropriated funds from FY 2025, which are essential to OTF's congressionally mandated mission. USAGM is withholding $19,063,013 in programmatic funds plus an additional $6,065,632 in operating funds for a total of $25,128,645. USAGM's refusal to disburse programmatic funds, planned to be used in support of critical OTF programs—has already substantially disrupted OTF's ability

to carry out its congressionally mandated mission by preventing OTF from funding any new projects.

17. Notwithstanding its continued refusal to disburse appropriated FY2025 funds, USAGM continues to promote OTF's mission to support open technologies and communities that increase free expression, circumvent censorship, and obstruct repressive surveillance as a way to promote human rights and open societies. USAGM, Mission, https://www.usagm.gov/who-we-are/mission/ (last visited Oct. 7, 2025). USAGM recognizes that OTF has pioneered support for the research, development, and implementation of cutting-edge internet freedom technologies to respond to rapidly evolving censorship threats.

18. In authorizing OTF as an independent grantee of USAGM, Congress charged OTF with a broad mandate to achieve its mission. That mission includes identifying, funding, and supporting a worldwide network of innovators to "maintain the technological advantage of the United States Government over authoritarian governments, non-state actors, and others." *See* 22 U.S.C. § 6208a(3). OTF's operating model is intentionally designed to nimbly respond to the rapid pace of authoritarian technological innovation, in contrast to traditional government procurement processes, which were deemed insufficiently agile. However, OTF must have funding to honor its contractual obligations in order to operate as Congress intended: to quickly and flexibly identify and invest in novel internet freedom technologies, staying one step ahead of authoritarian censors. This is one of the central reasons why—for 13 fiscal years—USAGM has distributed programmatic funds to OTF on or around the obligation of funds for specific development projects.

19. Throughout OTF's existence, first as a part of Radio Free Asia ("RFA") and then as an independent organization, both Congress and USAGM have recognized the importance of

Fifth Cunningham Decl. – 4
*Open Technology Fund v. Kari Lake et al.*, No. 1:25-cv-840

the reliable availability of programmatic funds to support complex, demanding, and at-times dangerous projects aimed at advancing internet freedom. Indeed, USAGM today touts this in its description of OTF's work:

> OTF funds internet freedom technologies at every stage of the development cycle from proof-of-concept, to on-the-ground deployments, to multi-year efforts. This approach ensures that USAGM journalists and audiences have the tools they need right now to safely access the uncensored internet, while investing in innovative solutions to stay ahead of evolving censorship threats. In order to provide comprehensive support to internet freedom projects, OTF provides resources through a variety of implementation mechanisms.

USAGM, Open Technology Fund, https://www.usagm.gov/networks/otf/ (last visited Oct. 7, 2025).

20. OTF relies on appropriated funds to satisfy Congress's direction that OTF research, develop, implement, and maintain technologies to circumvent authoritarian government censorship and secure communication tools that enable users safely access information censored by authoritarian regimes. 22 U.S.C. § 6208a(b)(1). Since March 15, 2025, OTF has received over 1,030 applications to support the research, development, implementation, and maintenance of internet freedom technologies that fall within OTF's congressional mandate under 22 U.S.C. § 6208a(b)(1). OTF continues to review applications on an ongoing basis per our congressional mandate to "solicit project proposals through an open, transparent, and competitive application process," *id.* § 6208a(c)(5). Of the applications received, OTF is prepared to contract and obligate $15 million in programmatic funds to these projects immediately. OTF cannot obligate the funds until they are received from USAGM. Thus, because USAGM is withholding the funds, OTF cannot support these urgent projects which are critical to further OTF's congressionally mandated mission.

21. In a prior declaration, I provided a detailed description of the types of projects that OTF cannot fund because of USAGM's refusal to disburse appropriated FY2025 programmatic funds. *See* Fourth Cunningham Decl., ¶¶ 13-22, ECF 36-2. Those projects seek to: support the use of Virtual Private Networks to overcome authoritarian censorship in China, Iran, Cuba, and other countries; develop new censorship circumvention tools and techniques to counter rapidly evolving censorship practices; combat AI-enhanced censorship efforts; support the development and implementation of decentralized messaging platforms; and develop and scale network shutdown mitigation solutions to enable users to communication and access information during government-imposed internet blackouts.

22. USAGM's refusal to distribute FY2025 appropriated funds also restricts OTF's ability to maintain its Rapid Response Fund—the only U.S. government-funded mechanism to provide rapid assistance to individuals and organizations facing authoritarian state-based digital attacks and emergencies. Since March 15, 2025, OTF has received over 90 applications for emergency assistance. OTF is currently unable to support these emergency requests while its FY2025 funds are withheld. There are likely dire, real-world consequences playing out right now due to the lack of available funding for this critical part of OTF's mission.

23. Congress also charged OTF with working to advance internet freedom by supporting private and public sector research assessing emerging technological threats to "maintain the technological advantage of the United States Government over authoritarian governments." 22 U.S.C. § 6208a(b)(2)–(3). As I detailed in a prior declaration, OTF currently has over 300 research applications pending; once the FY2025 programmatic funds are made available, it plans to contract and fund 15 research fellowships out of these pending applications.

Cutting-edge research is a critical part of countering censorship efforts across the globe. These research projects presently cannot move forward.

24. After withholding OTF's congressionally appropriated FY2025 funds for over five months, on August 27, 2025, USAGM again requested that OTF prepare an updated FY2025 financial plan. At that time, USAGM directed OTF to reduce the total amount of its financial plan for the fiscal year by 5%, stating that "USAGM is exercising the authority in the FY 2024 [A]ppropriations [A]ct, as carried forward by the FY 2025 continuing resolution, to reprogram up to 5% of each grantee's funding for other Agency requirements." At OTF, we viewed USAGM's reengagement on the FY2025 financial plan with cautious optimism, and a potential sign that the agency was prepared to move forward with good-faith efforts to disburse the remaining appropriated FY2025 funds (including programmatic funds).

25. In compliance with USAGM's directive, on August 28, 2025, OTF returned a reduced financial plan to USAGM reflecting the 5% reduction in its budget. In that same correspondence, OTF submitted its corresponding funding request for September 2025 programmatic funds, which reflected the total amount of contracts OTF planned to obligate that month, and all the months prior that USAGM had been unlawfully withholding OTF's FY2025 funds.

26. On September 8, 2025, USAGM requested additional clarifications regarding the financial plan–specifically how it reconciled with a draft still under agency review of the FY2025 Internet Freedom Spend Plan, which USAGM was required to submit to Congress in mid-June (90 days after the enactment of the continuing resolution).

27. On September 9, 2025, OTF submitted an updated financial plan (Exhibit F) in response to USAGM clarifying questions and an updated funding request for September 2025 programmatic funds consistent with the financial plan.

28. On September 16, 2025, USAGM confirmed receipt of the updated financial plan and funding request.

29. OTF's hope that USAGM was engaged in good-faith efforts to disburse appropriated FY2025 funds was extinguished on September 23, 2025, when USAGM emailed ("September 23 Email") OTF that it "cannot disburse the full amount of this approved funding." Without formal notice or any engagement about the potential effect, USAGM announced, in an about-face from years of prior practice, that it was, effective immediately, adopting a new interpretation and application of 2 C.F.R. § 200.305(b)(1), and implementing a dramatically different approach to programmatic fund disbursement. USAGM directed OTF to "revise your Financial Plan to show the scheduled payments (actual cash outflows) that you will be making by month/year" and indicated that it would not approve the full amount of the appropriated programmatic funds.

30. Prior to its incorporation as an independent entity in 2019, OTF operated as a program within RFA from 2012 to 2019. During that time, USAGM disbursed funds to RFA for the OTF program prior to or at the time that contracts were obligated for the full amount of those contracts.

31. When OTF was incorporated as an independent entity in 2019, USAGM continued this process of disbursing funding to OTF at the time that OTF obligated funding to downstream partners for the full amount of the obligated contracts. This process is reflected in OTF's FY2021, FY2022, FY2023, FY2024, and FY2025 approved financial plans. All of which

reflect USAGM's practice of disbursing funding to OTF at the time that OTF obligated funding to downstream partners for the full amount of the obligated contracts.

33. As authorized in the approved financial plans for FY2021, FY2022, FY2023, FY2024, and FY2025, USAGM consistently provided funding to OTF at the time that OTF obligated funding to downstream partners for the full amount of the obligated contracts. OTF's FY2020, FY2021, FY2022, FY2023, and FY2024 audits also reflect this policy stating, "USAGM's policy for its grantees aligns with Federal budgetary and obligation accounting, and grantees are required to draw down funds with the timing of obligation requirements, rather than with the timing of cash outlays."

33. In fact, OTF's fully executed grant agreements for FY2023, FY2024, and FY2025 enshrine this process stating, "The NFE [(Non-Federal Entity, i.e., OTF)] should not enter into an obligation without receiving the funding first from USAGM."

34. In response to USAGM's September 23 Email, OTF replied to USAGM on September 25, 2025, acknowledging that USAGM cited the language from 2 C.F.R. § 200.305(b)(1) in its email asking to change the timing of disbursement of OTF's funds.

35. Specifically, in that response, OTF acknowledged that the regulation provides: "[t]he timing and amount of advance payments must be as close as is administratively feasible to the actual disbursements . . . ." However, OTF also noted in its correspondence that:

> over the entirety of the relationship between USAGM and OTF, USAGM has, without deviation, interpreted this provision to mean that USAGM provides disbursements to OTF at the time of obligation for the full amount of those contracts. Moreover, all FY2025 funds disbursed to OTF to date ($16.1 million), as well as all prior disbursements over the last six years, have followed that same course of business. Distribution of appropriated funds to OTF as those funds are obligated has been USAGM and OTF's mutual understanding and interpretation of 2 C.F.R. § 200.305(b)(1). based on the complexity of OTF's work and is reflected in our grant agreements and approved financial plans, as well as implemented consistently in practice to date.

Fifth Cunningham Decl. – 9
*Open Technology Fund v. Kari Lake et al.*, No. 1:25-cv-840

36. In that same correspondence, OTF further reminded USAGM:

[t]his shared understanding and practice is intentional. As USAGM is aware and has previously acknowledged, OTF's Congressional mandate to support cutting edge technologies to counter rapidly evolving authoritarian technological advancements requires OTF to issue contracts and provide funding in real time. As a result, OTF cannot predict "actual cash outflows" for any given month because this depends entirely on the speed of technical developments and demand for the circumvention tools OTF supports. In acknowledgement of OTF's unique operating model and to ensure the continuity of OTF's services, USAGM has always provided funding to OTF in line with the obligation of our contracts for the full amount of those contracts. USAGM and OTF have agreed in practice over the entirety of our partnership that this disbursement methodology is, in fact, the "minimum amount needed . . . in accordance with the actual, immediate cash requirements [of OTF] . . ." to ensure OTF can meet its Congressional mandate and does not default on its financial and legal obligations.

37. OTF concluded its correspondence by providing:

Further, OTF has demonstrated, without fail, that it has the proper operational and internal controls to manage its disbursements in this way to be regulatorily compliant, which has been consistently confirmed through clean financial audits. Thus, as both USAGM and OTF have consistently understood, "administratively feasible" in the context of OTF's work translates to receiving funding at the point of obligation and disbursing those funds to Service Providers as work is completed. Critically, the FY2025 fiscal year for which these funds and the current grant agreement derives ends in five days. USAGM's reversal of its own interpretation and application of 2 CFR 200.305(b)(1) in this regard and at this critical juncture is untenable. Thus, while OTF is open to discussion around the application of 2 CFR 200.305(b)(1) in the future, we respectfully request that USAGM disburse the FY2025 funds appropriated for OTF in accordance with our grant agreement, our submitted financial plan, and USAGM's consistent regulatory interpretation and practice over the last many years.

38. On September 26, 2025, USAGM responded to OTF with a four-sentence reply stating that OTF must accept the new application of 2 C.F.R. § 200.305(b)(1) and submit a new financial plan reflecting that application to receive its FY2025 funds. USAGM further stated, "[t]his is not a new issue or request as the Agency made a similar request last year."

39. USAGM and OTF have previously discussed the timeliness of funding disbursements, particularly with respect to USAGM's pattern of irregular disbursement of OTF's appropriated funds. As stated by OTF in its correspondences to USAGM, USAGM has not

implemented any new policy on this issue. OTF's grant agreements, financial plans, and USAGM practice have remained consistent.

40. On October 1, 2025, OTF received the following communication from USAGM, essentially terminating any potential foreseeable discussions with anyone at the agency regarding the unlawful withholding of funds or disbursement thereof:

> We apologize for not resolving the next round of funding for OTF before the fiscal year closed. Due to a funding lapse across the U.S. government, the grants team is on a mandatory furlough. Once the furloughs are lifted and we return to work, we will regroup and continue our efforts.

OTF views this communication as nothing more than an empty promise to "continue [] efforts," as this issue is not regarding OTF's "next round of funding," but rather that USAGM has been unlawfully withholding FY2025 funds since March and refusing to disburse these in accordance with OTF's fully executed grant agreement and financial plan. While OTF understands that USAGM successfully ran out the clock on OTF's attempts to receive its overdue no-year funds before the highly anticipated federal government shutdown, it does not take USAGM's final sentence in the above communication as anything more than a vaporous olive branch in a long line of stall tactics the agency has deployed against OTF since March.

41. As stated above, as a result of OTF not receiving any FY2025 programmatic funds since February 2025, the organization has been severely restricted in its ability to issue new contracts since March 2025. USAGM's refusal to disburse appropriated FY2025 programmatic funds has upended OTF's careful planning of the funding of mission-critical projects. Currently, OTF has 61 new contracts it is ready to issue and fund to meet its congressional mandate but is unable to do so due to USAGM's actions.

42. The uncertainty caused by USAGM's refusal to disburse appropriated FY2025 funds (operational and programmatic) has prevented OTF from entering into new contracts,

Fifth Cunningham Decl. – 11
*Open Technology Fund v. Kari Lake et al.*, No. 1:25-cv-840

including contracts for statutorily mandated work that keep millions of users of OTF's partner technologies safe from authoritarian regime reprisal.

43. OTF has made its best efforts to engage USAGM to disburse OTF's FY2025 programmatic funds in accordance with the law, longstanding course of business between OTF and USAGM, and necessity due to OTF's unique work and mission, without requesting intervention by the courts. However, those efforts have proven futile at best, and seemingly without good-faith intention by USAGM at worst. OTF is desperate to resume normal business operations in accordance with its congressional mandate; but to fund new contracts, it must have its FY2025 funds disbursed in a manner that makes that possible.

44. In addition to OTF's functional necessity to have funds on-hand at the time of contractual obligation with its partners due to its unique mission and necessary exigent agility, USAGM's decisions to unlawfully withhold congressionally appropriated funds, without explanation, from OTF further illustrates the infeasibility for OTF to obligate funds before they are disbursed by USAGM. It is not feasible or prudent for OTF to enter into contracts with its partners and then face the prospect of being in breach of those contracts 30 days later if USAGM delays or withholds payment. The current situation, in which USAGM has not distributed the majority of FY2025 programmatic funds to OTF, is demonstrating in real-time the harms associated with a sudden departure in the agreed-upon method for disbursing programmatic funds.

45. The harms described in the preceding paragraphs are tangible and direct harms. USAGM's refusal to make OTF's FY2025 programmatic funding available has made it impossible for OTF to fund the projects described above and in prior declarations. Failure to fund these projects impairs OTF's ability to do what Congress has directed OTF to do. Further, it

puts millions of people around the world at risk, and it allows more aggressive authoritarian regimes to pull ahead of the United States in the most critical of technological races.

46. USAGM's actions are causing structural harm to the effectuation of a U.S. foreign policy that prioritizes American security at home and strength abroad. The Chinese Communist Party, for instance, has invested billions of dollars to design—and constantly iterate upon—the world's most sophisticated population-scale information control regime. The Kremlin has announced that it plans to follow suit and spend an additional $640 million to upgrade its censorship capabilities. Spending a mere fraction of these costs, OTF allows the United States to remain competitive in leveling the information playing field—benefitting the U.S. private technology sector, making meaningful other U.S. government investments in independent media and civil society organizations, and enabling a robust public diplomacy presence. Without FY2025 funds, OTF, and by extension the U.S. government, is ceding the internet freedom arms race to authoritarians. This is exactly the outcome Congress wished to avoid when appropriating this funding "to maintain the technological advantage of the United States Government over authoritarian governments." 22 U.S.C. § 6208a(b)(3).

47. I submit this Declaration in Support of the Motion for Further Preliminary Injunctive Relief filed by counsel. I am of the age of majority and I am competent to make this Declaration. I either have personal knowledge of the facts set forth in this declaration or I know them from OTF business records and my knowledge of the organization's history and operations. If called to testify, I would and could do so competently.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of October 2025.


<u>/s/ *Laura Cunningham*</u>
Laura Cunningham