**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

OPEN TECHNOLOGY FUND,

               Plaintiff,

    v.

KARI LAKE, in her official capacity, *et al*.,

               Defendants.

No. 25-cv-00840-RCL

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S SECOND MOTION
FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................- 1 -

BACKGROUND ................................................................................................................- 3 -

   A.   USAGM's Reforms to Cash Disbursement Policy and Procedures ..............................- 3 -

   B.   FY24 "Glide Path" Implementation.............................................................................- 5 -

   C.   FY25 Implementation and Recent Developments ........................................................- 6 -

LEGAL STANDARD..........................................................................................................- 7 -

ARGUMENT .....................................................................................................................- 8 -

   I.   Plaintiff is unlikely to succeed on the merits of its claims. ...........................................- 8 -

      a.   Plaintiff's request for relief does not arise from the factual circumstances and claims described in its complaint, therefore it is procedurally barred. ..........................................- 8 -

      b.   Jurisdiction over the issues raised in Plaintiff's motion is reserved for the Court of Federal Claims under the Tucker Act.................................................................................- 11 -

      c.   Disbursing funds to OTF at the time its payments are due rather than at the time it enters into contractual obligations is reasonable and consistent with, and indeed required by, governing authorities. .......................................................................................................- 12 -

      d.   *Ultra vires* review and mandamus relief are unavailable. ........................................- 20 -

   II.   Plaintiff will not suffer irreparable harm. ..................................................................- 21 -

      a.   OTF has access to FY25 funds. ................................................................................- 21 -

      b.   Monetary harm is not irreparable..............................................................................- 22 -

   III.   The balance of equities weighs against a preliminary injunction. ...............................- 23 -

   IV.   Should the Court enter another injunction, an additional bond is appropriate. ............- 24 -

CONCLUSION..................................................................................................................- 25 -

## INTRODUCTION

This is not a case about whether the Open Technology Fund ("OTF") is entitled to its remaining Fiscal Year 2025 appropriated funds[1] for use pursuant to an applicable grant agreement with the United States Agency for Global Media ("USAGM"). It is undisputed that OTF is at present so entitled—as the agency made clear to OTF in writing before the lapse in appropriations began and as it reaffirms today. Rather, the dispute here is fundamentally different than any previous disagreement between the parties and only concerns the timing of the disbursements of those dollars. USAGM's position—confirmed by the language of the grant agreement and the government-wide regulation it incorporates—is that funds can be disbursed to OTF only when OTF itself actually needs to disburse those funds. In other words, taxpayer dollars should not be given to OTF just to sit in OTF's bank account indefinitely. OTF disagrees, relying on a misreading of a contractual term and a previous course of conduct that USAGM explicitly began changing in 2024. Because OTF is not entitled to a lump-sum disbursement of FY25 funds without regard to when those funds will be needed, this Court should deny its procedurally flawed motion for a preliminary injunction.

USAGM has been in the process of modifying its cash disbursement operating procedures for more than a year to further the agency's goal of serving as a faithful steward of taxpayer dollars. This work, which has spanned two presidential administrations, was discussed with grantees like OTF as early as April 2024. Governing regulations require USAGM to "minimize the time elapsing between the transfer of funds and disbursement by the recipient." 2 C.F.R. § 200.305(b)(1). Those regulations are incorporated into the grant agreement, which itself imposes

---

[1] These are "no-year" appropriations, meaning that they did not need to be spent by the end of FY25. There is a 5 percent reprogramming authority provided for in the appropriation, which USAGM retains the option to use.

similar requirements explicitly. Thus, while USAGM historically transferred funds to recipients like OTF at the time of obligation to a contractor or subrecipient, last year (several years after a Government Accountability Office ("GAO") report had criticized that approach), the agency informed OTF that it planned to transition to making transfers at the time costs are actually incurred, as required by the applicable contractual requirements and regulations. Recognizing that this was a departure from past practice, the agency used Fiscal Year 2024 ("FY24") as a "glide path," in which there would be flexibility as to the timing of disbursements for that year. Now that the FY24 appropriations have been disbursed and requests are being made for Fiscal Year 2025 ("FY25") funds, USAGM is abiding by its contractually required operating procedures with fewer departures. Despite OTF's current refusal to update its spending plan to accurately reflect near-term expenditures, as required by the contract, USAGM today offered to immediately disburse $1,438,435 to cover near-term expenditures as soon as OTF accepts. *See* Smith Decl. ¶12. Thus, it is clear that USAGM has not refused to disburse funds, as Plaintiff alleges, and indeed, it is ready and willing to make payments in accordance with best financial management practices.

The new operating procedures from which Plaintiff seeks relief concern agency actions distinct from those challenged in Plaintiff's complaint, *see* Pl.'s Compl., ECF No. 1 ¶56-57 (challenging the termination of funds), and accordingly it is procedurally improper for Plaintiff to bring the current motion without at least amending its complaint first. Additionally, while this Court has rejected Defendants' arguments that the challenge to the terminations is jurisdictionally barred by the Tucker Act, Plaintiff's apparently new challenge to the timing of disbursement is even more fundamentally grounded in the terms of the parties' contractual agreement and thus belongs in the Court of Federal Claims.

Notwithstanding the procedural and jurisdictional infirmities of Plaintiff's motion, it also

fails on the legal merits. The new cash disbursement operating procedures were thoughtfully planned across two presidential administrations and executed consistent with the parties' agreement, federal regulations, the Administrative Procedure Act ("APA"), and the Constitution. The agreement states clearly and concisely that "[t]he Approved Financial Plan serves as the funding drawdown schedule; it should be the Non-Federal Entity's estimate of monthly costs." Defs.' Ex. 1 at 10. Matching drawdown amounts to align with near-term cost projections as the contract envisions advances the directive under 2 C.F.R. § 200.305(b)(1), which is incorporated into the governing grant agreement, to "minimize the time elapsing between the transfer of funds and disbursement by the recipient." This is a rational exercise of the agency's discretion on how to prudently manage funds appropriated by Congress, therefore it is clearly in accordance with the APA and Constitution.

## **BACKGROUND**

### A. **USAGM's Reforms to Cash Disbursement Policy and Procedures**

In 2021, the GAO issued a report that critiqued USAGM's compliance with federal grant regulations under 2 C.F.R. Part 200. *See* Smith Decl. ¶7; Defs.' Ex. 7 (hereinafter "GAO Report") (finding USAGM "ha[s] not corrected a longstanding significant deficiency in grants monitoring reported by independent audits of USAGM's financial statements for the past 5 years."). Subsequently, USAGM began exploring changes to its cash disbursement operating procedures that would better align with the federal regulations governing grantmaking. In the several years since the GAO Report, USAGM "has undertaken a sustained effort to improve fiscal controls and ensure that its grant-disbursement practices conform to 2 C.F.R. Part 200 . . . [a]s [has been] documented in internal agency work products and external trainings and by external oversight bodies[.]" *Id*.; *see also* Defs.' Exs. 4-6.

Beginning in December 2023, USAGM started developing comprehensive reforms to the

agency's grant cash management policies and procedures as part of its broader response to the GAO report. *Id*. at ¶6. In May 2024, the agency circulated an internal white paper that set forth a new plan for "Recipient Cash Management" reforms, which emphasized that advance payments to grantees must be limited to the minimum amounts needed and timed as closely as administratively feasible to actual disbursements by grantees. *Id*. This aligns with 2 C.F.R. § 200.305(b)(1), which states that "payment methods must minimize the time elapsing between the transfer of funds from the Federal agency or the pass-through entity and the disbursement of funds by the recipient." Implementing this reform meant that funding recipients like OTF would no longer receive disbursements of federal appropriations at the time they enter into agreements with contractors or subrecipients, *i.e.*, the point of the grantee's obligation. Instead, funds would be disbursed at the time payment was due to OTF's contractor or subrecipient.

Recognizing that such a change would be potentially disruptive to USAGM's partners like OTF, the agency decided to use FY24 as what it deemed a "glide path" in which the agency would roll out the changes progressively, have open dialogue with recipients, and offer flexibility in disbursement timing so that recipients would have ample time to adjust to the new cash disbursement processes. Accordingly, the agency first announced the intended changes at the April 2024 Annual USAGM Grants Technical Assistance Conference, in which the agency gave a Cash Management Policy presentation informing awardees of the new processes. *See* Defs.' Ex. 4 at 6 ("Advance payments to a non-Federal entity must be limited to the minimum amounts needed and be timed to be in accordance with the actual, *immediate cash requirements* . . .. The timing and amount of advance payment must be *as close as is administratively feasible* to the actual disbursement by the non-Federal entity" (emphasis in original)). During FY24, USAGM applied the new cash disbursement principles while offering flexibility at the same time, as described

further below.

**B. FY24 "Glide Path" Implementation**

Under the parties' contractual grant agreement, OTF is required to provide USAGM with "a proposed detailed financial plan consistent with the approved program plan and Internet Freedom Spend Plan and covering the full amount of the Grant" for its approval. Defs.' Ex. 1 at 10. This financial plan is required to include "anticipated monthly expenditures for each budget line item." *Id*. Once approved, "[t]he Approved Financial Plan *serves as the funding drawdown schedule*; it should be the Non-Federal Entity's estimate of monthly costs." *Id*. (emphasis added). The agreement also incorporates other federal government wide grant regulations into its terms, including 2 C.F.R. § 200.305(b)(1). *Id.* at 18 ("The Parties acknowledge and agree that the Parties are subject to all Federal laws and regulations pertaining to federal grants, including . . . 2 CFR Part § 200.").

In August 2024, OTF requested a drawdown of $13.2 million, however, USAGM determined that this amount did not align with the approved financial plan's projection of near-term disbursements. *See* Defs.' Ex. 3. Accordingly, the agency asked OTF to revise its request and financial plan to align with the actual, near-term cash requirements. USAGM's then-Acting CFO said in an email to OTF's COO, "we do not believe it prudent to disburse the full $13.3 million to OTF for contract services that are not needed for OTF to disburse or are even obligated." *Id*. She explained further, "USAGM OCFO wants to work on a 'glide path' that gives OTF as much flexibility as we can reasonably provide under the OMB regulations as we work to transition to a new cash disbursement process." *Id*.

In response, later that same day, August 23, 2024, OTF submitted a revised financial plan and an updated August funding request reducing its immediate drawdown request from $13.2

million to approximately $7.5 million and spreading the remainder of projected costs across the ensuing five months. *See id*. OTF explained that the revised plan "reflects OTF's monthly funding requirements … to cover contracts through the end of the year," attaching both the new financial plan and an adjusted August funding request. *See id*. Thus, the first introduction of the new cash disbursement processes apparently occurred without incident, and OTF demonstrated its awareness of their implementation and capability of adjusting its operations.

### C.  FY25 Implementation and Recent Developments

The parties agree that there remain $25,128,645 of FY25 appropriations to which OTF is presently entitled. They have been unable to reach an agreement, however, on the schedule by which OTF will draw down funds under the grant. OTF wishes to receive one balloon payment of $19,063,013, whereas USAGM believes that it is prudent, and indeed required under 2 C.F.R. Part 200 and the applicable provisions of the grant agreement, that the agency disburse funding only as it becomes due to third-party contractors and subrecipients (*i.e.*, when OTF itself must disburse the appropriated and obligated funds). Furthermore, OTF has refused to send an updated financial plan that includes projected monthly costs to USAGM for its approval, which OTF could then use to disburse the correct amount of near-term funding needs consistent with OTF's actual forecast cash requirements. *See* Defs.' Ex. 2. USAGM is eager to get the funding out the door to OTF, however, it can only do so consistent with the cash management procedures envisioned by federal regulations and the text of the grant agreement. Because OTF refuses to provide an updated spending plan, USAGM has been unable to precisely calculate OTF's necessary programmatic costs. However, today, October 21, 2025, USAGM offered two months of projected operational costs, equal to $1,438,435, which it is ready to disburse as soon as OTF accepts. *See* Smith Decl. ¶12.

**LEGAL STANDARD**

A preliminary injunction is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, 769 F. Supp.3d 1, 4 (D.D.C. Feb. 18, 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Although the party attempting to establish these four factors may rely on "evidence that is less complete than in a trial on the merits," *NRDC v. Pena*, 147 F.3d 1012, 1023 (D.C. Cir. 1998), it nevertheless "bear[s] the burden of produc[ing] . . . credible" evidence sufficient to demonstrate his entitlement to injunctive relief, *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 173 (D.D.C. 2015) (quotation omitted) (first alteration in original).

"Although the Court of Appeals has not yet expressly held that a plaintiff must make a clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach." *Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal

quotation and citation omitted). Indeed, relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

Moreover, the particular form of injunction Plaintiff seeks here—an affirmative injunction ordering Defendants to change the status quo, immediately pay Plaintiff a lump sum of nearly $20 million, under the Court's supervision—comprises a highly disfavored form of relief. Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

## ARGUMENT

### I.    Plaintiff is unlikely to succeed on the merits of its claims.

#### a.    Plaintiff's request for relief does not arise from the factual circumstances and claims described in its complaint, therefore it is procedurally barred.

Plaintiff seeks preliminary injunctive relief from conduct not described in its complaint and seeks to raise new claims that have not been previously pled. Doing so deprives Defendants of the fair notice that the Federal Rules of Civil Procedure envision.

"[A] proper motion for a preliminary injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to the completion of the litigation, and without such a connection between the claim and requested injunction, there is simply no jurisdictional basis for the Court to grant preliminary relief." *Bird v. Barr*, No. 19-CV-1581, 2020 WL 4219784 at *2 (D.D.C. July 23, 2020) (Brown Jackson, J.) (emphasis in original); *see also L.A. All. for Human Rights v. Cty. of L.A.,* 14 F.4th 947, 957 (9th Cir. 2021) ("[a court] does not have the authority to issue an injunction based on claims not pled in the complaint." (cleaned up)); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."); *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) ("[The plaintiff] had no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his [operative] complaint."); *Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002) ("Even when a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion.").

As then-Judge Ketanji Brown Jackson wrote, "it is important to understand what a preliminary injunction is not: it is not a generic means by which a plaintiff can obtain auxiliary forms of relief that may be helpful to them while they litigate unrelated claims." *Bird*, 2020 WL 4219784 at *2. Accordingly, "a plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint." *Aminjavaheri v. Biden*, No. 1:21-cv-2246-RCL, 2021 WL 4399690 at *5 (D.D.C. Sep. 27, 2021) (Lamberth, J.). Plaintiff's present motion fails to do so; it asserts new factual allegations, raises new causes of action, and seeks different relief than that requested in the complaint.

First, the factual allegations contained in the complaint do not align with those discussed in Plaintiff's motion. The entire background section of Plaintiff's motion contains factual allegations that postdate the complaint's filing, but Plaintiff has never sought to amend its complaint. *See* Pl.'s Second PI Mot. at 2-6. The original complaint concerns a dispute over the termination of agreements, not the present dispute over the timing of payments and the agency's interpretation of 2 C.F.R. § 200.305(b)(1). *See* Pl.'s Compl. ¶56-57. Furthermore, the complaint's focus is upon FY24 funding, namely the "February 26, 2025 drawdown request to USAGM for operating funds in the amount of $655,508," *id*. at 22, however, Plaintiff's new motion concerns FY25 funding, and "$788,875 in October 2025 operating funds" as well as "$19,063,013 in programmatic funds." Pl.'s Second PI Mot. at 2. And Plaintiff has already made its view clear that "the FY2025 Grant Agreement" at issue in the present motion "is entirely unrelated to OTF's FY2024 grant funds" that were at issue in their first motion for relief (and operative complaint). Pl.'s First PI Mot., ECF No. 22-1 at 24. "There is no rational connection between the two[.]" *Id.*

Second, Plaintiff attempts to bring new claims against different actions by USAGM than those challenged in the complaint. Plaintiff's present motion argues that USAGM's "reversing [of] their longstanding interpretation and application of 2 C.F.R. § 200.305(b)(1) to disbursement of OTF's programmatic funds . . . is patently arbitrary and capricious." Second PI Mot. at 15. Discussion of 2 C.F.R. 200.305(b)(1) appears nowhere in the original complaint, however, let alone under the APA cause of action. Furthermore, Plaintiff argues that its new allegations against Defendants constitute violations of the Impoundment Control Act and Anti-Deficiency Act, *see* Second PI Mot. at 14. Once again, however, neither statute is mentioned anywhere in Plaintiff's complaint, neither as freestanding claims nor in the APA claims for relief previously pled.

Third, the relief now requested was not ever requested in the original complaint. Nor could it have been, of course, since the activity Plaintiff now seeks to enjoin was never discussed. All this demonstrates an attempt on Plaintiff's part to "obtain auxiliary forms of relief that may be helpful to them while they litigate unrelated claims." *Bird*, 2020 WL 4219784 at *2. This litigation, as spelled out in the complaint, concerns the terminations that took place in March. It does not concern the cash disbursement operating procedures that USAGM has worked to implement for over a year. While both "relate" in the loosest sense to federal funding, they are two distinct sets of circumstances, and Plaintiff's complaint against one cannot be leveraged as a vehicle for relief against the other.

For these reasons, the Court should deny Plaintiff's motion as procedurally barred for lack of jurisdiction.

### b. Jurisdiction over the issues raised in Plaintiff's motion is reserved for the Court of Federal Claims under the Tucker Act.

Even assuming the Tucker Act does not preclude the Court from exercising jurisdiction over this matter generally,[2] it does preclude reaching the specific issues raised in Plaintiff's current motion, as they are firmly grounded in the terms of the parties' contract. Under the now familiar test from *Megapulse, Inc. v. Lewis*, whether the Tucker Act precludes a district court's jurisdiction "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought[.]" 672 F.2d 959, 968 (D.C. Cir. 1982)

Unlike Plaintiff's first request for preliminary relief, the question presented in Plaintiff's second request is not about whether OTF has "a claim of entitlement to congressional appropriations" as a general matter. *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 30 (D.D.C. 2025).

---

[2] Defendants preserve the right to appeal this issue.

Instead, the question is about timing of payment, which is governed only by the grant agreement and the regulations it incorporates. The appropriation "confers no such right" to the immediate payment Plaintiff seeks "in the absence of the contract itself." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Plaintiff cannot escape this basic fact; it claims Defendants are "contravening the express language of Grant Agreement FAIN OT01-25-GO-00001 (the "FY2025 Grant Agreement")[.]" Pl.'s Second PI Mot. at 3. Therefore, even under Plaintiff's framing, it is clear that "the source of the rights upon which the plaintiff bases its claims" is contractual. *Megapulse*, 672 F.2d at 968.

Furthermore, "the type of relief sought," *id.*, is an order directing specific performance of Defendants' contract obligations under Plaintiff's erroneous interpretation of the agreement to make a monetary payment on the schedule it prefers. In Plaintiff's words, "OTF requests that the Court enter an order requiring USAGM to disburse to OTF congressionally appropriated funds *on the schedule set forth in OTF's revised FY2025 financial plan* for October 2025." Pl.'s Second PI Mot. at 2 (emphasis added). The financial plan is a product of the parties' agreement as specified in the grant contract itself; it is not mentioned anywhere in the appropriation act. *See* Defs.' Ex. 1 at 10 (OTF "shall submit to USAGM a proposed detailed financial plan"); The Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, P.L. 118-47) (FY24 SFOAA), as carried forward by the Full-Year Continuing Appropriations Act, 2025 (Div. A, P.L. 119-4) (FY25 Full-Year CR).

It is plain then that Plaintiff does not "seek[] only what it is entitled to under statute," Pl.'s Second PI Mot. at 7—it seeks something more.

> **c.  Disbursing funds to OTF at the time its payments are due rather than at the time it enters into contractual obligations is reasonable and consistent with, and indeed required by, governing authorities.**

### i.  Administrative Procedure Act

USAGM's position that it disburses funds to OTF when OTF actually needs those funds is consistent with—and indeed, required—by the applicable contractual provisions, including those regulations incorporated by reference.[3] Accordingly, it easily passes review under the APA's "arbitrary and capricious" standard, 5 U.S.C. 706(2)(A), the scope of which is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency examined the relevant factors and authorities and articulated a satisfactory explanation for its actions including "a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

The parties' agreement concisely states that "[t]he Approved Financial Plan serves as the funding drawdown schedule; it should be the Non-Federal Entity's estimate of monthly costs." Defs.' Ex. 1 at 10. Thus, the contract plainly envisions that USAGM's decision about how much to distribute and when will be informed by the financial plan and its estimate of near-term expenditures. Not only is disbursing funds at the time OTF's payments are due, rather than at the time it makes obligations, permitted under the contract, however; it is also clearly and rationally connected with the governing requirement under 2 C.F.R. § 200.305(b)(1) that the agency "minimize the time elapsing between the transfer of funds and disbursement by the recipient." And this requirement is explicitly incorporated into the contract: "The Parties acknowledge and agree

---

[3] Defendants dispute that a mere change in agency payment operations constitutes reviewable agency action under the APA at all, as it is not clearly the "consummation of the agency's decisionmaking process" or a decision by which "'rights or obligations have been determined,'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).

that the Parties are subject to all Federal laws and regulations pertaining to federal grants, including

. . . 2 CFR Part § 200." Defs.' Ex. 1 at 18.

 Plaintiff wisely makes no attempt to dispute the plain meaning of these straightforward

contractual and regulatory requirements. Instead, it primarily argues that the steps the agency has

taken to abide by these requirements in practice are arbitrary and capricious because they are

different than how the parties have operated under the contract in the past. *See* Pl.'s Second PI

Mot. at 15-17. But "[a]gencies are free to change their existing policies as long as they provide a

reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221

(2016). All this requires is that the agency "'display awareness that it is changing position' and

'show that there are good reasons for the new policy.'" *Id*. (quoting *FCC v. Fox Television

Stations, Inc.*, 556 U.S. 502, 515 (2009)). The agency did so here, and it even considered OTF's

reliance interests by using FY24 as a glide path rather than "abruptly chang[ing] course," as

Plaintiff now accuses the agency. Pl.'s Second PI Mot. at 3.

 Plaintiff relies heavily upon the fact that "[f]or 13 years, OTF and USAGM agreed that it

was consistent with 2 C.F.R. § 200.305(b)(1)" to disburse funds at the time of obligation. What

this fails to acknowledge, however, is that according to an independent GAO audit, for 13 years

the parties were wrong. Indeed, GAO specifically critiqued USAGM for failing to implement grant

controls that would allow it to "[m]onitor and oversee the grantee's drawdowns and execution of

grant funds during the grant's period of performance to ensure the grantee is using grant funds at

appropriate times" and "[m]onitor [the] grantee's use of financial plans and funding requests

through the monthly reconciliation process." GAO Report at 42. It was reasonable for USAGM to

change its cash disbursement policies and procedures in response to this audit, and the APA does

not forever chain the agency to its previous understandings when it has been shown evidence it was incorrect.

Plaintiff's other attempts to paint the new procedures as arbitrary and capricious are also unpersuasive. The new procedures do not force OTF into breaching the contract, nor do they conflict with the agency's authority under the appropriations act and the objectives of the program.

Plaintiff's theory that the new processes force it to breach its contract rests upon a flawed interpretation that takes a single sentence out of its context. As discussed above, the agreement concisely states that "[t]he Approved Financial Plan serves as the funding drawdown schedule; it should be the Non-Federal Entity's estimate of monthly costs." This language appears exactly where one would expect: in the section concerning the "Approved Financial Plan." This requirement means what it says—monthly payments to OTF should accord with OTF's estimated monthly costs. Attempting to create a contradiction where none exists, Plaintiff jumps ahead to the "Grant Closeout" section, which states:

> Closeout is the process, as governed by 2 CFR 200.344, in which USAGM determines that a grant has been fully performed, the established POP [period of performance] has ended, and all administrative actions pertaining to the grant have been completed. … Any grant funds not obligated and disbursed by USAGM to the NFE [non-federal entity] at the time the POP expires revert to USAGM. The NFE should not enter into an obligation without receiving the funding first from USAGM.

Defs.' Ex. 1 at 18. Relying on the last quoted sentence, Plaintiff states that under new disbursement process, "OTF would almost immediately be in breach of its grant agreement." Pl.'s Second PI Mot. at 16. But this contract language is confined to the *grant closeout period*, which is initiated 30 days prior to the end of the period of performance, not the entire period of performance as Plaintiff's argument suggests (and nowhere does Plaintiff purport to challenge the closeout procedures). It makes eminent sense that the agency would not want OTF to enter into new, unfunded obligations when there is only 30 days remaining on the period of performance. Thus,

the new cash disbursement processes are consistent with the grant agreement and would not force OTF to breach the contract. Indeed, the fact that the agreement specified that in *closeout* periods OTF could not enter into obligations without receiving funding from USAGM, but not for other periods, indicates that there is no such requirement.

The current cash disbursement procedures are also consistent with the governing congressional appropriation. *See* The Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, P.L. 118-47) (FY24 SFOAA), as carried forward by the Full-Year Continuing Appropriations Act, 2025 (Div. A, P.L. 119-4) (FY25 Full-Year CR).

Plaintiff construes the requirement that funds "shall be made available" overbroadly to suggest that *all* funds must be available to the recipient *immediately*. But that is never how federal appropriations laws have worked; "[o]nce Congress authorizes funding through an appropriations bill, and the President signs the bill into law, constitutional responsibility shifts to the Executive Branch to allocate the funds according to congressional instructions. The decisions about how [and when] to allocate funds are called 'apportionments,' and they are used to ensure that the Executive Branch does not spend more or less than Congress appropriated." *Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget*, No. CV 25-1051 (EGS), 2025 WL 2025114, at *1 (D.D.C. July 21, 2025). While apportionment authority rests with the Office of Management and Budget, not USAGM, the existence of the apportionment process demonstrates that the premise of Plaintiff's argument, that Congress's directive that funds "shall be made available" requires instantaneous, lump-sum payments is patently incorrect.

Furthermore, this is not a situation in which "Defendants have specifically represented to the Court that they have decided to spend only part of the appropriated funds and that they will not spend the remaining funds. . . ." *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No.

CV 25-00400 (AHA), 2025 WL 2537200, at *9 (D.D.C. Sept. 3, 2025), *appeal filed Global Health Council, v. Trump*, 25-5319. Quite the opposite in fact. "The Agency has taken no action to cancel or revoke th[e]se funds, and it remains fully prepared to make them available in accordance with applicable law." Smith Decl. ¶12. The Court need only look at the disbursement of $1,438,435 USAGM offered to OTF today to conclude that funds are in fact available.

Finally, the new cash disbursement procedures are consistent with the program mission and will not undermine its objectives. OTF presently maintains large cash balances of more than $25 million on-hand in commercial U.S. banks, and these are more than sufficient to allow OTF to continue carrying out its core activities. Smith Decl. ¶11. Today's offered disbursement demonstrates USAGM has every intention of disbursing the funds OTF is obligated and sustaining its ability to operate and achieve its mission.

Nevertheless, the agency is reasonably concerned about OTF's lack of a reasonable financial plan for the drawdown of the remaining funds. Funding requirements should be driven by and align with OTF's acquisition plan and expenditure schedule to minimize funds outside the U.S. Treasury. USAGM has requested multiple revised financial plans (funding drawdown schedules) from OTF. *See* Defs.' Ex. 2. The revised financial plan should focus on cash outflows within 30 to 90 days of the anticipated need, enabling OTF and USAGM to better estimate future cash requirements for drawdown. Accurate recording of obligations and communication of cash needs by the entity will minimize the need for surplus cash on-hand by reducing the delay between grant drawdown and payment to a vendor or other party. *See* Defs.' Ex. 5. USAGM is requesting that OTF submit a revised financial plan, including a detailed acquisition and expenditure schedule, to minimize cash outside the U.S. Treasury. It is not necessary for OTF to have the cash on-hand from the grant to record an obligation, as an obligation is simply reporting the planned

use of funds. *See id*. Ultimately, OTF wants the agency to engage in a practice that does not align with federal regulations, which require grantees to only draw down cash balances for immediate cash needs, thereby minimizing the time period from drawdown to actual cash expenditure

### ii.   Impoundment Control Act and Anti-Deficiency Act

In addition to never having been pled, Plaintiff's claims under the ICA and ADA each fail on their own right. The ICA is not relevant here because no impoundment has occurred; funds are available for obligation by OTF. As explained, the dispute here is not about whether OTF is entitled to its remaining FY25 appropriated funds; it is undisputed that OTF is so entitled. Rather, the dispute here concerns only the timing of the disbursements of those dollars. But even if the ICA were relevant, Plaintiffs do not have a right of action to enforce the ICA, either on its own or through the APA. As the D.C. Circuit recently observed, "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits to enforce the ICA at any time and without notice to the Congress of the alleged violation. And there is no provision even inferentially allowing any person adversely affected to sue." *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *10 (D.C. Cir. Aug. 28, 2025) (cleaned up). Thus, "grantees have no cause of action to undergird their claim that the defendants have acted contrary to law by violating the ICA." *Id*. at *11.

The ADA requires that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). This statute is also not relevant here because USAGM is not holding the funds in reserve or repurposing them for a use that Congress did not intend. Nor does the ADA provide its own right of action. *See Glob. Health Council*, 2025 WL 2480618, at *10 ("Because the grantees lack a cause of action, we need not address on the merits whether the government violated the Constitution by infringing on the

- 18 -

Congress's spending power through alleged violations of . . . the Anti-Deficiency Act."); *Barhite v. Nadeau*, No. CV 23-3594 (UNA), 2023 WL 9000757, at *1 n.1 (D.D.C. Dec. 28, 2023) ("the Anti-Deficiency Act, *see* 31 U.S.C. § 1341, carries no private right of action").

### iii.   Constitutional Claims

Plaintiff is also unlikely to succeed in its attempt to invoke any tangentially relevant clause of the Constitution to see what sticks. The little relevance they do have exists only because Plaintiff relies upon a strawman that Defendants have "refus[ed] to distribute the money," Pl.'s Second PI Mot. at 20, when the reality is that USAGM has been consistently clear it is eager to distribute the money, *see* Defs. Ex. 2, and it even offered today to disburse $1,438,435. The agency stands ready and willing to distribute additional funds on a rolling basis as soon as OTF provides an updated, reasonable projection of its expenditures.

Plaintiff alleges that Defendants have violated the Appropriations Clause and Spending Clause of the Constitution by "refus[ing] to distribute the money," Pl.'s Second PI Mot. at 20, thus encroaching upon Congress's "exclusive power over the federal purse." *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012). As has already been explained, Defendants are not refusing to distribute the money; they are ensuring such distribution accords with best financial management practices that are required by federal law and the grant agreement that OTF itself signed. The appropriation does not require the Executive Branch to disburse all the funds the instant that OTF requests them. Moreover, this is not a situation like *U.S Dep't of the Navy*, the only Appropriations Clause case Plaintiff cites, where the agency was asked to spend funds when "no statutory language explicitly authorize[d] the purchase." 665 F.3d at 1348 (emphasis removed).

Plaintiff also argues Defendants have violated the Presentment Clause by attempting to analogize the present dispute to an unconstitutional line-item veto, *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Once again, the argument rests upon the notion that Defendants have cancelled funding when no such action has taken place. The current appropriation allows USAGM to administer the funds in accordance with sound financial management practices as spelled out in 2 C.F.R. Part 200, thus it is incorrect to suggest that the agency's doing so is an effective "attempt by the executive branch to amend the statute[]." Pl.'s Second PI Mot. at 20.

Next, Plaintiff argues that Defendants have violated the Take Care Clause by "refus[ing] to honor the statutory appropriations to OTF[.]" At risk of sounding like a broken record, Plaintiff is once again incorrect that Defendants refuse to distribute funds; they have done so and remain ready to do so again when Plaintiff provides an updated spending plan. And, indeed, Defendants have offered to distribute funds for near-term expenditures based on their best estimate of OTF's operational costs. Smith Decl. ¶12. But in any event, the Take Care Clause is not relevant here as it pertains specifically to "the President," who is not a defendant in this case. U.S. Const. art. II, sec. 3. Plaintiff's invocation the Take Care Clause coincides with its broader attack that "Defendants' actions have violated the separation of powers principles." Pl.'s Second PI Mot. at 21. However, both "the Take Care Clause and the separation of powers issues are just doppelgängers of the [Plaintiff's] APA claim. . . . [And] if every statutory compliance issue triggered separation of powers concerns, virtually all APA cases would balloon into disputes of constitutional proportions. *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 31–32 (D.D.C. 2025).

For these reasons, none of Plaintiff's constitutional claims have merit.

### d.  *Ultra vires* review and mandamus relief are unavailable.

Plaintiff's *ultra vires* and mandamus claims also run into obstacles. The relief offered by these forms of review is only available when the error is "so extreme that one may view it as jurisdictional or nearly so." *Griffith v. FLRA, 842 F.2d 487, 493 (D.C.Cir.1988).* Indeed, the D.C. Circuit has explained that these "[i]mplied equitable claims" (*i.e.*, *ultra vires* claims) are "extremely limited" in scope and that the Supreme Court has described *ultra vires* challenges as "essentially a Hail Mary pass" that "rarely succeeds." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 791 (D.C. Cir. 2025) (quotation omitted). Here, Defendants have demonstrated that there has been no legal error; however, even if the Court concludes the opposite, it certainly is not the type of "extreme" error that merits nonstatutory review. Furthermore, should the Court find a cause of action is available to Plaintiff under the APA, then *ultra vires* and mandamus review would be clearly unavailable. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025) ("ultra vires review is not available because [plaintiffs] had an alternative path to judicial review."); *Citizens for Resp. & Ethics in Washington v. U.S. S.E.C.*, 916 F. Supp. 2d 141, 152 (D.D.C. 2013) ("Plaintiff's mandamus claim cannot prevail because [Plaintiff] does have another available remedy in the APA.").

## II.    Plaintiff will not suffer irreparable harm.

### a.   OTF has access to FY25 funds.

As shown by today's offer of $1,438,435, OTF has access to its FY25 funds, just not on the schedule it would like (because it has yet to submit the required financial plan in accordance with contractual requirements). The fact that it must wait to receive the remainder of the funds it is obligated is not irreparable harm. This is especially so when "OTF does not have a cash shortage . . .. As of September 30, 2025, OTF submitted their bank account statement for the Agency's "Year-End Advance: Preliminary Trial Balance" exercise, with a closing balance of $25,283,707.08 in cash on hand." Smith Decl. ¶11.

### b. Monetary harm is not irreparable.

Even if the court finds that Plaintiff suffers some kind of economic harm, Plaintiff's alleged economic injuries are insufficient to show irreparable harm. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business" or a threat to the business's "very existence." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Plaintiffs may be forced to make difficult choices and lose profits in critical areas of their business without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock. . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And plaintiffs must document any claim that an alleged harm is a threat to the business's very existence with specific details. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory). Here, Plaintiff alleges that a lack of funds "'threatens the very existence" of the organization," Pl.'s Second PI Mot. at 22 (quoting *Wis. Gas Co. v. FERC*, 758

F.2d 669 (D.C. Cir. 1985)), but supplies none of the detailed projections required under the caselaw to substantiate such a claim. This is likely because OTF's current surplusage of cash on hand undermines such an argument.

The second exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply. Plaintiff's alleged economic injuries are reparable through the Tucker Act for contract disputes concerning monetary payments. Sovereign immunity is not an obstacle for monetary recovery on Plaintiff's claims because of that statute. *See Safari Club Int'l*, 47 F. Supp. 3d at 37.

### III.    The balance of equities weighs against a preliminary injunction.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). In this setting, granting the preliminary injunction that Plaintiff seeks would disrupt USAGM's oversight of its grantees to ensure taxpayer money is stewarded well, as intended by the statutory scheme that Congress provided.

In another case in which a grantee sought preliminary equitable relief against USAGM, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020). The Court held: "[s]etting USAGM's priorities and managing, at a broad level, U.S. international broadcasting is the prerogative of the USAGM CEO—not that of plaintiffs, and certainly not of this Court. Moreover, Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making and oversight of USAGM grantees is itself 'a declaration of public interest and policy which should be persuasive in inducing courts to give relief.'" *Id.* (quoting *Va. Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)).

In this setting, the balance of the equities and the public interest align against the entry of relief. Here, Plaintiff asks the Court to change the status quo and order USAGM, *inter alia*, to make an affirmative lump sum payment of approximately $20 million. Yet Plaintiff proffers insufficient grounds supporting this especially extraordinary form of relief. Mandatory injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018); *accord Archdiocese of Wash. v. Wash. Metro Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

## IV.    Should the Court enter another injunction, an additional bond is appropriate.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiff's motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiff to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues a preliminary injunction here, the Court should require Plaintiff to post an appropriate bond commensurate with the scope of any such preliminary

relief. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). As Plaintiff is seeking the payment of a particular sum, *i.e.* approximately $20 million, the Court should order the posting of a bond equal to the interest the Government would continue to accrue on that balance should it have remained in the Government's account as envisioned by 2 C.F.R. § 200.305(b)(1). Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c).

Finally, Defendants respectfully ask the Court to stay any order requiring disbursement of funds for at least seven days to allow the Solicitor General to determine whether to authorize the Government to seek a stay pending appeal.

## CONCLUSION

For the foregoing reasons, Plaintiff's second request for a preliminary injunction should be denied.


Dated: October 21, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           ERIC J. HAMILTON
                                           Deputy Assistant Attorney General
                                           Civil Division, Federal Programs Branch

                                           JOSEPH E. BORSON
                                           Assistant Branch Director
                                           Civil Division, Federal Programs Branch

                                           /s/ *Abigail Stout*
                                           ABIGAIL STOUT
                                           (DC Bar No. 90009415)

- 25 -

Counsel
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

*/s/ Eitan R. Sirkovich*
EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

*Attorneys for Defendants*