## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND,

               *Plaintiff*,

v.

KARI LAKE, et al.,

               *Defendants*.

No. 1:25-cv-00840-RCL

## BRIEF OF *AMICI CURIAE* RFE/RL, INC.,
## RADIO FREE ASIA, MIDDLE EAST BROADCASTING NETWORKS,
## AND *WIDAKUSWARA* PLAINTIFFS

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5), *Amici Curiae* submit the following corporate disclosure statement:

Reporters Without Borders, Inc. is a 501(c)(3) non-profit organization headquartered in Washington, D.C. and is the United States affiliate of Reporters Sans Frontières, which is headquartered in Paris, France.

American Federation of State, County and Municipal Employees ("AFSCME") is a national labor organization and unincorporated membership association headquartered in Washington, D.C.  AFSCME is the largest trade union of public employees in the United States.

American Federation of Government Employees ("AFGE") is a labor organization and unincorporated association headquartered in Washington, D.C.  AFGE is the largest federal employee union.

American Foreign Service Association ("AFSA") is a professional association and labor organization headquartered in Washington, D.C.  AFSA is the sole labor organization for the United States Foreign Service.

The NewsGuild-CWA ("TNG-CWA") is a labor union representing more than 27,000 employees.  It is the largest labor union representing journalists and media workers in North America.

RFE/RL, Inc., Radio Free Asia, and Middle East Broadcasting Networks, Inc., are private nonprofit news organizations that provide independent journalism to designated regions of the world.

None of the above-identified *amici curiae* has a parent corporation, and no publicly held company owns 10% or more of any of their stock.

i

### TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST ................................................................. 1

ARGUMENT ................................................................................ 2

I.    This Court Correctly Held That It Has Jurisdiction to Enjoin USAGM from Violating Congress's Funding Directions. ............................................. 2

II.   Recent Decisions Do Not Disturb this Court's Jurisdictional Holding......... 10

       A.   *National Institutes of Health v. American Public Health Association* .................................................................... 11

       B.   *Climate United Fund v. Citibank* ........................................ 12

       C.   *District Court Cases* ...................................................... 14

CONCLUSION ............................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ...................................................................................7

*Am. Ass'n of Physics Teachers v. NSF*,
  2025 WL 2615054 (D.D.C. Sept. 10, 2025) .................................................14, 15

*Appalachian Voices v. EPA*,
  2025 WL 2494905 (D.D.C. Aug. 29, 2025) ...............................................................15

*Astra USA, Inc. v. Santa Clara Cnty.*,
  563 U.S. 110 (2011).................................................................................................8

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ....................................................................................... *passim*

*California v. Dep't of Educ.*,
  25-cv-10548 (D. Mass. Mar. 6, 2025) ....................................................................10

*Climate United Fund v. Citibank, N.A.*,
  2025 WL 2502881 (D.C. Cir. Sept. 2, 2025)...............................................12, 13, 14

*Crowley Gov't Servs. v. GSA*,
  38 F.4th 1099 (D.C. Cir. 2022)...........................................................................2, 7

*Dep't of Educ. v. California*,
  145 S. Ct. 966 (2025).....................................................................................9, 10, 11

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985)...................................................................................10

*Md. Dep't of Hum. Res. v. HHS*,
  763 F.2d 1441 (D.C. Cir. 1985)......................................................................4, 6, 9

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ............................................................... *passim*

*Nat'l Ctr. for Mfg. Scis. v. United States*,
  114 F.3d 196 (Fed. Cir. 1997)..............................................................................4, 5

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025)..................................................................................2, 11, 12

*Quarles v. United States*,
  587 U.S. 645 (2019).................................................................................................7

*RFE/RL, Inc. v. Lake*,
  780 F. Supp. 3d 269 (D.D.C. 2025) ........................................................ *passim*

*RFE/RL, Inc. v. Lake*,
  No. 2025 WL 2023252 (D.D.C. July 18, 2025) ..................................................5

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ................................................................15

*Tootle v. Sec'y of Navy*,
  446 F.3d 167 (D.C. Cir. 2006) .................................................................5

*Train v. City of New York*,
  420 U.S. 35 (1975) ...........................................................................6, 7

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ...............................................................4, 9

*Widakuswara v. Lake*,
  779 F. Supp. 3d 10 (D.D.C. 2025) ......................................................... *passim*

**FEDERAL STATUTES**

22 U.S.C. § 6202 ................................................................................3, 4

22 U.S.C. § 6202(a)(5) ..........................................................................3, 6

22 U.S.C. § 6202(b) .............................................................................1, 3

22 U.S.C. § 6204(a)(5) .............................................................................3

22 U.S.C. § 6204(a)(6) .............................................................................3

22 U.S.C. § 6204(b) ................................................................................8

22 U.S.C. § 6208(c)(5) .............................................................................6

22 U.S.C. § 6209(d) ...............................................................................3

42 U.S.C. § 284(b)(2) .............................................................................11

42 U.S.C. § 1862(b) ...............................................................................14

42 U.S.C. § 7438(b)(1) ............................................................................15

Inflation Reduction Act of 2022,
  Pub. L. No. 117-169, 136 Stat. 1818 ............................................................13

Further Consolidated Appropriations Act of 2024,
   Pub. L. No. 118-47, 138 Stat. 460 ...................................................................................3, 6, 11

**OTHER AUTHORITIES**

D.D.C. R. 7(o)(5) .........................................................................................................................2

*Grants & Funding*
   (Oct. 15, 2024), https://grants.nih.gov/new-to-nih ...............................................................11

**STATEMENT OF INTEREST**

Radio Free Asia ("RFA"), RFE/RL (commonly known as Radio Free Europe/Radio Liberty), and the Middle East Broadcasting Networks ("MBN," and collectively the "Networks") are expressly designated by Congress as mandatory grantees of the U.S. Agency for Global Media ("USAGM"). Congress has charged the Networks, by name, with specific statutory obligations to provide United States international broadcasting, including the critical responsibility to provide "reliable and authoritative" news in areas of the world where independent journalism is too often stifled by authoritarian regimes. 22 U.S.C. § 6202(b). Congress has further instructed USAGM to disburse specific sums of appropriated funds to the Networks to carry out those statutory functions. *See* No. 1:25-cv-966, ECF 17-1 at 3. Nevertheless, for the better part of the last year, USAGM has sought to deny the Networks their statutorily mandated funds.

This Court has granted preliminary relief to each Network to stop USAGM's unlawful actions. *See* Nos. 1:25-cv-799 (RFE/RL); 1:25-cv-907 (RFA); 1:25-cv-966 (MBN). In the instant case, another mandatory USAGM grantee—the Open Technology Fund (OTF)—seeks preliminary injunctive relief against USAGM. Earlier in this litigation, this Court recognized that it could grant such relief notwithstanding the government's argument that this Court lacks jurisdiction under the Tucker Act. ECF 35 at 7. This Court relied on its earlier decisions holding that it had "jurisdiction over disputes between USAGM and its various network grantees suing for access to congressionally appropriated funds." *Id.* As those very "network grantees," along with organizations whose journalist members depend on them ("*Widakuswara* plaintiffs"), *amici curiae*

1

have a strong interest in this Court adhering to its correct decision that the Tucker Act does not

divest district courts of jurisdiction to enforce statutory limits on USAGM.[1]

## ARGUMENT

This Court has invited briefing on whether "the Supreme Court's ruling in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), and subsequent cases, affects the Court's jurisdiction." ECF 51. They do not. This Court was correct to hold that the Tucker Act does not divest this Court of jurisdiction to halt USAGM's unlawful actions against its congressionally designated mandatory grantees. *See RFE/RL, Inc. v. Lake*, 780 F. Supp. 3d 269, 277-78 (D.D.C. 2025); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 28-30 (D.D.C. 2025). The Supreme Court's recent order and subsequent lower-court decisions do not change the analysis.

## I. This Court Correctly Held That It Has Jurisdiction to Enjoin USAGM from Violating Congress's Funding Directions.

A. The Tucker Act applies "only if the claim is 'at its essence' a contract claim." *RFE/RL*, 780 F. Supp. 3d at 277 (quoting *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022)). The two-part inquiry set forth in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), determines whether that is the case. That inquiry considers (i) "the source of the rights upon which the plaintiff bases its claims" and (ii) "the type of relief sought (or appropriate)." *Id.* at 968. As this Court has correctly held, both inquiries favor district-court jurisdiction to enforce USAGM's statutory obligations to its mandatory grantees.

First, the source of the rights asserted by USAGM's mandatory grantees is "not rooted in any grant agreement with USAGM, but rather, two statutory schemes: the International

---

[1] No party's counsel has authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amici curiae* or its counsel contributed money that was intended to fund preparing or submitting this brief. *See* D.D.C. R. 7(o)(5).

Broadcasting Act and the continuing resolutions to the 2024 Consolidated Appropriations Act." *RFE/RL*, 780 F. Supp. 3d at 277.  In the International Broadcasting Act (IBA), Congress established that there shall be "United States international broadcasting," which "*shall* include … news which is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6202 (emphasis added).  Congress charged the Networks and OTF—all of which are identified by name, *see, e.g.*, 22 U.S.C. § 6209(d)—with providing the required broadcasting. *See, e.g.*, 22 U.S.C. § 6202(b) ("United States international broadcasting *shall* include" providing "programming to meet needs which remain unserved" in "certain nations" (emphasis added)); ECF 35 at 1-2 (responsibilities of OTF).  To enable those entities to fulfill those functions, Congress has each year appropriated defined sums specifically for them, directing that such amounts "shall be allocated" to them.  Pub. L. No. 118-47, div. F, 138 Stat. 460, 735 (2024).

The IBA directs USAGM to "make and supervise grants . . . for broadcasting . . . in furtherance of the purposes of this subchapter."  22 U.S.C. § 6202(a)(5).  Read together with the provisions just discussed, section 6202(a)(5) directs USAGM to make grants using appropriated funds *to the statutorily named entities*—the Networks and OTF—to enable them to "further[] the purposes" of the IBA—i.e., *to engage in "United States international broadcasting"* that satisfies the statutory directives.  Congress also sharply limited USAGM's authority to disburse less than the full amounts Congress appropriated for each named recipient, directing that USAGM may reprogram only up to "5 percent" of each entity's funds.  Pub. L. No. 118-47, div. F, 138 Stat. at 735; *see also* 22 U.S.C. § 6204(a)(5), (6).  That limitation reflects Congress's judgment that at least 95% of the funds specifically appropriated for each grantee are necessary to enable it to provide broadcasting that complies with the statutory standards.  Together, those statutory commands strictly limit USAGM's authority, preventing USAGM from withholding

the appropriated funds based on its own view that "providing for United States international broadcasting," 22 U.S.C. § 6202, is not an Executive Branch priority. It is assuredly a congressional priority; that is why the IBA requires that such broadcasting occur.

The grantees' suits are therefore founded on a straightforward claim that USAGM has exceeded its statutory authority: the IBA requires USAGM to further international broadcasting, but USAGM has instead withheld funds from its mandatory grantees in a manner that violates the reprogramming limitation and impedes the ability of the grantees to provide the international broadcasting that the IBA contemplates. That is a quintessential APA claim that the agency has acted contrary to law, and it turns entirely on construing the provisions of the IBA and the appropriations statutes. Far from raising claims "founded only on a contract," those lawsuits unquestionably enforce rights that "stem from a statute." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *overruled on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).

Second, the "type of relief" sought "is also not contractual in nature" because the mandatory grantees have not sought "money damages," but have instead sought "access to [their] congressionally appropriated funds." *RFE/RL*, 780 F. Supp. 3d at 278. The mandatory grantees have never sought "*compensation* for the damage sustained by the failure of the Federal Government to pay as mandated." *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988); *see Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1446 (D.C. Cir. 1985); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) (demand for appropriated funds "is not a demand for 'money damages'"). They have instead made classic requests for prospective relief to govern their "cooperative, ongoing relationship[s]" with the government regarding "the allocation and use" of funds, *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201—relief the Court of

4

Federal Claims ("CFC") is powerless to grant, *see Bowen*, 487 U.S. at 905. Indeed, relegating the Networks' claims to the CFC would render the IBA effectively unenforceable, as the Network might obtain retrospective damages for USAGM's wrongful termination, but could not obtain funding going forward—meaning that they would be unable to provide U.S. international broadcasting, and USAGM would be free to nullify the IBA entirely. That result would frustrate Congress's statutory enactments as well as the objectives that Congress sought to further.

Moreover, the CFC likely would not have jurisdiction over the grantees' claims—so there must be jurisdiction in this Court. The D.C. Circuit has "reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). The Federal Circuit, whose precedent binds the CFC, has held that the CFC lacks jurisdiction where, as in this case and the related cases, a plaintiff alleges a statutory right to appropriated funds designated for it, but the government contends that the suit in effect seeks to enforce a contract governing "the terms under which [the plaintiff] was to proceed with respect to the appropriated funds." *Nat'l Ctr. for Mfg. Scis*, 114 F.3d at 198. In that circumstance, the plaintiffs' claims are "plainly based on" statute and "therefore do not state a contract-based claim." *Id.*

B. The government has raised various counterarguments throughout the related litigation; none has merit.

1. The government primarily has argued that the grantees lack any statutory right to their funding and that their claims thus must sound in contract. That is wrong. As an initial matter, there can be no doubt that USAGM has a statutory obligation to enter into grant agreements with its mandatory grantees. And this Court has already correctly concluded that, when there is no grant agreement, the Tucker Act does not divest jurisdiction. *See RFE/RL, Inc. v. Lake*, 2025

WL 2023252, at *4 (D.D.C. July 18, 2025) (when the parties "are at an impasse in trying to enter a *new* grant agreement," "[i]t would be nonsensical for this Court to send this case to the CFC"; "there is no 'express or implied contract' between the parties for the CFC to review.").[2]

The government has urged that USAGM's statutory obligations end as soon as the grant agreement is signed—but that is obviously wrong.  The IBA mandates that the grantees perform specific responsibilities, and it makes grants the exclusive vehicle for USAGM to provide funding to the grantees to fulfill those obligations.  *See* pp. 3-4, *supra*.  Congress thus necessarily contemplated that USAGM would not only enter into grants, but would use those grants to distribute the appropriated funding "in furtherance of the purposes of this subchapter."  22 U.S.C. § 6202(a)(5).  USAGM nullifies Congress's direction to further those purposes if it enters into grant agreements, only to terminate them due to "agency priorities" the next day.  The statutory scheme reinforces that restriction because it gives USAGM authority to withhold or terminate funding only if a grantee fails to use its appropriated funds to further *Congress*'s expressed priorities.  *See, e.g.*, 138 Stat. at 735 (funds "shall be made available in accordance with the principles and standards set forth in" sections of IBA); 22 U.S.C. § 6208(c)(5) (termination allowed for failure to use funds "for activities consistent with this section").

Congress's specific instruction that the funds appropriated for the grantees "shall be allocated" to them confirms USAGM's statutory obligation.  Congress took the unusual step of prohibiting USAGM from reprogramming more than five percent of a grantee's designated

---

[2] Where there is no grant agreement, the claims cannot be contractual because there is no contract whose breach could be in dispute.  And the relief sought—an order requiring entry into a lawful grant agreement—is necessarily equitable relief outside the scope of the Tucker Act, even if the disbursement of congressionally appropriated funds is a consequence of such relief. *See Bowen*, 487 U.S. at 900 ("suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money" is not a suit for money damages within the meaning of the Tucker Act); *Md. Dep't of Hum. Res.*, 763 F.2d at 1446 (similar).

funding.  "[A]gencies generally are free to reprogram" appropriated funds, GAO, Redbook 2-44, including to further their own policy priorities.  But here Congress went out of its way to deny USAGM the lion's share of that authority.  Congress expressly determined for itself *how much* funding was necessary for each grantee to perform its statutory functions—and provided USAGM no discretion to alter those amounts by more than five percent for its own reasons.

The government's position would permit USAGM to negate Congress's express statutory commands and Congress's policy determination that the grantees should further U.S. interests through international broadcasting.  Congress did not "enact[] a self-defeating statute." *Quarles v. United States*, 587 U.S. 645, 654 (2019).  The Supreme Court has made exactly that point in the appropriations context, stating that where "legislation was intended to provide a firm commitment of substantial sums . . . to achieve" a specific "solution," courts should not conclude "that Congress at the last minute scuttled the entire effort by providing the Executive with the seemingly limitless power to withhold funds from allotment and obligation." *Train v. City of New York*, 420 U.S. 35, 45-46 (1975); *accord In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (Executive "does not have unilateral authority to refuse to spend [appropriated] funds" for "policy reasons").  The government seeks that same "seemingly limitless power" here.

2.  As a fallback, the government has argued that even if USAGM has statutory obligations, the lawsuits here seek to enforce contractual rights—not statutory ones.  But that ipse dixit mischaracterization cannot alter the gravamen of the grantees' claims.  The question is whether the grantees allege statutory violations rather than contractual ones. *Megapulse*, 672 F.2d at 969; *see also Crowley*, 38 F.4th at 1108-09 (rejecting Tucker Act jurisdiction where the

challenge "requires primarily an examination of the statutes the [government] has purportedly violated, not of [the plaintiff's] contract").  They do.

Ultimately, the government's argument reduces to the untenable proposition that because Congress has created a contractual scheme for routing the grantees' mandatorily appropriated funding to them, the very existence of those contracts extinguishes the grantees' statutory right to that funding and relegates them to contract claims.  But the D.C. Circuit has expressly held that the Tucker Act does not divest a district court of jurisdiction to enjoin a "clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971; *cf. Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011) (Congress's choice to use contracts to implement a statute does not transform statutory claims into contract claims).  As this Court has recognized, that rule perfectly fits this case.  *See, e.g.*, *RFE/RL*, 780 F. Supp. 3d at 277 ("The existence . . . of a grant agreement between USAGM and RFE/RL is incidental to RFE/RL's claims—a grant is involved only as a vehicle to distribute . . . funds because Congress requires USAGM to transmit funds to RFE/RL that way.").

Were the rule otherwise, the government could "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities."  *Megapulse*, 672 F.2d at 971; *Bowen*, 487 U.S. at 905 (CFC "does not have the general equitable powers of a district court to grant prospective relief").  Take a particularly salient example from the IBA itself.  The Act contains a provision known as the statutory firewall, which mandates that USAGM, "in carrying out [its] functions, shall respect the professional independence and integrity of" the Networks and other grantees.  22 U.S.C. § 6204(b).  If USAGM were to direct the Networks to broadcast only views approved by the Administration, that would unquestionably violate the firewall provision—and by enacting such an unequivocal prohibition,

8

Congress surely intended the Networks to be able to enforce the provision through an APA suit. But the firewall provision is regularly reproduced in grantees' agreements with USAGM—and so if the government's position were correct, the Networks would be unable to go to district court and seek an injunction to enforce that provision. That would render the statutory firewall entirely unenforceable, as the breach-of-contract damages that the CFC could award would not provide remotely effective relief. Again, Congress could not have intended, in directing USAGM in the IBA to use the convenient mechanism of grant agreements to disburse funds, to render unenforceable the IBA's substantive statutory commands. The D.C. Circuit has rightly refused to "accept such an interpretation of the law." *Megapulse*, 672 F.2d at 971.

3. The government has never meaningfully disputed that the grantees have not sought, and this Court has not ordered, "money damages"—yet the government has insisted that the remedy at issue is inherently contractual because it in substance orders specific performance. But the D.C. Circuit has rejected that argument, too: district courts are not "forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance of a government contract." *Transohio*, 967 F.2d at 611; *see also Md. Dep't of Hum. Res.*, 763 F.2d at 1449. Under *Megapulse*, once a plaintiff's claim is founded on statutory rights, it does not matter if the relief sought resembles specific performance because the plaintiff's statutory rights are also reproduced in a contract. 672 F.2d at 971. And the government's argument proves too much: it would foreclose jurisdiction over a statutory claim any time the government's unlawful conduct also violates a contract. As just explained, that is untenable.

4. Lastly, the government has relied on two inapposite cases. The first, *Department of Education v. California*, 145 S. Ct. 966 (2025), is nothing like this one. The plaintiffs in *California* were discretionary grantees who did not allege that the termination of their grants

violated *any statute*.  Mem. ISO Mot. for TRO at 16-23, *California v. Dep't of Educ.*, 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 7.  Instead, the plaintiffs' alleged entitlement to funds arose solely from grants awarded in the agency's discretion following a competitive process—and they contended only that the "terms and conditions of [their] grant awards d[id] not permit termination on the grounds" the government invoked.  *Id*. at 23.  The Supreme Court concluded that the plaintiffs sought to "enforce a contractual obligation," notwithstanding their invocation of the APA.  *California*, 145 S. Ct. at 968 (citation omitted).  As this Court has recognized, "*California* does not change the governing law."  *Widakuswara*, 779 F. Supp. 3d at 29.  The Tucker Act ousted district-court jurisdiction in *California* only because "the source of the rights relied on by the plaintiffs were contained *in the grant agreements*" and the "relevant statute did not entitle any particular grantee to the funds."  *Id*.  The opposite is true here.

The government's other oft-cited case, *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), is to the same effect.  There, the Air Force awarded a procurement contract to the plaintiff.  Without any statutory right to the contract, the plaintiff contended that "the *contract* forbids termination under th[e] conditions" presented—a quintessential Tucker Act claim.  *Id*. at 78 (emphasis added).  That is, again, nothing like the cases brought by the USAGM grantees, which have argued consistently that the relevant *statutes* forbid USAGM's actions.

## II.    <u>Recent Decisions Do Not Disturb this Court's Jurisdictional Holding.</u>

In recent months, a handful of decisions have held that the Tucker Act deprives district courts of jurisdiction to hear claims from certain federal grantees.  But those decisions do not alter the *Megapulse* framework for determining whether a claim is statutory or contractual—or suggest that the claims here fall on the contractual side of the line.  That is because the claims in those recent cases were brought by grantees that were awarded funding under discretionary funding schemes.  Those discretionary grantees could not argue that the government had violated

their rights without invoking their grant agreements.  After all, the statutes themselves provided

them no particular right to funding; any such right arose solely from their grant agreements.

Those claims are a far cry from the claims brought by USAGM's mandatory grantees, which are

specifically designated in the IBA as mandatory recipients of federal funding for the purpose of

fulfilling statutory responsibilities.

      A.     ***National Institutes of Health v. American Public Health Association***

     The National Institutes of Health (NIH) awards at issue in *NIH v. APHA* are paradigmatic

discretionary grants.  The NIH conducts a "highly competitive" grant process, NIH, *Grants &*

*Funding* (Oct. 15, 2024), https://grants.nih.gov/new-to-nih, using funds that Congress

appropriated to carry out the Public Health Service Act "with respect to allergy and infectious

diseases," Pub. L. No. 118-47, div. E, 138 Stat. at 656.  No statute specifies the mandatory

recipients of those funds or requires named entities to carry out particular functions in service of

the Public Health Service Act's purposes; Congress instead leaves specific funding decisions to

the agency and its leadership.  *See* 42 U.S.C. 284(b)(2).

     As in *California*, the Supreme Court determined that the Tucker Act bars jurisdiction

over challenges to grant terminations brought by NIH's discretionary grantees.  The statute itself

did not entitle any particular entity to NIH funding, so any right to payment the grantees enjoyed

against the government were "based on" their grants—no other source of law gave them any

entitlement to funding.  *NIH*, 145 S. Ct. at 2659 (quoting *California*, 145 S. Ct. at 968).  Relying

on *California,* the Court's order explained that the APA did not provide the district court "with

jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed

to enforce any 'obligation to pay money' pursuant to those grants."  *Id.* (quoting *California*, 145

S. Ct. at 968).  *NIH* thus stands for a proposition identical to that announced in *California*—that

when a grantee has no statutory right to perform its functions or receive its funding, any right to

payment arises exclusively from the grant agreement and must be adjudicated as a contract claim. Justice Gorsuch put the point clearly: When the "only injury the district court s[eeks] to remedy . . . stems from the government's denial of previously awarded *discretionary* grants, . . . *California* controls." *Id.* at 2664 (Gorsuch, J., concurring) (emphasis added); *cf. Widakuswara*, 779 F. Supp. 3d at 29 (*California* applies when the "relevant statute d[oes] not entitle any particular grantee to the funds"). Conversely, when the government is alleged to have violated *statutory* rights in connection with *mandatory* grants, *California* is inapposite.

Because *NIH* did not move the ball beyond where *California* left it, it does not affect this Court's jurisdiction to adjudicate the lawsuits brought by USAGM's mandatory grantees. Their claims, brought pursuant to the IBA and related appropriations acts, are completely different from the contract claims brought by the plaintiffs in *NIH*. The IBA creates rights in the Networks and OTF directly: it tasks them with fulfilling a statutory mandate to provide international broadcasting for the United States, and it requires USAGM to provide grant funding to them so that they may fulfill that statutory mandate. As a result, the Networks' and OTF's relationships with USAGM are matters of statute, and USAGM's interference with their statutory functions has resulted in statutory cases wholly divorced from any contract terms. Indeed, the Networks would have the very same claims even if the grant agreements never existed at all. The plaintiffs in *NIH*—like those in *California*—could not say the same.

### B.    *Climate United Fund v. Citibank*

*Climate United v. Citibank* is even more unhelpful to the government. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025).[3] As in *NIH*, the

---

[3] A petition for *en banc* review of the split panel decision in *Climate United* is pending before the full D.C. Circuit.

plaintiffs in *Climate United* were discretionary grantees, and the Executive Branch terminated their awards. The statute that authorized their funding "did not specify who was to receive money . . . or in what amount." *Id.* at *9. Instead, Congress had simply "appropriated" seven billion dollars for grants to "States . . . and eligible recipients for the purposes of providing grants . . . to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies." Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 60103, 136 Stat. 1818, 2065-67 (formerly codified at 42 U.S.C. § 7434 (2024)). And it specified that funding should be awarded "on a competitive basis" by the EPA. *Id.*

The court relied on these considerations to hold that the source of the plaintiffs' rights was contractual—and the court's description of the contractual source of the plaintiffs' rights leaves no doubt that the Networks are differently situated. The Networks contend that the IBA itself confers rights to continued funding by limiting USAGM's authority to withhold funding. *Climate United*, by contrast, concluded that the plaintiffs' claimed entitlement to the funds arose "only because they were awarded discretionary . . . grants" that were "governed by . . . grant agreements." *Climate United*, 2025 WL 2502881, at *9. And unlike here, the D.C. Circuit concluded that the plaintiffs' argument "turn[ed] on the government's rights under the agreements," a "fiercely dispute[d]" question of contract interpretation. *Id.* at *5. It was for that reason that the court concluded that the plaintiffs' claim did not depend "solely, or really at all, on the statute," but instead sounded in contract. *Id.* at *9. Here, the opposite is true: the claims depend on the relevant statutes, and not at all on disputed questions of contract interpretation.

The court also concluded that the remedy the grantees sought was "contractual in nature." *Id.* at *6. The grantees resisted that conclusion on the ground that they sought an "injunction barring unlawful interference, rather than an order for specific performance." *Id.* But, the D.C.

Circuit reasoned, the only reason the EPA's interference was unlawful was that it violated the grant agreements, such that the request for relief amounted to a demand that the government stop breaching the contract. Accordingly, the court held that the grantees were "in substance . . . seeking specific performance" and their claims belonged in the CFC. *Id.*

In short, the D.C. Circuit concluded that *Climate United* was on all fours with *NIH* and *California*. *Climate United*, 2025 WL 2502881, at *8 (*NIH* and *California* "strongly support[] [the] conclusion that the grantees' arbitrary and capricious challenge to the grant terminations is a disguised contract claim that cannot be heard in district court"). The grantees here, by contrast, advance a totally different argument. They allege that USAGM has exceeded the limits of its authority under the IBA and violated the rights that statute creates. For that reason, just as *California* and *NIH* do not bear on this Court's jurisdiction to hear the grantees' claims, neither does *Climate United*.

### C.    *District Court Cases*

Twice since *NIH*, other courts in this District have relied on that decision to find they lack jurisdiction to address grant termination claims. But each of those cases involved a discretionary grant program akin to the one at issue in *NIH*. As a result, neither impacts this Court's authority to hear the Networks' claims.

First, *American Association of Physics Teachers v. NSF*, 2025 WL 2615054 (D.D.C. Sept. 10, 2025), involved grants overseen by the National Science Foundation ("NSF"), which is authorized to "support specific scientific and engineering activities" through grantmaking. 42 U.S.C. § 1862(b). Statutory criteria, such as "intellectual merit" and the "broader impacts" of a proposal, govern its funding awards. *Id.* § 1862s(b). But the statutory scheme does not identify particular grantees. Accordingly, to argue that NSF had violated their rights, the plaintiffs had to invoke their grant awards, objecting that the NSF had "previously promised grant funding" but

"then withdrew that funding." *Am. Ass'n of Physics Teachers*, 2025 WL 2615054, at *9. Because their "rights to the[] payments [were] grounded in the canceled grant agreements," and not in statute, the court held it lacked jurisdiction over their claims for retrospective relief. *Id.*

*Appalachian Voices v. EPA*, 2025 WL 2494905 (D.D.C. Aug. 29, 2025), is in a similar vein. The statute there was also open-ended, directing the EPA to "award grants . . . to eligible entities to carry out [eligible activities] that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(b)(1). The district court held that the "source" of the grantee's right to funding was "contractual" because the statutory language did "not entitle grant funds to any particular entity 'in the absence of the contract itself.'" *Appalachian Voices*, 2025 WL 2494905, at *7 (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)). Indeed, the court expressly held that the case was "distinguish[able] . . . from *Widakuswara*" because Congress had not "explicitly appropriated" funds for Appalachian Voices and the other plaintiffs in the Inflation Reduction Act. *Id.* at *7.

In other words, in both cases, the plaintiffs had no rights aside from those created by the contract. They were not named in the statute, and they were not tasked with fulfilling mandatory statutory duties using appropriated funding disbursed by an agency obligated to do so. Absent a grant, they would have no relationship with the federal government. Whatever their efforts to repackage their claims as statutory or regulatory, at bottom they still sought contractual relief. That is simply not the case for the Networks, whose claims are completely uncoupled from the terms of their grant agreements. No other decision—aside from this Court's rulings about the Networks themselves—has grappled with such a scheme. Accordingly, no other decision suggests that this Court was wrong to find it had jurisdiction to address the Networks' claims.

## **CONCLUSION**

This Court should hold that *NIH* and subsequent decisions do not affect its jurisdiction.

15

Dated:  November 7, 2025

DEMOCRACY FORWARD
FOUNDATION


_____/s/_____
Kristin Bateman
Cynthia Liao
Robin F. Thurston
Skye L. Perryman
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
cliao@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org


*Counsel for Amici Curiae American
Federation of State, County and
Municipal Employees (AFSCME);
American Federation of Government
Employees (AFGE); American Foreign
Service Association (AFSA); Middle
East Broadcasting Networks, Inc.; the
NewsGuild-CWA; and Radio Free Asia*

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP


*/s/ Donald B. Verrilli, Jr.*_____
Donald B. Verrilli, Jr.
Ginger D. Anders
Jeremy S. Kreisberg
Helen E. White
Esthena L. Barlow
601 Massachusetts Ave. NW, Ste. 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Hailyn J. Chen
Adeel Mohammadi
350 S. Grand Ave., Fiftieth Floor
Los Angeles, CA 90071
(213) 683-9100
Hailyn.Chen@mto.com
Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn
560 Mission St., Twenty-Seventh Floor
San Francisco, CA 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com


*Counsel for Amici Curiae Middle East
Broadcasting Networks, Inc. and Radio
Free Asia*

GOVERNMENT
ACCOUNTABILITY PROJECT

_____ /s/ _____
David Z. Seide
1612 K Street NW
Washington, DC 20006
(202) 457-0034
davids@whistleblower.org

*Counsel for Amici Curiae Patsy*
*Widakuswara, Jessica Jerreat, Kathryn*
*Neeper, John Doe 1, John Doe 2, John*
*Doe 3, and John Doe 4*


AMERICAN FEDERATION OF
STATE, COUNTY, AND
MUNICIPAL EMPLOYEES, AFL-
CIO (AFSCME)

_____ /s/ _____
Teague Paterson
Matthew Blumin
Georgina Yeomans
1625 L Street NW
Washington, DC 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Amicus Curiae American*
*Federation of State, County, and*
*Municipal Employees, AFL-CIO*
*(AFSCME)*


COVINGTON & BURLING LLP

_____ /s/ _____
Marney L. Cheek
David M. Zionts
Thomas Brugato
Covington & Burling LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
mcheek@cov.com
dzionts@cov.com
tbrugato@cov.com

*Counsel for Amicus Curiae RFE/RL, Inc.*


DEMOCRACY DEFENDERS FUND

_____ /s/ _____
Norman L. Eisen
Joshua Kolb
Taryn Wilgus Null
Sofia Fernandez Gold
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@democracydefenders.org
Joshua@democracydefenders.org
Taryn@democracydefenders.org
Sofia@democracydefenders.org

*Counsel for Reporters Sans Frontières,*
*Reporters Without Borders, Inc.,*
*American Federation of State, County*
*and Municipal Employees (AFSCME);*
*and American Federation of Government*
*Employees (AFGE)*

17

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
Andrew G. Celli, Jr.
Debra L. Greenberger
Daniel M. Eisenberg
Nick Bourland
One Rockefeller Plaza, 8th Floor
New York, NY 10020
(212) 763-5000
acelli@ecbawm.com
dgreenberger@ecbawm.com
deisenberg@ecbawm.com
nbourland@ecbawm.com

*Counsel for Amici Curiae Patsy
Widakuswara, Jessica Jerreat, Kathryn
Neeper, John Doe 1, John Doe 2, John
Doe 3, John Doe 4, American Federation
of State, County and Municipal
Employees (AFSCME); American
Federation of Government Employees
(AFGE); American Foreign Service
Association (AFSA); and the NewsGuild-
CWA*

AMERICAN FOREIGN SERVICE
ASSOCIATION

_____/s/_____
Sharon Papp
Raeka Safai
2101 E Street NW
Washington, DC 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Amicus Curiae American
Foreign Service Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-
CIO

_____/s/_____
Rushab Sanghvi
80 F Street NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for Amicus Curiae American
Federation of Government Employees,
AFL-CIO (AFGE)*

MEDIA FREEDOM &
INFORMATION ACCESS CLINIC -
YALE LAW SCHOOL**

_____ /s/ _____
David A. Schulz
127 Wall Street
New Haven, CT 06520
tobin.raju@YLSClinics.org
David.schulz@YLSClinics.org

*Counsel for Amici Curiae Patsy
Widakuswara, Jessica Jerreat, Kathryn
Neeper, and John Does 1-4*

** The views expressed herein do not
purport to represent the institutional
views of Yale Law School, if any.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2025, I filed the foregoing document with the Clerk of Court for the U.S. District Court for the District of Columbia using the Court's CM/ECF filing system, which will send notifications to all counsel of record.

Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.