## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND,

               Plaintiff,

    v.

KARI LAKE, in her official capacity, *et al.*,

               Defendants.

No. 25-cv-00840-RCL

## DEFENDANTS' SUPPLEMENTAL BRIEF

## INTRODUCTION

On October 28, 2025, the Court ordered the parties to provide supplemental briefing explaining the extent to which the Supreme Court's decision in *National Institutes of Health v. American Public Health Association*, 606 U.S. ___, 145 S. Ct. 2658 (2025) ("*NIH*") and subsequent decisions like *Climate United Fund v. Citibank, NA.,* No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) and *American Association of Physics Teachers, Inc.,* No. 25-cv-1923-JMC, 2025 WL 2615054 (D.D.C. Sept. 10, 2025) ("*AAPT*") affect the Court's jurisdiction to order the relief requested in Plaintiff's Second Motion for Preliminary Injunction.[1] *See* Order, ECF No. 51 at 1.

The *NIH* Court held that the plaintiffs' challenge to NIH's termination of their federal grant awards pursuant to a change in priorities described in internal policy documents must be bifurcated between the Court of Federal Claims ("CFC") and the district court, with the contractual claims

---

[1] In light of the specific limitation of this Court's order to the pending Second Motion for Preliminary Injunction, Defendants do not address in this filing the impact of these decisions on this case more generally.

1

about the legality of the termination to be heard in the CFC and the Administrative Procedure Act ("APA") claims challenging the policy documents to be heard in the district court. 145 S. Ct. 2658. Four justices would have required the entire suit to be brought in the CFC, and four others would have allowed the entire matter to proceed in district court. *Id.*

In *Marks v. United States*, the Supreme Court explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . .." 430 U.S. 188, 193 (1977) (internal quotation marks omitted); *see also United States v. Duvall*, 740 F.3d 604, 610 (D.C. Cir. 2013) (Kavanaugh J. concurring) ("*Marks* means that, when one of the opinions in a splintered Supreme Court decision has adopted a legal standard that would produce results with which a majority of the Court in that case necessarily would agree, that opinion controls."). As Justice Barrett's concurrence marks the intermediate position of the nine justices, it provides the narrowest grounds for the decision and is controlling.

Justice Barrett's analysis concluded that the Tucker Act did not deprive district courts of jurisdiction over the run-of-the-mill APA challenges to an agency's policy just because that policy might implicate contracts. *See NIH*, 145 S. Ct. at 2661. Therefore, the district court had jurisdiction to review NIH's internal policy documents and, if those claims were properly brought and ultimately found to be meritorious, to vacate them under the APA. *Id.* However, Justice Barrett distinguished between vacatur of a policy and vacatur of past actions taken pursuant to that policy, like the grant terminations at issue there: "The claims are legally distinct. And if the CFC has exclusive jurisdiction over the grant terminations, the plaintiffs cannot end-run that limit simply by packaging them with a challenge to agency guidance." *Id.* (citations omitted).

2

Justice Barrett's opinion creates a dichotomy between agency policies that may implicate contracts, which can be reviewed in district court, and actions taken under a contract pursuant to that policy, which must be heard in the CFC. In the present case, Plaintiff only challenges the latter. To be sure, theoretically, Plaintiff may have been able to challenge USAGM's broader cash management policy at issue here (described in Defs.' Second PI Opp'n, ECF No. 48 at 3) under the APA and that could be reviewed in district court.[2] Nowhere in the Plaintiff's complaint, motion for relief, or supplemental brief, however, does Plaintiff directly challenge the cash management policy or seek its vacatur. Instead, Plaintiff attacks Defendants' interpretation of the contractual grant agreement and the contract's incorporation and application of 2 C.F.R. § 200.305 as arbitrary and capricious and contrary to law to seek classically contractual relief. This it cannot do under *NIH*.

## ARGUMENT

### I.    Plaintiff Cannot Challenge Defendants' Interpretation of the Contract as Arbitrary and Capricious in This Forum.

The Tucker Act deprives district courts of jurisdiction to hear Plaintiff's argument that Defendants' interpretation of the parties' grant agreement and its incorporation of 2 C.F.R. § 200.305 is arbitrary and capricious under the APA. Plaintiff seeks an order requiring Defendants to disburse funding according to a particular timetable it believes the contract requires. However, "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual

---

[2] Like the internal policy documents in *NIH* setting the agency's priorities, which had downstream implications for the parties' contract, USAGM's revised cash management policy also established the agency's practices and had downstream implications for the parties' contract agreement. As Justice Barrett explained, however, "[t]hat the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded ... upon' contract that only the CFC can hear. 28 U.S.C. § 1491(a)(1)." *NIH*, 145 S. Ct. at 2661. Accordingly, had Plaintiff here properly challenged the cash management policy, it is unlikely that the Tucker Act itself would have deprived this Court of jurisdiction to hear that claim. There may be other barriers to review, however, such as standing and a failure to challenge final agency action under the APA.

obligation to pay money.'" *Dep't of Educ. v. California*, 604 U.S. 650, 651(2025) ("*California*") (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). That order is what Plaintiff impermissibly seeks here.

Under *Megapulse, Inc. v. Lewis*, whether the Tucker Act precludes a district court's jurisdiction "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought[.]" 672 F.2d 959, 968 (D.C. Cir. 1982). The thrust of Plaintiff's claim of entitlement to relief is contract-based and seeks a typical contractual remedy, therefore it belongs in the CFC.

### a. The Source of Plaintiff's Rights is Contractual.

The source of Plaintiff's claim to entitlement is the contractual grant agreement, which incorporates the regulatory guidance in 2 C.F.R. Part 200. Plaintiff attempts to circumvent the Tucker Act by framing its arbitrary and capricious attack as against the agency's interpretation of the guidance, not the contract, *see* Pl.'s Second PI Mot. at 16 ("USAGM changed its interpretation and application of 2 C.F.R. § 200.305(b)(1) without a reasoned explanation and without even a minimal level of analysis"), but in this context the two are one and the same; an attack on the agency's interpretation of the incorporated guidance equates to an attack on the agency's interpretation of the contract.

It is of no import that interpreting the contract also requires interpreting 2 C.F.R. § 200.305. In *Climate United Fund*, the D.C. Circuit clarified that when the Office of Management and Budget's ("OMB") regulatory guidance found in 2 C.F.R. Part 200 is incorporated as a contract term, a Court should understand a plaintiff's "attempt to ground their [APA] claims in [the] OMB guidance . . . 'as entirely contained within the terms of the contract' or in principles of contract law." *Climate United Fund*, 154 F.4th at 821 (quoting *Ingersoll-Rand Co. v. United States*, 780

F.2d 74, 78 (D.C. Cir. 1985)). This follows logically from the fact that the guidance does not bind the parties until it becomes incorporated as a contract term. *See id.* at 822 ("the guidance documents [found in 2 C.F.R. Part 200] on which the grantees rely likely do not create enforceable private rights because they merely set out principles for agencies to follow when making grants"). Thus, Plaintiff cannot escape the fact that at bottom, this is a dispute about what duties and corresponding rights the contract confers upon the parties, which places it squarely within the jurisdiction of the CFC.

Moreover, even beyond the incorporated OMB guidance, *Plaintiff* rests its entitlement to relief largely on the contract itself. *See e.g.*, Fifth Cunningham Decl. ¶33 ("OTF's fully executed grant agreements for FY2023, FY2024, and FY2025 enshrine this process stating, 'The NFE [(Non-Federal Entity, i.e., OTF)] should not enter into an obligation without receiving the funding first from USAGM.'"); Pl.'s Second PI Opp'n at 4 (claiming Defendants are "contravening the express language of Grant Agreement FAIN OT01-25-GO-00001 (the "FY2025 Grant Agreement")"); Pl.'s Second PI Reply at 5-6 (arguing about contract interpretation); Sixth Cunningham Decl. ¶6 (describing how OTF has acted "Consistent with . . . OTF's grant agreement"); Pl.'s Ex. G (evidence of the terms of the parties' contract agreement). That the text of the parties' grant agreement looms so large over the present dispute over Plaintiff's entitlement indicates that jurisdiction ultimately rests exclusively with the CFC.

### b. The Type of Relief Plaintiff Seeks is Specific Performance, a Contract Remedy.

The relief that Plaintiff seeks is specific performance of duties Plaintiff believes are owed under the contract agreement. Plaintiff wants funds to be disbursed to it at the time it obligates them to third parties, whereas Defendants do not intend to disburse them until those funds are due to be paid to those third parties. Defendants identify the contract term incorporating 2 C.F.R

5

200.305(b)(1) as the basis for their position, as it states that "[t]he timing and amount of advance payments must be as close as is administratively feasible to the actual disbursements." Plaintiff argues that Defendants' interpretation is arbitrary and capricious because "it is a departure from past practice without a reasoned explanation" and "because it would violate the terms of OTF's grant agreement."[3] Pl.'s Second PI Mot., ECF No. 44-1 at 15. Furthermore, it argues the separate clause in the agreement stating that OTF "should not enter into an obligation without receiving the funding first from USAGM[,]" requires the agency to disburse funds as soon as OTF seeks to obligate them. *See id.* Thus, the relief Plaintiff seeks is an order from this Court directing USAGM to disburse funds in the manner called for in the contract under OTF's interpretation.

Setting aside the merits of Plaintiff's contractual argument, which is wrong for the reasons previously briefed, *see* Defs.' Second PI Opp'n at 15-16, the Tucker Act requires this claim to be raised in the CFC because specific performance of a contractual duty "is a 'typical contract remedy' that indicates a claim is 'founded upon a contract for purposes of the Tucker Act.'" *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 823 (D.C. Cir. 2025) (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894-95 (D.C. Cir. 1985)).[4] "[I]ssuing an injunction" of the type

---

[3] Tellingly, in order to understand what performance Plaintiff believes it is owed by Defendants, Plaintiff deploys typical tools of contract interpretation—examining the parties' prior dealings and actions during the course of performance of the contract at issue to support its call for USAGM to "disburse[] FY2025 funds to OTF in the manner it had for the previous 13 years." Pl.'s Second PI Mot. at 15. But dressing these tools up in the language of APA jurisprudence requiring an agency to "provide a reasoned explanation for the change [in position]," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), does not change their contractual nature. In any event, the agency did provide a reasoned explanation for its actions, *see* Defs.' Second PI Opp'n at 12-18.

[4] Amici argue that injunctive relief that equates to specific performance is not contractual for Tucker Act purposes by relying upon *Transohio Sav. Bank v. Dir., Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992). *See* Br. of Amici Curiae, ECF No. 60 at 9. But *Transohio Savings* was abrogated and is no longer good law on this point. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) (affirming that the district court may not grant specific performance of a government contract and holding "*Transohio Savings* [is] no longer good law."). This was reiterated only several months ago in a case to which one amicus was party, *see Middle E. Broad.*

Plaintiff seeks here "'would mean that the government must perform' the terms of the contract . . . that relief must therefore 'be resolved by' the Court of Federal Claims." *AAPT*, 2025 WL 2615054, at *9 (quoting *Ingersoll-Rand Co.*, 780 F.2d at 80).[5]

Plaintiff's own words reveal that it truly seeks specific performance; "OTF requests that the Court enter an order requiring USAGM to disburse to OTF congressionally appropriated funds *on the schedule set forth in OTF's revised FY2025 financial plan* for October 2025." Pl.'s Second PI Mot. at 2 (emphasis added). The financial plan is a product of the parties' agreement as specified in the grant contract itself; it is not mentioned anywhere in the Appropriations Act. Defs.' Ex. 1, ECF No. 48-2 at 10 (OTF "shall submit to USAGM a proposed detailed financial plan"); *see also* The Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024

---

*Networks, Inc. v. United States*, No. 25-5150, 2025 WL 1378735, at *3 (D.C. Cir. May 7, 2025) (Katsas J. dissenting) (citing *Transohio Savings* with the following parenthetical: "abrogated on other grounds as recognized in *[Perry]* (Tucker Act bars awards of specific performance); *[Spectrum Leasing]* (same)"). For its part, Plaintiff acknowledges that requests for specific performance belong in the CFC. *See* Pl.'s Suppl. Br. at 7 ("The claims belonged in the Court of Federal Claims because . . . the requested relief was for specific performance of the contracts.").

[5] While the CFC is limited to offering money damages and cannot order specific performance,

> that limitation does not transform Plaintiffs' contract claim into one that this Court has jurisdiction over; it is another reason to bar its entry. That is because Congress established a scheme that included a "deliberate limitation on certain types of remedies," which was "intended to foreclose specific performance of government contracts." *Ingersoll-Rand*, 780 F.2d at 80; *see also Climate United Fund*, 2025 WL 2502881, at *4 ("Because Congress has limited the forum and the remedies for contract claims against the government, a litigant whose claim is essentially contractual cannot avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by simply asking for injunctive relief in district court."). That of course means that sometimes a "plaintiff cannot receive all its requested remedies," but the Court cannot relax jurisdictional requirements because available remedies may seem inadequate. *Ingersoll-Rand*, 780 F.2d at 80.

*AAPT*, 2025 WL 2615054, at *9 (D.D.C. Sept. 10, 2025).

(Div. F, P.L. 118-47) ("FY24 SFOAA"), as carried forward by the Full-Year Continuing Appropriations Act, 2025 (Div. A, P.L. 119-4) ("FY25 Full-Year CR") (discussing only a "spend plan[]," which is provided for separately from the "financial plan" in the parties' grant agreement).

Because an injunction of the type Plaintiff requests is the functional equivalent of ordering specific performance of a contract, the relief Plaintiff seeks is contractual. Thus, Plaintiff's claims fail both prongs of the *Megapulse* test.

## II.    Plaintiff Cannot Make an End-Run Around the Tucker Act Through its Contrary-to-Law Arguments.

Following *NIH*, the *AAPT* Court found that "[*NIH*] does not bar [a plaintiff's] APA contrary-to-law claim *insofar as that claim challenges agency guidance*. But if Plaintiffs are suggesting that they can use their APA contrary-to-law claim to vacate the [contract decision] or otherwise seek the reinstatement of grant funding, that claim would fail the *Megapulse* test…." *AAPT*, 2025 WL 2615054, at *11 (emphasis added). The pertinent agency guidance here, the revised cash management policy, has not itself been challenged by Plaintiff, therefore this path to contrary-to-law review is foreclosed. And "Plaintiffs have cited no authority for applying the *Megapulse* inquiry differently for APA contrary-to-law claims, as opposed to arbitrary-and-capricious claims. Nor could they, given that the limits on APA relief apply to both." *Id*.

Plaintiff seeks to take advantage of one caveat left by the *AAPT* Court, however, which was that perhaps contrary-to-law review could take place if a "Plaintiff['s] claims to . . . grant funding" came from "any statutory provision" rather than "their grant awards." *Id*. Plaintiff attempts to argue this is the case here, as the International Broadcasting Act ("IBA") makes funding to OTF mandatory and not discretionary. *See* Pl.'s Suppl. Br. at 8-11. But whether USAGM is statutorily mandated to fund OTF is not the present issue; "USAGM does not dispute that OTF is currently entitled to the full amount of funding allocated for OTF…." Smith Decl. ¶12, ECF No 48-1. The

instant question is about timing of disbursement, and with respect to that question, the IBA affords USAGM discretion—and in any event, those timing issues are covered by the parties' contract.

Congress has vested the Chief Executive Officer of USAGM with the authority to "allocate funds appropriated for international broadcasting activities among the various elements of the Agency and grantees" and to "make and supervise grants and cooperative agreements for broadcasting and related activities[.]" 22 U.S.C. § 6204(a). USAGM's implementation of the revised cash management policy is a natural and proper use of this delegated authority. Where Congress wishes for non-federal entities to be funded directly without tasking a federal agency with oversight, it has done so. For example, the Legal Services Corporation, another non-federal entity established by Congress, receives its appropriations directly. 42 U.S.C. § 2996i. Congress did not use this model with OTF, suggesting that it desired USAGM to actively monitor and oversee disbursements of the appropriations.

The IBA further specifies that "[a]dministrative and managerial costs for operation of the Open Technology Fund should be kept to a minimum and, to the maximum extent feasible, should not exceed the costs that would have been incurred if the Open Technology Fund had been operated as a Federal entity rather than as a grantee." *Id.* at § 6208a(d)(5). USAGM's implementation of the revised cash management policy achieves this goal by ensuring that federal dollars remain in U.S. Treasury accounts as long as administratively feasible, thereby ensuring any interest accrues to the government or are otherwise available to the government and not an outside entity, as would be the case "if the Open Technology Fund had been operated as a Federal entity rather than as a grantee." *Id.*

Plaintiff places tremendous weight upon the phrase in the IBA stating that funds "shall be available," 22 U.S.C. § 6208a(a)(1), which it reads expansively to mean "shall be available *on*

*OTF's preferred schedule*." Nothing in the statute supports such a reading; indeed, as just discussed, it strongly suggests the opposite. The operative Appropriations Act lends Plaintiff's reading no support either. It directs USAGM and OTF to create a "spend plan[]," but gives no further direction on what that plan for disbursements should entail. This stands in stark contrast to other parts of appropriations acts where Congress expressly instituted schedules when it desired funding to be used in certain ways by certain times. *See, e.g.,* Consolidated Appropriations Act of 2024, Pub. L. 118-42, 138 Stat. 25, 46 ("funds made available under this heading for fiscal year 2024, for each approved project shall be obligated: (1) by the awarding of a construction documents contract by September 30, 2024; and (2) by the awarding of a construction contract by September 30, 2025."). The fact Congress did not implement any specific deadlines here directly undermines Plaintiff's contention that USAGM has a mandate from Congress to disburse funding on the schedule OTF prefers. The statutes Plaintiff references "confer[] no such right" to the immediate payment Plaintiff seeks "in the absence of the contract" it has with USAGM. *Spectrum Leasing Corp.*, 764 F.2d at 894. Because the only plausible (albeit incorrect) basis for OTF's entitlement to disbursements on the schedule it seeks stems from the contract, jurisdiction over Plaintiff's claims is reserved for the CFC under the Tucker Act.

### c. Plaintiff's Constitutional Claims are Merely Repackaged Statutory Claims.

This Court need not credit Plaintiff's constitutional claims when it is clear on their face that they are simply repackaged statutory claims brought for purposes of evading the Tucker Act. *See Appalachian Voices v. United States Env't Prot. Agency*, No. CV 25-1982 (RJL), 2025 WL 2494905, at *9 (D.D.C. Aug. 29, 2025) ("Plaintiffs, however, may not circumvent the Tucker Act and the APA's non-reviewability provision by reframing an alleged statutory violation as constitutional claims."). Like the plaintiffs in *Appalachian Voices* and *Climate United Fund*,

Plaintiff here seeks to bring a constitutional separation of powers claim predicated upon the Executive Branch's alleged failure to comply with congressional mandates in the governing statute. "As an initial matter," however, "this is not a constitutional claim at all, but rather a claim that [USAGM] violated the [IBA]. Claims that agency officials acted in excess of their statutory authority do not *ipso facto* allege violations of the 'Separation of Powers.'" *Climate United Fund*, 154 F.4th at 826 (D.C. Cir. 2025).

The constitutional separation of powers doctrine is only implicated when the challenged executive acts are taken by "inherent constitutional" authority or when the statute that the Executive Branch relies on for authority is itself unconstitutional. *See Dalton v. Specter*, 511 U.S. 462, 472-73 (1994). Neither fact pattern is present here. USAGM's authority to disburse funding only when it becomes due to third parties stems from the parties' grant agreement and its incorporation of 2 C.F.R. § 200.305, not the Constitution, and Plaintiff does not challenge the constitutionality of that source of executive authority. "Our Circuit interprets *Dalton* as prohibiting a plaintiff from 'bring[ing] a freestanding constitutional claim if the underlying alleged violation and claimed authority are statutory.'" *Appalachian Voices*, 2025 WL 2494905, at *9 (quoting *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *1 (D.C. Cir. Aug. 13, 2025). Because "plaintiff[] ha[s] not raised in [its] motion a 'serious legal question' on the merits," *Appalachian Voices v. United States Env't Prot. Agency*, No. CV 25-1982 (RJL), 2025 WL 2732746, at *2 (D.D.C. Sept. 25, 2025), the Court should find that "[t]he grantees' regulatory and arbitrary and capricious claims can be heard only in the Court of Federal Claims, and their constitutional claim is meritless." *Climate United Fund*, 154 F.4th 809, 819 (D.C. Cir. 2025).

III.    *NIH* **is Not Limited to Discretionary Spending and Plaintiff has Failed to Identify Legal Grounds Independent from the Contract to Pursue Its Claims.**

As already discussed, it is irrelevant for present purposes whether the funding obligated to OTF is "mandatory" or "discretionary," because the current dispute is not about *if* Defendants will disburse the funding but instead *how* they will do it and on what timeline. On this question, it is clear that Defendants have been delegated discretionary authority. *See supra* at 9. Nevertheless, Plaintiff devotes the bulk of its supplemental brief to attempting to narrow *NIH*'s holding to discretionary spending, despite Justice Barrett's opinion, which is controlling, *see supra* at 2, never drawing such a distinction.

Plaintiff quotes a handful of sentences from various non-controlling opinions that do little more than observe that the grants at issue there were discretionary. *See* Pl.'s Suppl. Br. at 2-3 (quoting from the opinions of Justices Gorsuch, Jackson, and Kavanaugh). But the grants' discretionary nature did not factor into Justice Gorsuch and Kavanaugh's jurisdictional analyses in any meaningful sense. Indeed, Justice Gorsuch's opinion, joined by Justice Kavanaugh, forcefully rebuked the district court's attempt to draw a distinction between discretionary and non-discretionary funding in order to avoid the natural extension of the Supreme Court's prior holding in *California*. *See NIH*, 145 S .Ct. 2663-64 (J. Gorsuch concurring in part and dissenting in part) (finding that the failure to follow *California* "was error" and that the attempt to distinguish it was a "failed" "effort").

Justice Kavanaugh's own observation of the "highly discretionary" nature of the grants was noted only in passing as he suggested the discretion meant plaintiffs would be "unlikely to succeed on the *merits* of their arbitrary and capricious challenge." *Id*. at 2665 (J. Kavanaugh, concurring in part and dissenting in part) (emphasis added). At no point did it factor into his *jurisdictional* analysis.

Plaintiff notes that Justice Jackson observed how "[v]arious statutory provisions shape the NIH's discretion in allocating these funds." *Id*. at 2667 (J. Jackson, concurring in part and dissenting in part). But given that Justice Jackson would have rejected Justice Barrett's dichotomy between challenges to policies and challenges to contracts and instead held that all the claims could be heard in district court, it is not clear why her observation of NIH's discretionary authorities should play any role in this Court's understanding of the case's prevailing jurisdictional holding.

Even assuming the discretionary versus mandatory distinction was essential to the ultimate holding in *NIH*—even though all signs indicate it was not—Plaintiff fails to persuasively argue why it should matter here. Plaintiff suggests that the mandatory nature of OTF's funding creates "'truly independent legal grounds'" for its claims divorced from the contract. Pl.'s Suppl. Br. at 6 (quoting *Climate Fund United*, 2025 WL 2502881, at *5). But Plaintiff fails to connect these grounds to the relief it requests. The only "mandate" is Congress's requirement that appropriated funds "shall be available to make annual grants [to OTF.]" 22 U.S.C. § 6208a(a)(1). This language says nothing specific about the timing of disbursement. Nor does the appropriation of funding "for programs to promote Internet freedom globally." *See* FY24 SFOAA, as carried forward by FY25 Full-Year CR. The appropriation also calls for the parties to submit "spend plans" to Congress, but it does not direct that these plans shall contain a specific timeline for disbursement; all it specifies is that the plans "shall include a description of safeguards established by relevant agencies to ensure that such programs are not used for illicit purposes." *Id*.

To the extent there are any statutory guidelines about the agency's obligation to disburse appropriated funds according to a particular timeline, the applicable statute is 31 U.S.C. § 1552, which establishes the default timeline by which an appropriation must be spent or otherwise revert to the Treasury. "On September 30th of the 5th fiscal year after the period of availability for

obligation of a fixed appropriation account ends, the account shall be closed and any remaining balance (whether obligated or unobligated) in the account shall be canceled and thereafter shall not be available for obligation or expenditure for any purpose." *Id*. That period has not lapsed.

Since there is no statutorily mandated duty with which Defendants have failed to comply, Plaintiff does not have any legal grounds truly independent from the contractual grant agreement by which it can pursue the relief it requests, therefore Plaintiff's claims belong in the CFC under the Tucker Act.

## CONCLUSION

For the foregoing reasons, and those previously stated in Defendants' opposition brief, the Court should deny Plaintiff's second motion for a preliminary injunction.


Dated: November 11, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General
                                            Civil Division, Federal Programs Branch

                                            JOSEPH E. BORSON
                                            Assistant Branch Director
                                            Civil Division, Federal Programs Branch

                                            /s/ *Abigail Stout*
                                            ABIGAIL STOUT
                                            (DC Bar No. 90009415)
                                            Counsel
                                            Civil Division
                                            U.S. Department of Justice
                                            950 Pennsylvania Avenue, NW
                                            Washington, DC 20530
                                            Telephone: (202) 514-2000
                                            Email: Abigail.Stout@usdoj.gov

14

_/s/ Eitan R. Sirkovich_
EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

_Attorneys for Defendants_