**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**OPEN TECHNOLOGY FUND,**

    *Plaintiff,*

**v.**

    **Case No. 1:25-cv-00840-RCL**

**KARI LAKE**, *et al.*,

    *Defendants.*

## MEMORANDUM OPINION & ORDER

Before the Court is Plaintiff Open Technology Fund's ("OTF") Motion for a Preliminary Injunction, *see* ECF No. 44, which seeks to enjoin the defendants (collectively, "USAGM") from withholding congressionally appropriated funds under the OTF grant for Fiscal Year 2025. For the reasons explained below, the Motion is **GRANTED**.

## I.    BACKGROUND

### a.    Key Facts

Open Technology Fund ("OTF") is a private nonprofit organization authorized by federal law under the William M. ("Mac") Thornberry National Defense Authorization Act of 2021. *See* Fifth Decl. of Laura Cunningham ¶ 1, ECF No. 44-2 ("Fifth Cunningham Decl."). Its mission is to "advance freedom of the press and unrestricted access to the internet in repressive environments" by "research[ing], develop[ing], implement[ing], and maintain[ing] . . . technologies that circumvent techniques used by authoritarian governments . . . to block or censor access to the internet," as well as "secure communication tools . . . that facilitate the creation and distribution of news and enable audiences to access media content on censored websites." 22 U.S.C. § 6208a(b). Congress also tasks OTF with "advanc[ing] internet freedom by supporting private and public sector research, development, implementation, and maintenance of technologies

1

that . . . counter attempts by authoritarian governments, nonstate actors, and others to improperly restrict freedom online," and to "research and analyze emerging technical threats and develop innovative solutions . . . to maintain the technological advantage of the United States Government over" such actors. *Id.* § 6208a(b)(2)–(3). OTF fulfills this remit by homing in on the surveillance and censorship technologies used by repressive regimes such as Iran, China, and Cuba, and by developing and deploying digital tools to circumvent these technologies, such as virtual private networks ("VPNs") and internet shutdown-resistant communication technologies. *See Open Tech. Fund v. Lake*, 788 F. Supp. 3d 32, 34 (D.D.C. 2025). It does so primarily through contracts with individual or organizational partners.

Since OTF's inception, Congress has appropriated money to OTF for that purpose. In the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, §§ 7019, 7050, 138 Stat. 460, 833 (2024), Congress allocated \$43.5 million specifically for OTF for the 2024 fiscal year. Since then, OTF has been allocated funding via continuing resolutions, including the resolution signed into law by President Trump on March 15, 2025 that allocated a further \$43,500,000 to OTF.[1] *See* Full Year Continuing Appropriations and Extensions Act, 2025, H.R. 1968, 119th Cong. § 1101(a) (2025). The money appropriated for OTF is first apportioned to USAGM and then provided to OTF under a grant between OTF and USAGM, and the period of performance for each OTF grant lasts for the three subsequent fiscal years. *See* 22 U.S.C. § 6208a(e); Fifth Cunningham Decl. ¶ 3.

OTF filed the instant motion in response to USAGM's refusal to disburse funds under the Fiscal Year ("FY") 2025 grant that USAGM and OTF received. That grant covers the period of

---

[1] Both parties acknowledge that OTF receives money through "no-year" appropriations that can be spent beyond the specific fiscal year in which the funds were appropriated. Fifth Cunningham Decl. ¶ 3.

2

October 1, 2024 through September 30, 2027. *See* Fifth Cunningham Decl. ¶ 3. As with every other OTF grant, it includes a Financial Plan prepared by OTF that identifies the operational expenses and programs that OTF will fund each month, as well as the schedule for distribution of the funds. Fifth Cunningham Decl. ¶ 7.

In typical practice, at the beginning of each month, OTF makes drawdown requests to USAGM in accordance with the approved financial plan for the operative grant. *Open Tech. Fund*, 778 F. Supp. 3d at 34. OTF's drawdown requests include funding for OTF's monthly operating costs — like salaries and utilities. The drawdowns also include programmatic costs, which are the costs OTF pays to its partners. Since OTF's inception in 2012,[2] USAGM has disbursed to OTF the full amount due to such contractors at the time of OTF obligated the funds due under the contact. Fifth Cunningham Decl. ¶ 30. So, if OTF entered a $60,000 six-month agreement to obtain technical support for journalists in an oppressive foreign state, USAGM would disburse the full $60,000 to OTF at the time OTF became obligated under the agreement.

USAGM approved the 2025 Financial Plan on January 22, 2025. Fifth Cunningham Decl. ¶ 7. As has been routine, on January 24, 2025, OTF requested and received a drawdown for $16,196,355 of its congressionally appropriated FY 2025 funds in accordance with the 2025 Financial Plan, amounting to $8,098,178 for January 2025, and $8,098,177 for February 2025. Fifth Cunningham Decl. ¶ 8.

However, since that date, USAGM has not disbursed any funds under the executed FY 2025 grant beyond certain minimum operating expenses, and its reasons have shifted over time. Initially, in April 2025 — six months after execution of the FY 2025 grant — USAGM sent OTF

---

[2] OTF operated as a program within Radio Free Asia from 2012 to 2019, at which time Congress incorporated it as an independent entity. *See* Fifth Cunningham Decl. ¶ 30.

3

a revised FY 2025 grant containing more than 100 modifications. After negotiations, USAGM became unresponsive, and remained so until August 27, 2025. Fifth Cunningham Decl. ¶ 24. At that time, USAGM requested from OTF an updated FY 2025 financial plan with a five percent reduction in total funding, which USAGM would reprogram pursuant to the allowance under the OTF appropriations. *Id*. OTF complied with the request the next day. *Id*. ¶ 25. USAGM requested further clarification on September 8, and OTF again addressed USAGM's request the next day. *Id*. ¶ 26–27.

After two more weeks passed, on September 23, 2025, USAGM returned, requiring yet another change to the 2025 Financial Plan. *Id*. ¶ 29. Rather than requiring a mere five percent reduction in costs for reprogramming, USAGM now refused to disburse funding to OTF at the time of obligation, instead insisting that USAGM would only disburse appropriated funds when contractual payments became due. *Id*. USAGM asserted that it had taken the position that federal grantmaking regulations — specifically, 2 C.F.R. § 200.305(b)(1), discussed in greater detail below — required the change in accounting procedures. *Id*. This was despite OTF and USAGM's longstanding practice, which USAGM had previously found to have complied with federal budgetary regulations: during OTF's annual audits from 2020 through 2024, USAGM explained that its "policy for its grantees aligns with Federal budgetary and obligation accounting," and that OTF was "required to draw down funds with the timing of obligation requirements, rather than with the timing of cash outlays." *Id*. ¶ 32.

OTF did not comply with the request. Instead, it explained to USAGM that disbursing funds as funds became due would make it impossible for OTF to serve its statutory mission:

> OTF's Congressional mandate to support cutting edge technologies to counter rapidly evolving authoritarian technological advancements requires OTF to issue contracts and provide funding in real time. As a result, OTF cannot predict "actual cash outflows"

> for any given month because this depends entirely on the speed of
> technical developments and demand for the circumvention tools
> OTF supports. In acknowledgement of OTF's unique operating
> model and to ensure the continuity of OTF's services, USAGM has
> always provided funding to OTF in line with the obligation of our
> contracts for the full amount of those contracts. USAGM and OTF
> have agreed in practice over the entirety of our partnership that this
> disbursement methodology is, in fact, the "minimum amount needed
> . . . in accordance with the actual, immediate cash requirements [of
> OTF] . . ." to ensure OTF can meet its Congressional mandate and
> does not default on its financial and legal obligations.

Fifth Cunningham Decl. ¶ 36 (alterations in original) (quoting 2 C.F.R. § 200.305(b)(1)). Instead,

OTF brought this motion for preliminary injunction vacating USAGM's decision to withhold

OTF's congressionally appropriated programmatic funds until OTF complies with its revised

interpretation of § 200.305(b)(1), which has resulted in the retention of $19,063,013. Since the

filing of their motion, USAGM has disbursed OTF's October and November operating funds,

totaling $551,263 for October and $536,591 for November, but no programmatic funds. *See* Sixth

Declaration of Laura Cunningham ¶ 16, ECF No. 49-1 ("Sixth Cunningham Decl.").

### b. Procedural History

This is the second motion for a preliminary injunction OTF has brought against USAGM

for failure to disburse appropriated funds under its grants. In April 2025, OTF moved for a

preliminary injunction ordering OTF to distribute funds appropriated by Congress for allocation

under the FY 2024 grant, which the Court granted on June 20. *See Open Tech. Fund*, 788 F. Supp.

3d at 39–40.

OTF filed the present motion on October 10, 2025. USAGM opposed on October 21, *see*

Mem. Opp'n, ECF No. 48 ("Opp'n"), and OTF replied on October 24, *see* Reply, ECF No. 49.

The Court then ordered supplemental briefing, including amicus briefing by other USAGM

grantees, on intervening case law related to the jurisdictional issues in this case. *See* ECF No. 51.

OTF filed its supplemental memorandum on November 5. *See* Supp. Mem., ECF No. 58. Amici

filed a brief on November 7. *See* Amicus Br., ECF No. 60. USAGM filed a supplemental opposition on November 11. *See* Supp. Opp'n, ECF No. 61. The motion is now ripe.

## II.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a movant must establish (1) a substantial likelihood of success on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in her favor, and (4) that a preliminary injunction is in the public interest. *See id.* at 20. Though the party seeking a preliminary injunction may rely on "'evidence that is less complete than in a trial on the merits,' she nevertheless bears the burden of producing credible evidence sufficient to demonstrate her entitlement to injunctive relief." *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017) (quoting *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022–23 (D.C. Cir. 1998)). All four factors, taken together, must weigh in favor of a preliminary injunction. *See Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).

## III.    ANALYSIS

OTF seeks preliminary relief for USAGM's refusal to disburse funds under the FY 2025 grant via four claims: a claim under the Administrative Procedure Act ("APA"), an *ultra vires* claim, a mandamus claim, and a claim brought directly under the Appropriations Clause, the Spending Clause, the Presentment Clause, and the Take Care Clause of the Constitution. After addressing two jurisdictional concerns raised by USAGM — that this case belongs in the Court of Claims under the Tucker Act, and that OTF seeks relief outside that requested in its pleadings — the Court concludes that OTF is likely to succeed on the merits of its APA claim and declines to address the remaining theories of relief at the preliminary injunction stage.

6

### a. Prong 1: Likelihood of Success on the Merits

The first of the four *Winter* factors requires a plaintiff to show a substantial likelihood of success on the merits. *See* 555 U.S. at 20. "The merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019). Thus, before turning to the likelihood of success on the substantive merits, OTF must first establish that the Court has jurisdiction over its claims. "A plaintiff who fails to show a substantial likelihood of jurisdiction is 'not entitled to any relief . . . .'" *Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021) (quoting *Schindler Elevator Corp. v. WMATA*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020), *aff'd* 16 F.4th 294 (D.C. Cir. 2021)).

### i. Tucker Act

USAGM argues that the government enjoys sovereign immunity in federal district court from OTF's claims, which it contends belong in the Court of Claims under the Tucker Act. "'[S]overeign immunity is jurisdictional in nature' and deprives courts of the power to hear suits against the United States absent Congress's express consent." *United States v. Miller*, 604 U.S. 518, 527 (2025). Thus, unless Congress has waived sovereign immunity, federal courts lack jurisdiction over civil actions. OTF's motion implicates two congressional waivers of sovereign immunity. First, the APA "provides a limited waiver of sovereign immunity" for "action[s] 'seeking relief other than money damages.'" *Am. Public Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 48 & n.4 (1st Cir. 2025) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 891–93 (1988)), *aff'd in relevant part and reversed in part on other grounds*, 145 S. Ct. 2658, 2659 (2025) (Mem.); *see also* 5 U.S.C. § 702. That waiver is inapplicable, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.

7

Second, under the Tucker Act, the Court of Federal Claims enjoys jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). In the D.C. Circuit, the Tucker Act is understood "to confer exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Hammer v. United States*, 989 F.3d 1, 2 (D.C. Cir. 2021)). In other words, in conjunction with § 702, the Tucker Act "'impliedly forbid[s]' contract claims against the Government from being brought in district court under the waiver in the APA." *Id.* (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618–19 (D.C. Cir. 2017)). Except under narrow circumstances,[3] the Court of Federal Claims "has no power to grant equitable relief." *Bowen*, 487 U.S. at 905.

Requests for retrospective money damages or prospective injunctive or declaratory relief are often intertwined, particularly in cases involving grant awards. But the mere fact that an injunction or declaratory judgment may "ultimately . . . lead to the disbursement of funds by the federal government" does not render such relief an award of money damages that falls outside the scope of the APA. *Am. Pub. Health Assan*, 145 F.4th at 49. Rather, relief under the APA may permissibly result in payment of money as a "by-product of th[e] court's primary function" of setting aside unlawful agency action. *Bowen*, 487 U.S. at 910. The D.C. Circuit has "rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily *on* the contract and therefore directly within the Tucker Act.'" *Crowley*, 38 F.4th at 1107 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982).

---

[3] The Court of Claims can provide limited equitable relief "only when jurisdiction was properly founded on a money claim." *Walters v. Sec'y of Def.*, 725 F.2d 107, 112 n.10 (D.C. Cir. 1983) (quoting 28 U.S.C. § 1491(a)(2)).

On the other hand, "a litigant whose claim is essentially contractual cannot 'avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act' by simply asking for injunctive relief in district court." *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 820 (D.C. Cir. 2025) (quoting *Megapulse*, 672 F.2d at 967). This jurisdictional inquiry does not allow courts to blindly defer to a plaintiff's characterization of its own claims. *See id.* (explaining Tucker Act applicability "cannot turn on a plaintiff's preferred characterization of its claim"); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("The fact that the pleadings may 'nowhere mention[] breach of contract . . . cannot alone suffice to establish jurisdiction.'" (citation omitted)). Rather, courts must guard against "the creative drafting of complaints," lest litigants "'disguis[e]' . . . claim[s] for money damages as one[s] for equitable relief." *Crowley*, 38 F.4th at 1107 (first alteration in original) (quoting *Kidwell v. Dep't of Army, Bd. of Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)).

It is thus incumbent on the Court to conduct an independent examination of whether a claim is "at its essence a contract claim." *Megapulse*, 672 F.2d at 967. In ruling on OTF's initial motion for preliminary injunction, this Court concluded that it likely has jurisdiction over the claims presented by OTF in this case. *See Open Tech. Fund v. Lake*, 788 F. Supp. 3d 32, 37 (D.D.C. 2025); *see also Widakuswara v. Lake*, 779 F. Supp. 3d 10, 28–30 (D.D.C. 2025). Despite USAGM's protestations, this Court likely continues to enjoy such jurisdiction.

The well-established *Megapulse* test ferrets out contract claims cloaked in APA garb. Under that test, courts examine (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *Id.* at 968. To determine "the source of the rights upon which the plaintiff bases its claims," the Court must determine whether the rights

at issue emanate from a contract or another source of law. *See id.*; *Crowley*, 38 F.4th at 1107. Here, the answer is the latter.

OTF alleges in its complaint, and asserts in its preliminary injunction papers, that USAGM is once again acting contrary to the APA, the International Broadcasting Act, and duly enacted federal appropriations by stonewalling the disbursement of funding allocated to OTF by Congress. *See* Compl. ¶¶ 47–57. Congress established OTF as a "grantee entity" by statute, 22 U.S.C. § 6208a(a)(2), and assigned it specific functions by law, *id.* § 6208a(a)(1), (b). Congress also authorized the making of annual grants to OTF to fund those functions, *id.* § 6208a(a)(1), and set "limitations and restrictions on such grants," including specific terms such grants must include, *see id.* § 6208a(d)(2)–(4) (specifying mandatory grant terms).

In furtherance of those provisions, Congress appropriated defined sums that, by statute, "shall be allocated" to OTF by USAGM. *See* Pub. L. No. 118-47, div. F, 138 Stat. 460, 833 (2024); Pub L. No. 119-4, div. A, tit. I, 139 Stat. 9, 12 (2025). No more than five percent of those funds may be reprogrammed. *See* 2024 Appropriations Act, 138 Stat. at 735; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025). And as with the grantee networks, like Radio Free Asia, USAGM may terminate a grant "only for 'failure to comply with' the requirement 'that grant funds be used only for activities consistent with' the statute." *Widakuswara v. Lake*, 2025 WL 1288817, at *11 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) (quoting 22 U.S.C. § 6208(c)(5)); *see also Widakuswara v. Lake*, 2025 WL 1321355, at *1 (D.C. Cir. May 28, 2025) (en banc) (reversing panel's jurisdictional basis for denying stay "substantially for the reasons explained by Judge Pillard"); 22 U.S.C. § 6208a(d)(2) (subjecting OTF to similar termination provision ).

10

The foregoing provisions distinguish this case from those on which USAGM relies, because they evince Congress's intent to mandate that USAGM allocate funding to OTF.[4] Congress's "use of grants as a vehicle to deliver appropriated funds to the Networks does not 'automatically transform' their case into a contract action." *Widakuswara*, 2025 WL 128817, at *12 (Pillard, J., dissenting) (quoting *Megapulse*, 672 F.2d at 968).

USAGM contends that it is merely asserting its authority to supervise OTF's grant funds. In particular, the agency argues that it is altering its disbursement protocols for OTF to facilitate oversight of the agency. Setting aside the merits of that argument for APA purposes, the very oversight authority that USAGM cites originates in federal statutes and regulations, not the terms of any particular grant between OTF and the government. Congress specified that OTF "shall be subject to the same oversight and governance by the United States Agency for Global Media as other grantees." *Id.* § 6208a(e)(1) (incorporating grantee requirements established under 22 U.S.C. § 6204). Those include the USAGM CEO's specific authority "[t]o make and supervise grants" and "[t]o allocate funds . . . among . . . [the] grantees." *Id.* § 6204(5)–(6). And, to the extent USAGM contends this dispute ultimately centers on USAGM's authority to supervise grant disbursements — and thus, to reinterpret how OPM grantmaking regulations apply to OTF —it is worth noting that the statutes conferring such authority and the OPM guidance itself are both extrinsic to the grant. *See* 22 U.S.C. § 6204(5); 2 C.F.R. § 200.305(b)(1).[5] Thus, even USAGM's

---

[4] The Court expresses gratitude to OTF, USAGM, and the amici for their helpful supplemental briefing on this point.

[5] USAGM cites *Climate United Fund* to support its view that "when the Office of Management and Budget's ("OMB") regulatory guidance found in 2 C.F.R. Part 200 is incorporated as a contract term, a Court should understand a plaintiff's 'attempt to ground their [APA] claims in [the] OMB guidance . . . 'as entirely contained within the terms of the contract' or in principles of contract law.'" Supp. Opp'n at 4 (quoting *Climate United Fund*, 154 F.4th at 821). The role of the OMB Guidance in *Climate United Fund* is not analogous to the case here. In *Climate United*, the grantees cited *separate* provisions of OMB guidance governing the agency's right to terminate a grant and the notice required for such termination. 154 F.4th at 821; *see also* 2 C.F.R. §§ 200.340(a)(4), 200.341(a). Critically, the meaning of those regulations was not in dispute, and those regulations were incorporated as specific terms within the agreement. *Climate United Fund*, 154 F.4th at 821. Here, the dispute centers on the question of whether USAGM's

justification of its actions on oversight grounds "require[s] primarily an examination of . . . statutes" and regulations, not of the grant itself. *Crowley*, 38 F.4th at 1109–10.

USAGM also disclaims that this dispute is about OTF's statutory entitlement to Congress's appropriated funds — it has conceded in its opposition, its declarations, its supplemental briefing, and at oral argument that OTF is plainly entitled to such monies[6] — and instead maintains it is about the schedule on which funding is disbursed, which presents a contract question. USAGM apparently argues that because it has an active grant with OTF, the agency has satisfied the statutory obligation to make funds available to OTF. Thus, all that remains is what the grant might require, and consequently, any claim OTF might have against the agency necessarily sounds in contract. But *Megapulse* rejected the suggestion that "an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might *also* amount to a breach of contract." 672 F.2d at 971 (emphasis added). To hold otherwise would allow the government to "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities." *Id.* Justice cannot tolerate that outcome, and neither will this Court. OTF asserts an APA claim, not a contract claim cloaked in administrative garb.

USAGM does not fare much better at *Megapulse* step two: the relief sought in this case mirrors injunctive relief routinely afforded under the APA. OTF's complaint requests, among other things, a "permanent injunction barring Defendants from impounding the Open Technology Fund's congressionally appropriated funds and requiring Defendants to honor subsequent drawdown requests submitted by the Open Technology Fund made consistent with the USAGM

---

novel interpretation of a distinct provision of the OMB guidance complied with the requirements of the APA. And the relevant portion of the guidance — 2 C.F.R. § 200.305(b)(2) — is not incorporated as a term anywhere within the FY 2025 grant document. *See* ECF No. 48-2.

[6] *See* Opp'n at 20 ("[T]he dispute here is not about whether OTF is entitled to its remaining FY25 appropriated funds; it is undisputed that OTF is so entitled."); Supp. Opp'n at 8 ("USAGM does not dispute that OTF is currently entitled to the full amount of funding allocated for OTF . . . ." (quoting Smith Decl. ¶ 12)).

12

Grant Agreements, USAGM procedure for grantee drawdown requests, the Open Technology Fund's financial plan previously approved by USAGM, and the congressional appropriations to the Open Technology Fund." Compl. at 22. This is not, on its face or in substance, a request for money damages. Rather, OTF seeks vacatur of USAGM's refusal to pay and the reasons (or lack thereof) underlying it. "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. Damages are "compensatory relief" paid as a "substitute[] for that which ought to have been done." *Id.* at 895, 910. The relief sought would not just result in disbursement of money OTF claims it is due to date. It would also effectuate forward-looking relief ensuring that USAGM makes available the funds Congress specifically appropriated for the furtherance of its statutory mission for the duration of its grant term. *See Nat'l Ctr. For Mfg. Scis. v. United States*, 114 F.3d 196, 201 (D.C. Cir. 1997).

USAGM maintains that OTF's prayer for relief is therefore the functional equivalent of a request for specific performance, the equitable contract remedy available when money damages are insufficient. *See* Opp'n at 14; Supp. Opp'n at 7. This argument falters for three foundational reasons. First, for the remedy to sound in contract, the claim must too — but the claims here emanate from statutory regulatory duties, not assumpsit, for the reasons just described. *See Climate United Fund*, 154 F.4th at 820 ("[T]he APA does not waive sovereign immunity for *contract claims* seeking specific relief." (emphases altered) (quoting *Transohio*, 967 F.2d at 613)). Second, the mere fact that Congress routes OTF's funding through grants does not mean that impeding the flow of taxpayer money to its appropriated destination becomes a mere question of contract law. The D.C. Circuit has confirmed as much, recognizing that the Tucker Act does not forbid district courts "from granting injunctive relief merely because that relief might be the

equivalent of ordering specific performance of a government contract." *Transohio*, 967 F.2d at

611, *abrogated in part on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir.

2017).[7] The suggestion that the Tucker Act forbids requests for APA vacatur any time such relief

might overlap with contractual specific performance in the manner USAGM suggests is little more

than a red herring. *Md. Dep't of Hum. Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441,

1449 (D.C. Cir. 1985) ("[U]nlike normal contractual undertakings, federal grant programs

originate in and remain governed by statutory provisions expressing the judgment of Congress

concerning desirable public policy." (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669

(1985))). Rather, as the Circuit has explained, the Tucker Act is concerned with ferreting out

"money claims" masquerading as injunctive relief. *Kidwell*, 56 F.3d at 284 ("'[J]urisdiction under

the Tucker Act cannot be avoided by . . . disguising a money claim' as a claim requesting a form

of equitable relief." (quoting *Van Drasek v. Lehman*, 762 F.2d 1065, 1071 n.11 (D.C. Cir. 1985)).

Third, USAGM's sole authority is the D.C. Circuit's recent ruling equating a "request to set aside

[a] grant termination[]" with "specific performance" of such agreement. *Climate United Fund*,

154 F.4th at 823. But reinstatement of a terminated discretionary grant, as the supplemental and

amicus briefing explains, is plainly not the relief OTF seeks here: an injunction ensuring timely

distribution of appropriated funds. *See Washington v. U.S. Dep't of Comm.*, 2025 WL 2978822,

at *6 (W.D. Wash. Oct. 22, 2025) (distinguishing *Climate United Fund* from cases involving

---

[7] USAGM suggests, in a footnote, that *Transohio* has been abrogated in this respect. *See* Supp. Opp'n at 6 n.4. The D.C. Circuit abrogated *Transohio*'s "holding" that the waiver of sovereign immunity under § 702 of the APA is limited by the "adequate remedy" bar of § 704. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620–21 (D.C. Cir. 2017). In this Court's view, nothing in *Perry Capital* casts doubt on the soundness of *Transohio*'s reasoning with respect to the language cited in this opinion. In any event, in asserting its broader reading of the effect of *Perry Capital*, USAGM cites only a dissent, which of course has no binding effect and does not reflect "the current state of the law." *See Middle East Broadcasting Networks, Inc. v. United States*, 2025 WL 1378735, at *3 (D.C. Cir. May 7, 2025) (Katsas, J., dissenting); *see also Abramowitz v. Lake*, — F. Supp. 3d —, No. 25-cv-887, 2025 WL 2480354, at *11 n.5 (D.D.C. Aug. 28, 2025) ("[T]he dissent on which the defendants rely is, by its nature, not the current state of the law." (citation omitted)).

payment of non-discretionary grants on the ground that "the grants at issue were not cooperative agreements and the relief sought does not appear to be parallel with what is sought here").

Finally, as explained in greater detail below, USAGM's refusal to pay and its proffered interpretation of 2 C.F.R. § 200.305(b)(1) occurred in one fell swoop. Vacating that action thus affords complete relief to OTF. *Cf. Nat'l Insts. of Health v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Mem.) (Barrett, J.). The Court thus agrees with OTF and amici that OTF's APA claim belongs in federal court.

### ii. Scope of the Complaint

USAGM next contends that OTF is unlikely to succeed on the merits of its claim because its motion "seeks preliminary relief from conduct not described in its complaint and seeks to raise new claims that have not been previously pled." Opp'n at 8. "[A] plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint." *Aminjavaheri v. Biden*, 2021 WL 4399690, at *5 (D.D.C. Sept. 27, 2021). Absent a connection between the relief sought and the action alleged to be unlawful, "there is simply no jurisdictional basis for the Court to grant preliminary relief." *Bird v. Barr*, 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (Brown Jackson, J.). "[S]uch a connection exists," and jurisdiction is thus sufficient, "where 'the preliminary injunction would grant relief of the same character as that which may be granted finally.'" *Id.* (quoting *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015)).

The present motion for preliminary injunction falls within the boundaries of these principles. *First*, USAGM is incorrect that the "operative complaint" focuses only on the FY 2024 grant to the exclusion of the 2025 grant at issue in the instant motion. Opp'n at 12. OTF's pleadings ask the Court to "declare unlawful and set aside USAGM's termination of the 2023, 2024 *and 2025* Grant Agreements." Compl. ¶ 57; *see also id.* at 22 (describing relief requested as

15

including a declaration that the "termination of Grant FAIN OT01-25-GO-00001, Grant FAIN OT01-24-GO-00001, and Grant FAIN OT01-23-GO-0001 is unlawful and null and void").

*Second*, USAGM is wrong that the sole focus of the Complaint is grant terminations, as opposed to other means of obfuscating the distribution of appropriated funds. The Complaint specifically requests that OTF "order Defendants to obligate, approve, and disburse congressionally appropriated funds in accordance with law." *Id.* *Third*, similar reasons refute USAGM's suggestion that the relief requested in OTF's pleadings is incongruous with its current request for preliminary relief. The Complaint specifically requests "a permanent injunction" that would (1) "bar[] the Defendants from impounding the Open Technology Fund's congressionally appropriated funds," and (2) "require[e] Defendants to honor subsequent drawdown requests submitted by the Open Technology Fund made consistent with the USAGM Grant Agreements, USAGM procedure for grantee drawdown requests, the Open Technology Fund's financial plan previously approved by USAGM, and the congressional appropriations to the Open Technology Fund." Compl. at 22. USAGM cannot reasonably characterize the present request for a preliminary injunction ordering payment of the appropriations channeled through the 2025 grants as an "auxiliary form[] of relief" to serve OTF while it "litigate[s] unrelated claims." *Bird*, 2020 WL 4219784, at *2. OTF comes to the Court asking for precisely the relief requested in the Complaint: an order requiring USAGM to "honor subsequent drawdown requests" and "USAGM procedure for grantee drawdown requests."

Having established the substantial likelihood of jurisdiction over OTF's APA claim, the Court turns now to the claim's merits.

### iii. APA Claim

The APA authorizes courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). It also directs courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Because the Court concludes that OTF is likely to succeed on the merits of its arbitrary and capricious claim under § 706(2)(A), the Court declines to reach OTF's §705(1) claim.

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it fails to "supply a reasoned analysis" for a change in policy. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). To constitute "reasoned analysis," the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *State Farm*, 463 U.S. at 43). Thus, where an agency reverses course and "fail[s] to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

By failing to develop an argument to the contrary, USAGM has waived, and therefore conceded, any argument that the decision to withhold funding subject to a revised financial plan is final agency action.[8] And for the reasons that follow, the refusal to disburse OTF's appropriated

---

[8] USAGM makes a boilerplate and conclusory statement that "a mere change in agency payment operations" does not "constitute[] reviewable agency action under the APA . . . , as it is not clearly the 'consummation of the agency's decisionmaking process' or a decision by which "'rights or obligations have been finally determined.""" Opp'n at 15 n.3 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The Court cannot credit this presentation, without even cursory analysis of how the applicable principles of administrative law apply to the facts of this case, as making or preserving a challenge to the decision's status as final agency action. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). "[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." *Id.* (citation omitted). In any case, the Court has little difficulty concluding that USAGM is simply wrong on this score. "[F]inal does not mean permanent," *Abramowitz*, 2025 WL 2480354, at *9 (quoting *Widakuswara*, 779 F. Supp. 3d at 32), and USAGM's representations to this Court indicate that the agency

17

funds is arbitrary and capricious because (1) USAGM provided *no* contemporaneous reasoning when it informed OTF of its decision; (2) the Court cannot consider the post-hoc rationalizations that USAGM urges in its briefing, and (3) even those rationalizations are substantively inadequate because they fail to address OTF's well-founded reliance interests.

First, it is axiomatic that "post hoc rationalizations of [an] agency. . . cannot serve as a sufficient predicate for agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 23 (2020) (quoting *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 539 (1981)). Rather, for a court to consider reasons offered by the government in support of agency action, the "[a]gency must defend its actions based on the reasons it gave when it acted." *Id.*; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Here, USAGM changed its longstanding interpretation of § 200.305(b)(1) as applied to OTF, and the record discloses that USAGM gave *no* reason for its departure from prior practices at the time it acted. USAGM apparently informed OTF about the new interpretation in an email from Ryan Weber to Laura Cunningham on September 8, 2025. *See* ECF No. 48-3 at 5–6. Weber stated that "in line with the requirement to minimize the time federal funds are held outside of the US treasury, we ask [that] the financial plan time the drawdowns to coincide with OTF's actual and immediate expenditure needs." *Id.* at 6. Then, on September 23, Weber stated USAGM's view that § 200.305(b)(1) "requires" that:

> Advance payments to a recipient or subrecipient *must be limited to the minimum amounts needed and be timed to be in accordance with the actual, immediate cash requirements* of the recipient or subrecipient in carrying out the purpose of the approved program or project. *The timing and amount of advance payments must be as close as is administratively feasible to the actual disbursements* by

has no intention of releasing Congress's funding absent acquiescence by OTF or an order by this Court. And because this interrupts the flow of statutory funding to OTF and its partners, it has necessarily determined their legal rights.

18

> the recipient or subrecipient for direct program or project costs and
> the proportionate share of any allowable indirect costs.

ECF No. 48-3 at 4 (emphasis in original). In other words, up to this point, USAGM had provided *no* explanation for the change in its interpretation of 2 C.F.R. § 200.305(b)(1) apart from the conclusory — and therefore insufficient — explanation that the agency believed that was what the regulation required. *See A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (conclusory rationales are insufficient).

The absence of an explanation is all the more glaring in light of what happened next. After receiving Weber's email, Cunningham wrote back seeking an explanation for the agency's "new interpretation of and application of 2 CFR 200.305(b)(1)." ECF No. 48-3 at 4. She explained that the change constituted a "drastic departure from the uniform course of business that USAGM and OTF ha[d] followed since OTF's inception." *See id.* In the past, and indeed "over the entirety of the relationship between USAGM and OTF, USAGM has, without deviation, interpreted this provision to mean that USAGM provides disbursements to OTF at the time of obligation for the full amount of those contracts." *Id.* "Of exceptional relevance, all FY 2025 funds disbursed to OTF to date ($16.1M), as well as all prior disbursements over the last six years, have followed that same course of business." *Id.* And the reason USAGM had adopted that policy was, in her view, because "OTF cannot predict 'actual cash outflows' for any given month because this depends entirely on the speed of technical developments and demand for the circumvention tools OTF supports." *Id.*

The Agency's response ignored these concerns apart from the suggestion, without elaboration, that the issue was not "new." Marcus Murchison, a grant analyst, responded to Cunningham as follows:

19

Dear Laura,

Thank you for getting back to us. I wanted to repeat our request for an updated financial plan covering the balance of the FY 2025 funds that reflects the funding increments requested. This is not a new issue or request as the Agency made a similar request last year. We would appreciate your cooperation, so we can award the balance of the funds. Kind Regards, Marcus

*Id.* at 3. He did not explain, in that message, any substantive basis for the revised interpretation or address the concerns, including OTF's reliance interests, that Cunningham had raised.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars*, 579 U.S. at 221. The agency "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "But the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars*, 579 U.S. at 221 (quoting *Fox Television*, 556 U.S. at 515). Here, USAGM refused even to acknowledge that its decision to withhold congressionally appropriated funds was predicated on a changed interpretation of federal regulations, let alone provide an explanation for it. Instead, the agency pretended its position was nothing new. This failure to explain is quintessential arbitrary and capricious action.

Second, USAGM cannot cure this inadequacy by offering further explanation through court filings, which it has attempted to do through its opposition briefing and further declarations by a newly installed CFO whose service began only after the events at issue here. *See* Smith Decl. ¶ 1, ECF No 48-1 (noting that Anthony Smith has "served in [the] role [of CFO] since October 1, 2025). "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2020)).

USAGM attempts to shoehorn two post-hoc rationalizations into the record in defense of its conduct, both of which are too late and, in any event, substantively deficient. For one, it contends that OTF was on notice as early as August 2024 that the cash disbursement process governing its grants were under review. In support, they have filed email correspondence from August 23, 2024. ECF No. 48-4. In that email, USAGM asked OTF to revise a request for FY 2024 funds to include only "funds needed to disburse prior to December 31, 2024," rather (it would seem) than the full amount due on contracts OTF had entered as of that date, explaining that the agency "d[id] not believe it prudent" to do otherwise. *Id.* at 2. USAGM explained that it "want[ed] to work on a 'glide path'" that would afford OTF "flexibility" as the agency "work[ed] to transition to a new cash disbursement process." *Id.* The agency further contends that the putative reforms were long in the making, based on a Government Accountability Office ("GAO") report that criticized inefficiencies in USAGM's grantmaking process. *See* Opp'n at 16.

Setting aside the merits of these arguments, which the Court will address in short order, these are classic post-hoc rationalizations. "[W]hen an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones." *Regents*, 591 U.S. at 21 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)). But the agency has not pointed to a shred of evidence that it provided any substantive reasoning when it announced its decision to OTF — let alone was relying on the findings of a GAO Report — so there is no explanation for the agency to elaborate on now.

*Third*, OTF would prevail even if the Court considered USAGM's belated justifications for its changed interpretation of § 200.305(b)(1). The Court has carefully examined the GAO report cited by USAGM, *see* ECF No. 48-8, and agrees with OTF that (i) the report almost exclusively focuses on funding practices associated with USAGM grantees *other than* OTF, and

(ii) the four-page discussion of OTF's grantmaking practices do not address OTF's receipt of programmatic funds at the time of obligation. *See id.* at 40–44. Indeed, although the report urges — generally, and not with respect to OTF in particular — that USAGM should "[m]onitor and oversee the grantee's drawdowns and execution of grant funds during the grant's period of performance to ensure the grantee is using grant funds at appropriate times," GAO did not conclude that the timing of OTF's grant disbursements or use of funds was inappropriate. *Id.* at 48. Without more, the GAO Report cannot substitute for reasoned justification for the agency action at issue.

Nor do the August 2024 communications regarding cash disbursement support USAGM's position. As Cunningham explains in her most recent declaration, following the August 2024 correspondence, "USAGM continued to disburse funding to OTF *at the time of OTF's contractual obligations* with its partners." Sixth Cunningham Decl. ¶ 11 (emphasis added). The effect of the interaction was simply to "reduce[] the amount of funds it planned to contractually obligate" in August 2024 from $13.2 million to $7.48 million and spread the difference across the remainder of that year. Therefore, contrary to the Murchison email, what USAGM proposes is, in fact, "new." But were that not so, USAGM's position would falter for the independent reason that the August 2024 correspondence *also* lacks reasoned explanation sufficient to support moving toward a cash-disbursement system. USAGM merely relayed that its then-CFO thought it would not be "prudent" to issue the OTF's drawdown for August 2024 as requested. Like the communications supporting the September 2025 policy change, that statement is too conclusory to survive APA review.

The failings described above render USAGM's conduct arbitrary and capricious, but the agency action here suffers from one more defect: neither USAGM's contemporaneous explanations, nor its post-hoc rationalizations, nor the arguments presented by defense counsel in

these proceedings make any effort to address OTF's reliance interests. "When an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Regents*, 591 U.S. at 30 (second level quotation marks omitted) (quoting *Encino Motorcars*, 579 U.S. at 222). "It would be arbitrary and capricious to ignore such matters." *Id.* (citation omitted). Yet USAGM did precisely that. OTF and USAGM used an upon-obligation cash-disbursement process for years — indeed, for the entirety of OTF's existence. OTF has never received programmatic funds in any other way. For its part, OTF maintains that its "operating model is intentionally designed to nimbly respond to the rapid pace of authoritarian technological innovation," and "cannot operate — at least under USAGM's last minute change — in a world where it receives funding from USAGM at the time cash becomes due each month." Reply at 7. Critically, USAGM does *not* dispute the facts undergirding OTF's claimed reliance interests.

An agency committed to non-arbitrary action would thus reasonably need to consider "where there was 'legitimate reliance'" on those policies. *See id.* (quoting *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996)). The agency might assess, for example, whether the grant recipient's accounting practices or downstream agreements with partner organizations had been structured in expectation that such practices would continue. Instead, USAGM ghosted OTF for more than five months, only to thrust an end-of-fiscal-year demand that risked upsetting the effectiveness of the cashflows Congress tasked USAGM with providing, likely intensifying the effect of USAGM's actions on OTF's reliance interests. In response, USAGM simply asserts that "for 13 years the parties [have been] wrong" and it may therefore do as it thinks right. Opp'n at 16. That is not how APA review works. To be clear, none of that is to say that USAGM could not pursue its preferred cash-disbursement procedures in the future. The agency enjoys

"considerable flexibility" in how to pursue its oversight objectives. *Regents*, 591 U.S. at 31. The point is that for agency action to survive judicial review, reliance interests must be considered, and those "consideration[s] must be undertaken by the agency in the first instance." *Id.* "[T]he agency failed to do" so, and it acted arbitrarily and capriciously as a result. *Id.* at 32.

### b. Irreparable harm

To qualify as irreparable harm, the injuries alleged "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). As this Court has explained in the context of OTF and the other USAGM grantees, "[a]n organization can only survive so many rounds of missed payments" and "broken contracts." *Open Tech. Fund*, 788 F. Supp. 3d at 39 (quoting *RFE/RL, Inc. v. USAGM*, 780 F. Supp. 3d 269, 282 (D.D.C. 2025)). Although USAGM has continued to provide operating expenses to OTF, OTF's core mission — distributing funds to partners to support the research, development, implementation, and maintenance of internet freedom technologies, as well as rapid response to imminent cyber threats — is at a standstill from lack of a funding stream. "Obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes [of] . . . irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). And these are not the sort of harms for which later corrective relief will become available, because the time lost that could have been allocated to pursuing OTF's mission will never be recovered. Time is the scarce resource at the heart of OTF's research and technical operations.

USAGM contends that OTF has enough cash on hand to forestall these concerns. But although OTF had approximately $21.286 million in cash on hand as of September 30, it represents that $13.586 million of that funding had already been obligated, meaning its balance sheet shows

only $8 million in unobligated funds, just $1.7 million of which were allocated from its Fiscal Year 2025 appropriation. *See* Sixth Cunningham Decl. ¶ 3–4, 7. OTF represents that it is prepared to obligate sixty-one new contracts in furtherance of its mission totaling $15 million in programmatic funds. *Id.* ¶ 9. These projects would support the use of VPNs

> to overcome authoritarian censorship in China, Iran, Cuba, and other countries; develop new censorship circumvention tools and techniques to counter rapidly evolving censorship practices; combat AI-enhanced censorship efforts; support the development and implementation of decentralized messaging platforms; and develop and scale network shutdown mitigation solutions to enable users to communication and access information during government-imposed internet blackouts.

Fifth Cunningham Decl. ¶ 21. Similarly, OTF is unable to maintain its Rapid Response Fund, "the only U.S.-government funded mechanism to provide rapid assistance to individuals and organizations facing authoritarian state-based digital attacks and emergencies." *Id.* ¶ 22. "OTF is currently unable to support these emergency requests while its FY 2025 funds are withheld." *Id.* As OTF explains, and this Court agrees,[9] it "faces an existential funding crisis due to USAGM's wrongful withholding of . . . appropriated funds," and so cannot obligate its cash on hand "due to the uncertainty of funding disbursements from USAGM to OTF." Sixth Cunningham Dec. ¶ 8. The inability to pursue its long-term programmatic goals while preserving its short-term operational capacity means OTF cannot serve its statutory function of "maintain[ing] the technological advantage of the United States Government over authoritarian governments." 22 U.S.C. § 6208a. This harm to OTF and its mission is permanent and ongoing — and leaves no room for "do over" or "redress." *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

---

[9] USAGM has only approved disbursement of operating expenses through November 2025, so the Court agrees OTF has certainty of future operational funding beyond that time. *See* Sixth Cunningham Decl. ¶ 16.

### c. **Prongs 3 and 4: Balance of the Equities and Public Interest**

As at earlier stages of this litigation, the final two *Winter* factors weigh in OTF's favor. *See Open Tech. Fund*, 788 F. Supp.3d at 39. When the government is the non-movant, these factors merge, and the Court weighs "the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (internal quotations and citation omitted). Granting the preliminary injunction here would not only serve the public interest by avoiding irreparable injury to OTF's statutory mission, but also by ensuring the continued availability of its services for third parties around the world who rely on it for protection on the internet. By contrast, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (citation omitted). "There is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. Rather, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (citation omitted).

### d. **Bond**

As with respect to its earlier preliminary injunction ruling in this case, the Court will exercise its discretion to impose nominal bond of $100. *See Open Tech. Fund*, 788 F. Supp. at 39.

## IV.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that USAGM's determination not to distribute appropriated programmatic funds under the FY 2025 grant and its related interpretation of 2 C.F.R. § 200.305(b)(2) are hereby **VACATED**, and USAGM shall therefore disburse the September 2025 drawdown of $19,063,013, as described in the September 9, 2025 revision to the Approved Financial Plan, to OTF no later than December 1, 2025.

26

**IT IS SO ORDERED.**

Date: _____11-25-25_____

Royce C. Lamberth
United States District Judge